IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v.   : | CRIMINAL NUMBER 99-035-1 |
| : | |
| CURTIS WILKERSON : | |

## O R D E R

**AND NOW**, this _____ of _____ 2020, upon consideration of Defendant's Motion to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), and the government's response thereto, it is hereby **ORDERED** that the Motion is **GRANTED**.

The Court has considered the factors listed in 18 U.S.C. § 3553(a), to the extent that they are applicable, and finds that Mr. Wilkerson has presented extraordinary and compelling reasons justifying a reduction of his sentence.

Thus, Mr. Wilkerson's term of imprisonment is hereby reduced to the time he has already served. He shall be released from the custody of the Bureau of Prisons (FMC Butner) as soon as possible. Upon his release from custody, Mr. Wilkerson shall begin serving the term of supervised release previously imposed by the Court and shall contact the U.S. Probation Office within 24 hours of his release and follow its instructions.

**IT IS SO ORDERED.**

BY THE COURT:

_____
**THE HONORABLE J. CURTIS JOYNER**
**Senior United States District Court Judge**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NUMBER 99-035-1 |
| | : | |
| CURTIS WILKERSON | : | |

## DEFENDANT'S MOTION TO REDUCE SENTENCE
## PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)

### I. INTRODUCTION

Curtis Wilkerson, by and through his attorney Kathleen Gaughan, Assistant Federal Defender, Federal Community Defender Office for the Eastern District of Pennsylvania, moves this Court pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) to reduce his sentence to time served. As amended by the First Step Act (FSA), the compassionate release statute allows courts to reduce sentences for "extraordinary and compelling" reasons. Mr. Wilkerson is 45 years old, at low risk for recidivism, is overweight and suffers from Hypertension, Chronic Kidney Disease and Retinopathy. The combination of Mr. Wilkerson's serious illnesses and the growing coronavirus pandemic—a ticking time bomb that, if detonated, could most certainly result in Mr. Wilkerson's death—constitutes an extraordinary and compelling basis for sentence reduction. He therefore requests that this Court reduce his sentence to time served so that he may live his life in the care and company of his loved ones and in the safest setting available to him during this pandemic—with his friend, Shinique Pugh.

### II. PROCEDURAL HISTORY

Mr. Wilkerson has been in custody since December 22, 1998 in connection with his convictions for conspiracy to commit bank robbery, in violation of 18 U.S.C. § 371; armed

bank robbery, in violation of 18 U.S.C. § 2113(d); brandishing a firearm during a crime of violence, in violation of 18 U.S.C. § 924 (c)(i); attempted bank robbery, in violation of 18 U.S.C. § 2113(d) and using a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c). On December 18, 2000, this Court sentenced Mr. Wilkerson to 447 months of incarceration. Mr. Wilkerson is currently serving his sentence at FMC Butner in North Carolina. To date, he has served almost 22 years in prison, and he is a demonstrably rehabilitated man, unrecognizable from the 1998 version of himself.

## III. LEGAL ARGUMENT

### A. Mr. Wilkerson's Motion to Reduce Sentence Should be Heard by This Court

On December 21, 2018, the FSA was enacted into law. Among several criminal justice reforms, the FSA makes fundamental changes to how federal compassionate release functions.[1] Notably, Congress amended 18 U.S.C. § 3582(c)(1)(A) by permitting the sentencing court to entertain motions for compassionate release filed by defendants.[2] Specifically, the amended statute instructs that the Court may modify a term of imprisonment once it has been imposed if "the court, upon motion of the Director of the Bureau of Prisons (BOP), or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier,…after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that extraordinary and compelling reasons warrant such a reduction[.]"[3]

---

[1] *See* First Step Act of 2018, § 603(b), Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018).
[2] *Id*.

[3] 18 U.S.C. § 3582(c)(1)(A).

Mr. Wilkerson petitioned for compassionate release and home confinement on April 30, 2020. *See* Application for Compassionate Release attached as Exhibit A. Thirty days have elapsed since the filing of his request for Compassionate Release. Mr. Wilkerson has therefore complied with the administrative requirements governing the compassionate release application process, and his motion pursuant to § 3582(c)(1)(A) is properly before this Court.[4]

### B. In Light of COVID-19, Mr. Wilkerson's Serious Medical Condition Constitute Extraordinary and Compelling Reasons Warranting a Reduction in Sentence

Mr. Wilkerson's documented chronic Kidney Disease, Hypertension and Retinopathy issues put him in grave danger should he contract COVID-19 in BOP custody, which constitutes an "extraordinary and compelling" reason for compassionate release. Medical experts name both kidney disease and hypertension as serious COVID-19 comorbidities, especially when coupled with Mr. Wilkerson's job as a Nurse's assistant through the Inmate Companion Program. The duties of his job require him to have contact with extremely sick inmates, including those with lupus, COPD and cancer. Mr. Wilkerson is a first line responder and COVID-19 continues to infect BOP facilities—particularly Butner—at an unconscionable rate such that Mr. Wilkerson will inevitably contract the virus. To assume otherwise would be to defy statistics, science, and reason. *See* Exhibit B: Declarations of Experts regarding COVID-19 and Hypertension and Chronic Kidney Disease.

#### 1. The COVID-19 Pandemic is an Unprecedented Public Health Crisis, and the Government is Ignoring Its Grave Risk to Inmates

On March 11, 2020, the World Health Organization officially classified COVID-19 as a pandemic.[5] Infectious disease experts have since identified specific populations, including those

---

[5] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (Mar. 11, 2020), https://bit.ly/2W8dwpS.

with certain preexisting health problems and individuals over 65 years old, as particularly vulnerable to severe illness and death caused by COVID-19.[6] About twenty percent of COVID-19 patients have required hospitalization, which is ten times more than the percentage of patients who contract influenza ("flu").[7] COVID-19 is estimated to kill at least ten people per thousand infected, making it ten times more lethal than the seasonal flu.[8] The disease may be deadlier still, as research surrounding the virus's impact continues to evolve and the virus itself has mutated to become more contagious than the original strain in a matter of a few months.[9]

As of May 29, 2020, COVID-19 has infected over five million 700,000 people worldwide, leading to 357,688,000 deaths.[10] On March 26, 2020, the United States became the global leader in COVID-19 diagnoses.[11] As of May 29, 2020, over 1,675, 258 people in the United States have been diagnosed with coronavirus, and over 100,000 people have died[12] The number of confirmed COVID-19 cases continues to rise exponentially; yet reported numbers underrepresent the true scope of the crisis as experts believe that the United States has thus far failed to do sufficient testing to accurately determine the outbreak's spread.[13]

---

[6] *People at Risk for Serious Illness from COVID-19*, CDC (Mar. 12, 2020), https://bit.ly/2vgUt1P.
[7] Pien Huang, *How The Novel Coronavirus And The Flu Are Alike...And Different*, Nat'l Pub. Radio (NPR) (Mar. 20, 2020), https://www.npr.org/sections/goatsandsoda/2020/03/20/815408287/how-the-novel-coronavirus-and-the-flu-are-alike-and-different.
[8] *Id.*; s*ee also* Nick Wilson et al., *Case-Fatality Risk Estimates for COVID-19 Calculated by Using a Lag Time for Fatality*, 26 EID JOURNAL (prepublication June 2020), https://wwwnc.cdc.gov/eid/article/26/6/20-0320_article.
[9] Ralph Vartabedian, *Scientists Say a Now-Dominant Strain of the Coronavirus Could be More Contagious than the Original*, L.A. Times (May 5, 2020), https://www.latimes.com/california/story/2020-05-05/mutant-coronavirus-has-emerged-more-contagious-than-original.
[10] World Health Organization, *Coronavirus (COVID-19)* (May 29, 2020), https://covid19.who.int (updating regularly).
[11] Tom Porter, *The U.S. is Well on the Way to Having a Coronavirus Outbreak Worse than China's or Even Italy's,* Business Insider (Mar. 26, 2020), https://www.businessinsider.com/figures-show-us-soon-coronavirus-worse-china-2020-3.
[12] World Health Organization, *Coronavirus (COVID-19)* (May 29, 2020), https://covid19.who.int (updating regularly).
[13] Alexis C. Madrigal & Robinson Meyer, *How the Coronavirus Became an American Catastrophe*, The Atlantic (Mar. 21, 2020), https://www.theatlantic.com/health/archive/2020/03/how-many-americans-are-sick-lost-february/608521/.

Even more staggering than the rate of transmission in the general population is the rate among inmates in the United States. Despite early warnings by medical experts[14] and proactive measures to reduce prison populations taken by government officials across the country[15] and around the world,[16] the Department of Justice (DOJ) has maintained an irrationally steadfast

---

[14] *See* Gregg S. Gonsalves, et al., *Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States* (Mar. 2, 2020), https://bit.ly/2W9V6oS (open letter signed by 815 experts in public health, law, and human rights); *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, CDC (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html ("Incarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced…There are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress[.]"; Danielle Ivory, *'We Are Not a Hospital': A Prison Braces for the Coronavirus,* N.Y. Times (Mar. 17, 2020), https://www.nytimes.com/2020/03/17/us/coronavirusprisons-jails.html; Martin Kaste, *Prisons and Jails Worry About Becoming Coronavirus 'Incubators,'* NPR (Mar. 13, 2020), https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about-becoming-coronavirusincubators; Keri Blakinger & Beth Schwarzapfel, *How Can Prisons Contain Coronavirus When Purell is a Contraband?*, ABA Journal (Mar. 3, 2020), https://www.abajournal.com/news/article/when-purell-iscontraband-how-can-prisons-contain-coronavirus; Benjamin Weiser, et al., *'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars*, N.Y. Times (Mar. 31, 2020) https://nyti.ms/3dQTPcz (quoting president of board of commissioners for Cook County, where a "week ago, the … jail in Chicago had two diagnoses; by Sunday, 101 inmates and a dozen employees had tested positive"); Jennifer Gonnerman, *How Prisons and Jails can Respond to the Coronavirus*, New Yorker, (Mar. 14, 2020), https://www.newyorker.com/news/q-and-a/how-prisons-and-jails-can-respond-to-the-coronavirus ("it's going to be very, very difficult to deliver a standard of care either in the detection or the treatment of people who are behind bars. I just have really grave concerns"); *see also* Robert L. Cohen, M.D., *Why We Must Reduce Jail Populations Now: Coronavirus, Incarceration and Public Healthy*, N.Y. Daily News (Mar. 19, 2020) *at* https://bit.ly/2QES6xi; Dr. Lipi Roy, *Infections And Incarceration: Why Jails And Prisons Need To Prepare For COVID-19 Now,* Forbes, (Mar. 11, 2020), https://www.forbes.com/sites/lipiroy/2020/03/11/infections-and-incarceration-why-jails-and-prisons-need-to-prepare-for-covid-19-stat/#1fa6b08e49f3 ("Hand sanitizers, for instance, are often considered contraband . . . . Other harsh realities of jail life that prevent proper application of CDC recommendations include limited access to toilet paper and paper towels; and handcuffs prohibit the use of hands to cover one's mouth.").

[15] *See e.g.* Tracey Tully, *1,000 Inmates Will Be Released from N.J. Jails to Curb Coronavirus Risk*, N.Y. Times (Mar. 23, 2020), https://www.nytimes.com/2020/03/23/nyregion/coronavirus-nj-inmates-release.html; Zusha Elinson & Deanna Paul, *Jails Release Prisoners, Fearing Coronavirus Outbreak*, Wall St. J. (Mar. 22, 2020), https://on.wsj.com/2vOW8vO ("Jails in California, New York, Ohio, Texas and at least a dozen other states are sending low-level offenders and elderly or sickly inmates home early due to coronavirus fears."); Sarah Lustbader, *Coronavirus: Sentenced to COVID-19*, The Daily Appeal (Mar. 12, 2020)*,* https://theappeal.org/sentenced-to-covid-19/) (Brooklyn District Attorney Eric Gonzalez, joined by public health experts, has asked Governor Cuomo to grant emergency clemencies to elderly and sick prisoners.); *see also* Julia Marsh & Ben Feuerherd, *NYC to Begin Releasing Inmates Amid Coronavirus Outbreak*, N.Y. Post (Mar. 18, 2020), https://nypost.com/2020/03/18/nyc-to-begin-releasing-inmates-amid-coronavirus-outbreak/ ("Mayor Bill de Blasio plans to release 'vulnerable' inmates from city jails to prevent the spread of the coronavirus pandemic into local lockups").

[16] *See e.g. Iran Temporarily Releases 85,000 Prisoners from Jail Including Political Prisoners* (Mar. 17, 2020), https://www.reuters.com/article/us-health-coronavirus-iran-prisoners/iran-temporarily-frees-85000-from-jail-including-political-prisoners-amid-coronavirus-idUSKBN21410M (Iran released prisoners as response to COVID-19); *Wider Steps Needed to Protect Prisoners' Health in Italy*, Human Rights Watch (Mar. 20, 2020), https://www.hrw.org/news/2020/03/20/wider-steps-needed-protect-prisoners-health-italy# (Italian government adopted decree allowing for early supervised release of prisoners to prevent spread of coronavirus).

position of opposing the release of high-risk BOP inmates.[17] Touting the BOP's COVID-19 Action Plan as a failsafe against the introduction of the virus into "most of [the BOP's] facilities" including the Philadelphia FDC, the United States Attorney for the Eastern District of Pennsylvania, for example, asserted in its brief filed April 20, 2020 that BOP institutions are "maintaining both an incidence rate and growth rate well below that observed in the nation at large."[18] This is patently false. In BOP facilities, there are at least 26.63 COVID-19 infections per 1,000 people as compared with 4.02 infections per 1,000 people in the U.S. general population.[19] (See Figure 1 below). Similarly, the cumulative growth rate of COVID-19 infections in BOP institutions since March 20, 2020 is 1,083.47 percent as compared to 538.42 percent among the broader U.S. population.[20] (See Figure 2 below). As of May 18, 2020, 4,274 federal inmates and 287 BOP staff have tested positive for COVID-19, and 56 inmates have died as a result.[21]

---

[17] *See* Charles Creitz, *Prosecutor Rips Philadelphia Officials for Using Coronavirus Pandemic to "Fling Open the Prison Doors,"* Fox News (Mar. 27, 2020), https://www.foxnews.com/media/william-mcswain-philadelphia-police-coronavirus-jail-release.
[18] Resp't Br. in Supp. of Mot. to Dismiss, *Brown v. Marler*, No. 20-cv-01914, Dkt. 12, at 2 (E.D.P.A. Apr. 20, 2020).
[19] *BOP-Reported Positive Tests for COVID-19 Nationwide*, Federal Defenders of New York (May 11, 2020), https://federaldefendersny.org/ (updating regularly).
[20] *Id.*
[21] *COVID-19 Tested Positive Cases*, Fed. Bureau of Prisons (May 18, 2020), https://www.bop.gov/coronavirus/.



*Figure 1*



*Figure 2*

In that same brief, maintaining that the Philadelphia FDC remained COVID-19 free, the government boasted that "well-run prisons, with the ability to take extraordinary measures and

isolate from the outside world, provide a firmer barrier against this horrible disease."[22] Ten days later, it confirmed that a staff member at the Philadelphia FDC tested positive for COVID-19.[23] One day after that, it confirmed that a second staff member tested positive.[24] Four days after that, it confirmed that a third staff member tested positive.[25] Alarmingly, to date, the government has provided no evidence that a single inmate at the Philadelphia FDC has been tested.[26]

Put simply, the government's assurances that the BOP's Action Plan has kept or will keep the virus from spreading throughout its facilities are worth nothing. Conditions of confinement facilitate the rapid spread of infectious diseases like coronavirus.[27] No amount of temperature-taking, quarantining of new inmates, or other "screening" procedures can keep inmates safe from a disease commonly spread by asymptomatic individuals[28] when correctional staff come and go from facilities, untested, on a daily basis. Moreover, the BOP has failed to consistently follow its own "Action Plan." Staff who should be quarantined after exposure are not.[29] Prisons are failing to stock basic essentials like soap.[30] The situation is so dire that a union representing 30,000 BOP employees has filed an Occupational Safety and Health Administration

---

[22] Resp't Br. in Supp. of Mot. to Dismiss, *Brown v. Marler*, Dkt. 12, at 2.
[23] *Id.* at Dkt. 32.
[24] *Id.* at Dkt. 36.
[25] *Id.* at Dkt. 41.
[26] Out of 2,700 tests conducted nationwide by the BOP, nearly 2,000 have come back positive—roughly 70%. Michael Balsamo, *Over 70% of tested inmates in federal prisons have COVID-19*, Associated Press (Apr. 29, 2020), https://apnews.com/fb43e3ebc447355a4f71e3563dbdca4f. If this figure is generalizable to the broader population in the BOP's care, all of those people are in grave danger. We should not feel comforted by a facility reporting zero cases among inmates if that facility has not tested a single inmate.
[27] *COVID-19 in Correctional and Detention Facilities—United States, February-April 2020*, CDC (May 6, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6919e1.htm.
[28] *See Coronavirus Disease 2019 (COVID-19): How It Spreads*, CDC (Mar. 4, 2020), https://tinyurl.com/vv99uoo (People who are asymptomatic can transmit COVID-19 to others).
[29] Joseph Neff & Keri Blakinger, *Federal Prisons Agency "Put Staff in Harm's Way" of Coronavirus*, The Marshall Project (Apr. 3, 2020), https://bit.ly/2VkWuTC.
[30] *See* Letter from Jerrold Nadler, Chair, House Judiciary Comm., to William Barr, Att. Gen., at 1 (Apr. 10, 2020) ("Reports from inside the Oakdale facility indicate that there is a continuing lack of availability of personal hygiene products and that general sanitation is lacking.") (citing Sadie Gurman et al., *Coronavirus Puts Prison Under Siege*, Wall Street Journal (Apr. 6, 2020), https://on.wsj.com/3a4TD6K).

(OSHA) complaint because "staff who were screened and ordered home" based on the "Action Plan's" screening tool were "ordered back to work within 48 hours."[31] In light of the overwhelming evidence that the BOP's "Action Plan" has utterly failed to keep inmates safe and to contain the spread of the virus, to continue to give any weight to the government's assurances ignores science, reason, and common sense.

> **2. Mr. Wilkerson is Among the Most Vulnerable, is Confined at a BOP "Hotspot," and is Therefore Almost Certain to Die If Not Released, which Constitutes an "Extraordinary and Compelling Reason" Warranting Sentence Reduction**

An inmate seeking relief under 18 U.S.C. § 3582(c)(1)(A)(i) must show that "extraordinary and compelling reasons" exist, which warrant a reduction in sentence. "Extraordinary and compelling reasons exist[where] [t]he defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia."[32] Additionally, any other "serious physical or medical condition" can qualify as an "extraordinary and compelling reason."[33]

Mr. Wilkerson is overweight and suffers from Chronic Kidney Disease, Hypertension and Retinopathy. *See* BOP Medical Report attached as Exhibit C[34] The increased risk of death posed by his inevitable exposure to COVID-19, however, compounds the direness of Mr. Wilkerson's situation and is nothing short of "extraordinary and compelling" in its own right.[35]

---

[31] Council of Prison Workers 33, Imminent Danger Report, at 3 (Mar. 31, 2020), https://www.afge.org/globalassets/documents/generalreports/coronavirus/4/osha-7-form-national-complaint.pdf.
[32] U.S.S.G. § 1B1.13 app. n. 1(A)(i).
[33] *Id.* at (ii)(I).
[34] Defendant provided the most recent medical records to counsel. Counsel also received medical records from the government.
[35] Courts across the country and in our own district have agreed that the increased risks associated with COVID-19 for medically compromised inmates constitute "extraordinary and compelling reasons" for sentence reduction. *See*

At FMC Butner, which houses the most medically vulnerable BOP inmates in the country, five inmates and five staff have so far tested positive for COVID-19.[36] Another 244 inmates and 16 staff have tested positive at FCI Butner Medium I and II and FCI Butner Low, and seven inmates have died.[37] These four facilities make up the Butner Federal Correctional Complex, which went

---

*e.g. United States v. Bazzle*, No. 2:11-cr-74, Dkt. 84 (E.D.P.A. May 5, 2020) (J. Schiller granting compassionate release noting current pandemic coupled with preexisting illness amplifies risks); *United States v. Rodriguez*, No. 2:03-cr-271-AB, Dkt. 135 (E.D.P.A. Apr. 1, 2020) (J. Brody granting release for inmate with hypertension, diabetes, and liver abnormalities finding risk factors for COVID-19 constitute extraordinary and compelling reason and noting prisons are "tinderboxes for infectious disease"); *United States v. Kataev*, No. 1:16-cr-763-LGS, Dkt. 778 (S.D.N.Y. Apr. 14, 2020) (releasing 51 year old defendant with "chronic sinusitis" whose wife is disabled such that she cannot care for 10 year old child, noting "defendant's unique health and family circumstances together, and in light of the COVID-19 public health crisis, constitute 'extraordinary and compelling reasons' to modify Defendant's sentence"); *United States v. Tran*, 8:08-cr-197, Dkt. 405 (C.D. Cal. Apr. 10, 2020) (ordering compassionate release in light of BOP's inability to protect vulnerable inmates from COVID-19); *United States v. Sawicz*, No. 08-cr-287, Dkt. 66 (E.D.N.Y. Apr. 10, 2020) (releasing child pornography offender based on "[t]he COVID-19 outbreak at FCI Danbury, combined with the fact that the defendant is at risk of suffering severe complications if he were to contract COVID-19 because of his hypertension"); *United States v. Hansen,* 2020 WL 1703672 (E.D.N.Y. Apr. 8, 2020) (COVID-19 pandemic and medical problems justify reduction in sentence); *United States v. Hakim*, No. 4:05-cr-40025, Dkt. 158 (D.S.D. Apr. 6, 2020) (reducing sentence by extra 40 months under First Step Act in light of extreme danger posed by COVID-19); *United States v. Foster*, No. 1:14-cr-324-02, Dkt. 191 (M.D. Pa. Apr. 3, 2020) (noting "unprecedented" circumstances facing prison system and finding that COVID-19 is extraordinary and compelling basis for release: "[n]o rationale is more compelling or extraordinary"); *United States v. Edwards*, No. 6:17-cr-3, Dkt. 134 (Apr. 2, 2020) (granting compassionate release noting, "[h]ad the Court known when it sentenced Defendant in 2018 that the final 18 months of his term in federal prison would expose him to a heightened and substantial risk presented by the COVID-19 pandemic on account of Defendant's compromised immune system, the Court would not have sentenced him to the latter 18 months"); *United States v. Colvin*, 2020 WL 1613943 (D. Conn. Apr. 2, 2020) (noting defendants multiple health conditions and inability to social distance in prison and concluding "[i]n light of the expectation that the COVID-19 pandemic will continue to grow and spread over the next several weeks, the Court concludes that the risks faced by Defendant will be minimized by her immediate release to home"); *United States v. Perez*, No. 1:17-cr-513, Dkt. 98 (S.D.N.Y. Apr. 1, 2020) (granting compassionate release where "[t]he benefits of keeping [Perez] in prison for the remainder of his sentence are minimal, and the potential consequences of doing so are extraordinarily grave"); *United States v. Gonzalez*, No. 2:18-cr-232, Dkt. 834 (E.D. Wash. Mar. 31, 2020) (releasing defendant one month into 10-month sentence in light of medical issues, noting that ordinarily these conditions would be manageable but "these are not ordinary times"); *United States v. Marin*, No. 15-cr-252, Dkt. 1326 (E.D.N.Y. Mar. 30, 2020) (granting compassionate release "for the reasons stated in [the defendant's] motion, including his advanced age, significantly deteriorating health, [and] elevated risk of dire health consequences due to the current COVID-19 outbreak…"); *United States v. Muniz*, No. 4:09-cr-199, Dkt. 578 (S.D. Tex. Mar. 30, 2020) (releasing defendant serving 188-month sentence for drug conspiracy in light of vulnerability to COVID-19: "[W]hile the Court is aware of the measures taken by the Federal Bureau of Prisons, news reports of the virus's spread in detention centers within the United States and beyond our borders in China and Iran demonstrate that individuals housed within our prison system nonetheless remain particularly vulnerable to infection."); *United States v. Copeland*, No. 2:05-cr-135 (D.S.C. Mar. 24, 2020) (granting First Step Act relief to defendant in part due to "Congress's desire for courts to release individuals at the age defendant is, with the ailments that defendant has during this current pandemic"); *United States v. Underwood*, No. 8:18-cr-201, Dkt. 179 (Mar. 31, 2020) (encouraging release to furlough of elderly defendant in BOP custody because, even though no positive case of COVID-19 in his facility, "there is significant potential for it to enter the prison in the near future").

[36] *COVID-19 Tested Positive Cases*, BOP (May 18, 2020), https://www.bop.gov/coronavirus/.
[37] *Id.*

11

from having zero reported cases to becoming one of the BOP's COVID-19 hotspots in a matter of days.[38] The virus is tearing through Butner FCC, which is the best evidence that the BOP cannot control its spread. Cancer patients there are exponentially more vulnerable to contracting COVID-19 and to the most severe consequences associated with it, including death.[39] Mr. Wilkerson, in caring for the sickest of inmates as a front line responder, including cancer patients has an increased exposure and a heightened chance of contracting COVID-19. Proper PPE is necessary to protect the front line responders and is a concern at Butner like it is in thousands of other hospital settings. Currently, the number of positive COVID-19 at Butner Federal Correction Complex is staggering. The majority of the COVID-19 cases are at FDC Butner Medium I and II and FDC Butner Low. However, upon information and belief, staff members go from facility to facility so the chance of transferring to FMC Butner is dramatically increased. Mr. Wilkerson is almost certain to become infected and, when that happens, certain to experience severe health consequences and could very likely die. We would not tempt these odds ourselves, and there is no conscionable excuse for tempting them for Mr. Wilkerson.

    **C.   A Time Served Sentence Accomplishes the Goals of Sentencing Pursuant to 18 U.S.C. § 3553(a) to the Extent they are Applicable**

When extraordinary and compelling reasons are established, the Court must consider the sentencing factors in § 3553(a), to the extent that they are applicable, to determine whether a sentence reduction is warranted. 18 U.S.C. § 3582(c)(1)(A). Mr. Wilkerson has been incarcerated for almost 22 years. He was 25 years old when he was charged and a truly different person than the 45 year old man he is today. During his period of incarceration he focused on rehabilitation, education and helping others. He completed high school and has the equivalent of

---

[38] *Id.*
[39] M. Dai, et al. *Patients with Cancer Appear More Vulnerable to SARS-COV-2: A Multi-Center Study During the COVID-19 Outbreak.* Cancer Discovery (Apr. 27, 2020), aacr.ent.box.com/s/2mh5713e6irjvcz6hb4c6y72bu1pljxq.

1 year of college credits. He has held numerous jobs at all the facilities to which he was designated. He is currently designated at the Federal Medical Center in Butner, North Carolina. He is housed in the CADRE unit that means "Here to Work". He has completed over 55 programs and classes including; parenting, anger management, OSCHA and drug education. He is compassionate in his desire to help others. He completed the Inmate Companion Program where he gained Certified Nursing Skills. He was promoted to work with Suicide Watch Team. He sits for 4 hours two days per week talking with inmates and giving them hope for a future. He also holds a second job as a barber.

In its analysis of the applicable § 3553(a) factors, this Court should conclude that the sentence portion Mr. Wilkerson has served to date has accomplished the goals of sentencing, particularly in light of the overwhelming evidence of Mr. Wilkerson's post-sentencing rehabilitation discussed herein.[40]

### 1. The Nature and Circumstances of the Offense and Mr. Wilkerson's History and Characteristics

There is no question that the nature and circumstances of the offenses to which Mr. Wilkerson was found guilty were extremely serious and deserving of significant punishment. The government will undoubtedly focus extensively on this factor in its opposition to Mr. Wilkerson's release. Indeed, if this were the only factor the Court had to consider, its decision would be rather obvious and simple. Thankfully, our society recognizes the existence and importance of redemption and rehabilitation. After close to 22 years in prison and in light of Mr. Wilkerson's extraordinary rehabilitative efforts and serious medical issues which place him in a vulnerable population, the nature and circumstances of the offenses he committed more almost

---

[40] *See United States v. Pepper,* 562 U.S. 476 (2011) (district court must consider evidence of defendant's post-sentencing rehabilitation at new sentencing hearing and such evidence may support downward variance from advisory Guidelines range).

22 years ago should be the least relevant factor in the Court's decision.

Instead, it is Mr. Wilkerson's character today that is most relevant to the analysis of this particular § 3553(a) factor. During his significant time in prison, Mr. Wilkerson has taken almost every course and program available to him to better himself and has maintained employment. *See e.g.* 10-25-19 Educational Data and 10-23-19 Individualized Reentry Plan Program Review[41] attached as Exhibit D. He is a Nursing Assistant through the Inmate Companion Program. He is dedicated to providing medical care to the inmates who suffer from terminal illnesses as well as those compromised by audio immune disorders and COPD. *See* Exhibit E Letter of Accomplishment From Butner Medical Center.

Confronted with the likely reality of serving over 30 years in jail most individuals would allow themselves to be overcome with hopelessness and anger; yet, Mr. Wilkerson has chosen the path of hope, righteousness, and self-discipline. These admirable efforts are worthy of recognition and are far more relevant today than his conduct almost 22 years ago.

    **2. The Need for the Sentence Imposed to Promote Certain Statutory Objectives**

As this Court is all too familiar, § 3553(a) requires sentences imposed to promote the following statutory objectives: (1) to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (2) to afford adequate deterrence to criminal conduct; (3) to protect the public from further crimes of the defendant; and (4) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.[42] The almost 22 years Mr. Wilkerson has already served certainly reflect the seriousness of the offense, promote respect for the law, and

---

[41] This is the most recent and complete IRP available to defense counsel at this time.

[42] 18 U.S.C. § 3553(a)(2)(A)-(D).

provide just punishment. His significant rehabilitative efforts are proof of this. With respect to general deterrence, it is well established that it is the *certainty* of punishment—not its *severity*—that serves this sentencing goal.[43] In Mr. Wilkerson's case, the 22 years he has served is a clear example of the certain punishment one faces should they commit the types of crimes Mr. Wilkerson committed and, by all accounts, is severe nonetheless.

Regarding protection of the public from further crimes of Mr. Wilkerson, two important factors weigh heavily in assuring the Court that Mr. Wilkerson is not a future threat. First, Mr. Wilkerson has been evaluated as low-risk for reoffending by the BOP. This and the combination of his accomplishments while incarcerated should provide the Court with necessary assurances regarding Mr. Wilkerson's unlikelihood of reoffending.

Finally, regarding § 3553(a)(2)(D), in light of Mr. Wilkerson's vulnerable medical issues and the COVID-19 pandemic, he would need extensive medical care if afflicted.

If released, Mr. Wilkerson will live in Columbia, North Carolina with his friend. Considering the additional risks posed by the COVID-19 outbreak at Butner and the complications Mr. Wilkerson, the goal of providing him with much needed medical care in the most effective manner would best be served by his immediate release.

### 3. Pertinent Policy Statement

The Court must consider "any pertinent policy statement issued by the Sentencing Commission pursuant to [28 U.S.C. § 994(a)(2)]…" in considering Mr. Wilkerson's compassionate release request.[44] In developing policy statements regarding the appropriate use

---

[43] *See* USSC, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* at 133-35 (2004), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/15-year-study/15_year_study_full.pdf; U.S. Dep't of Justice, Office of Justice Programs, Nat'l Institute of Justice, *Five Things About Deterrence* (July 2014).

[44] 18 U.S.C. § 3553(a)(5).

of the sentence modification provisions set forth in 18 U.S.C. § 3582(c), the Commission is authorized to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."[45]

### 4. The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct

Had Mr. Wilkerson been sentenced today, he would not have been subject to a mandatory 32 year sentence. The Court should equitably consider this disparity. Undoubtedly, Mr. Wilkerson's offenses are very serious. However, today, his sentence would be 19 years, or 228 months for the exact same crime. Mr. Wilkerson would by now have served two years of his five year period of supervised release having already served 21.5 years. Today, the Court would still be compelled to sentence Mr. Wilkerson to 7 years' incarceration consecutive to Counts One and Two. But the mandatory minimum on Count Five, would be five years' incarceration consecutive to any other count, <u>not</u> 25 years consecutive. Notably, Congress has decided that conduct that previously warranted 32 years mandatory minimum consecutive to other sentences, now warrants 12 years in Mr. Wilkerson's case. These dramatic reductions were part of the First Step Act of December 2018. As a result, there is immense disparity among inmates sentenced for 924 c offenses pre-FSA and post-FSA. This is a stark and dramatic difference. So stark, that in fact several courts have already granted compassionate release based in whole or in part on the elimination of the §924c stacking provision.[46] This change is recent and deliberate and comes after years of litigation and study.

---

[45] 28 U.S.C. § 994(t).
[46] Cases in which the district court granted compassionate release based in whole or in part on the elimination of the § 924(c) stacking provision in first offenses. See e.g. *United States v. Haynes*, 2020 WL 1941478 at *15 (defendant Haynes committed four bank robberies over an 8 month period and was sentenced to more than 46 years, 40 of which was mandated by the law at that time. Haynes served 27 of 46.5 years when he was granted relief)("the FSA's elimination of

16

The totality of the circumstances demonstrate that reducing Mr. Wilkerson's sentence to time served after almost 22 years in custody is "sufficient, but not greater than necessary" to serve the applicable purposes of sentencing under § 3553(a). Therefore, he should be released immediately.

**D. Mr. Wilkerson Does Not Pose a Danger to the Safety of His Community**

Pursuant to § 1B1.13, the Court must determine whether the defendant is a danger to the community by applying the factors prescribed by 18 U.S.C. § 3142(g), [47] which addresses the circumstances under which release pending trial is appropriate. When evaluating the defendant's dangerousness under § 3142(g), factors to consider include the nature of the offense, the history and characteristics of the defendant, and the nature of the danger that would be posed by his release.[48]

As acknowledged *supra*, the nature and circumstances of the offenses to which Mr. Wilkerson was found guilty of almost 22 years ago are extremely serious. However, given the amount of time that has passed since his commission of the offenses and the overwhelming evidence that he is a different man than the one who stood before this Court in 1998, this factor—appropriately given substantial weight in a decision to release a newly charged defendant

---

the § 924(c) sentencing weaponry that prosecutors employed to require that sentence is an extraordinary and compelling circumstance warranting relief under § 3582(c)."); *United States v. Redd*, 2020 WL 1248493 (E.D. Va. Mar. 16, 2020); (defendant Redd committed three bank robberies at gunpoint and was sentenced to more than 50 years, 45 of which were mandated by the law at that time. He served 23 years before being granted relief); Other cases include: *United States v. Maumau*, 2020 WL 806121 (D. Utah Feb. 18, 2020); *United States v. O'Bryan*, 2020 WL 869475 (D. Kan. Feb. 21, 2020); *United States v. Urkevich*, 2019 WL 6037391 (D.Neb., Nov. 14, 2019); *United States v. Cantu-Rivera*, 2019 WL 2578272 at *2 (S.D.Tex., June 24, 2019); *United States v. Cantu*, 423 F. Supp. 3d 345, 347-48 (S.D. Tex. June 17, 2019).

[47] U.S.S.G. § 1B1.13(2).
[48] § 3142(g); *United States v. Johns*, 2019 WL 2646663 at *3 (D. Ariz., June 27, 2019).

pending trial—should not be the Court's primary focus in deciding whether to grant Mr. Wilkerson's compassionate release. Rather, Mr. Wilkerson's history and characteristics over the past almost 22 years and that he poses no danger if released are the more relevant factors at hand.

Mr. Wilkerson is 45 years old. He is incarcerated at an institution with one of the highest rates of COVID-19 infection in the country, and the BOP has proven it cannot keep him safe or healthy. He has proven his value via his immense rehabilitative efforts and achievements during a lengthy period of incarceration, and for all of that he deserves mercy. Mr. Wilkerson has the support of his family and girlfriend who awaits his homecoming and has pledged to care for him. He poses no threat to others and simply wishes to spend his days with his family and giving back to society. He has the full support of his family and children and the community. *See* Exhibit :F Letter of Support From Shinique Pugh; Letter of Support From Dennis Garrett Founder of Love and Respect Recovery. Mr. Wilkerson has also written a letter to the Court on his own behalf. *See* Exhibit G Letter from Curtis Wilkerson.

## IV. CONCLUSION

For all of the above reasons, Mr. Wilkerson's Motion to Reduce Sentence pursuant to 18 U.S.C. § 3582(c)(1)(A) should be granted and he should be released immediately.

    Respectfully submitted,

    */s/ Kathleen M. Gaughan*
    KATHLEEN M. GAUGHAN
    Assistant Federal Defender

# **CERTIFICATE OF SERVICE**

      I, Kathleen M. Gaughan, Assistant Federal Defender, Federal Community Defender Office for the Eastern District of Pennsylvania, hereby certify that I caused a copy of the Defendant's Motion to Reduce Sentence to be filed and served electronically through the Eastern District Clerk's Office Electronic Case Filing ("ECF") and/or electronic mail upon Robert Zauzmer and Laurie Magid, Assistant United States Attorneys, United States Attorney's Office, 615 Chestnut Street, Suite 1250, Philadelphia, Pennsylvania 19106.

                                          */s/ Kathleen M. Gaughan*
                                          KATHLEEN M. GAUGHAN
                                          Assistant Federal Defender

DATE: May 29, 2020