# Exhibit B

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                          :
                                          :
                                          :
                                          :
                                          :
APPLICATION FOR RELEASE FROM              :   **AFFIDAVIT OF BRIE WILLIAMS,**
CUSTODY                                   :   **M.D.**
                                          :
                                          :
                                          :
                                          :
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X
```

I, Brie Williams, hereby affirm as follows:

      1.      I am a doctor duly licensed to practice medicine in the State of California.

      2.      I am currently a Professor of Medicine at the University of California, San Francisco ("UCSF") in the Geriatrics Division, Director of UCSF's Amend: Changing Correctional Culture Program, as well as Director of UCSF's Criminal Justice & Health Program. In that capacity, my clinical research has focused on improved responses to disability, cognitive impairment, and symptom distress in older or seriously ill prisoners; a more scientific development of compassionate release policies; and a broader inclusion of prisoners in national health datasets and in clinical research. I have developed new methods for responding to the unique health needs of criminal justice-involved older adults—including an evidence-based approach to reforming compassionate release policies and the design of a new tool to assess physical functioning in older prisoners. I was previously a consultant for the California Department of Corrections and Rehabilitation, as well as for other state prison systems.

      3.      I have extensive experience working with vulnerable populations, in particular the incarcerated and the elderly.

4. I submit this affidavit in support of any defendant seeking release from custody during the COVID-19 pandemic, so long as such release does not jeopardize public safety and the inmate can be released to a residence in which the inmate can comply with CDC social distancing guidelines. The statements in this affidavit are based only on the current state of emergency and the circumstances described below.

**The Risk of Infection and Accelerated Transmission of COVID-19 within Jails and Prisons is Extraordinarily High.**

5. Prisons and jails are not actually isolated from our communities: hundreds of thousands of correctional officers and correctional healthcare workers enter these facilities every day, returning to their families and to our communities at the end of their shifts, bringing back and forth to their families and neighbors and to incarcerated patients any exposures they have had during the day. Access to testing for correctional staff has been "extremely limited," guards have reported a "short supply" of protective equipment, and prisons are not routinely or consistently screening correctional officers for symptoms.[1]

6. The risk of exposure is particularly acute in pre-trial facilities where the inmate populations shift frequently.[2] For example, despite the federal government's guidance to stay

---

[1] Keegan Hamilton, *Sick Staff, Inmate Transfers, and No Tests: How the U.S. Is Failing Federal Inmates as Coronavirus Hits*, Vice (Mar. 24, 2020), https://www.vice.com/en_ca/article/jge4vg/sick-staff-inmate-transfers-and-no-tests-how-the-us-is-failing-federal-inmates-as-coronavirus-hits.

*See also* Daniel A. Gross, *"It Spreads Like Wildfire": The Coronavirus Comes to New York's Prisons*, The New Yorker (Mar. 24, 2020), https://www.newyorker.com/news/news-desk/it-spreads-like-wildfire-covid-19-comes-to-new-yorks-prisons; Josiah Bates, *'We Feel Like All of Us Are Gonna Get Corona.' Anticipating COVID-19 Outbreaks, Rikers Island Offers Warning for U.S. Jails, Prisons*, Time (Mar. 24, 2020), https://time.com/5808020/rikers-island-coronavirus/; Sadie, Gurman, *Bureau of Prisons Imposes 14-Day Quarantine to Contain Coronavirus*, WSJ (Mar. 24, 2020), https://www.wsj.com/articles/bureau-of-prisons-imposes-14-day-quarantine-to-contain-coronavirus-11585093075; Cassidy McDonald, *Federal Prison Workers Say Conflictings Orders on Coronavirus Response Is Putting Lives at Risk*, CBS News (Mar. 19, 2020), https://www.cbsnews.com/news/coronavirus-prison-federal-employees-say-conflicting-orders-putting-lives-at-risk-2020-03-19/.

[2] Emma Grey Ellis, *Covid-19 Poses a Heightened Threat in Jails and Prisons*, Wired (Mar. 24, 2020), https://www.wired.com/story/coronavirus-covid-19-jails-prisons/.

inside and many states' stay-in-place orders, many prosecutors are still arresting individuals and seeking detention.[3] Pre-trial detention facilities are still accepting new inmates who are coming from communities where COVID-19 infection is rampant. As of today's date, the Bureau of Prisons is still moving inmates from facility to facility, including prisoners in New York.[4]

7.     Because inmates live in close quarters, there is an extraordinarily high risk of accelerated transmission of COVID-19 within jails and prisons. Inmates share small cells, eat together and use the same bathrooms and sinks. They eat together at small tables that are cleaned only irregularly. Some are not given tissues or sufficient hygiene supplies.[5] Effective social distancing in most facilities is virtually impossible, and crowding problems are often compounded by inadequate sanitation, such as a lack of hand sanitizer or sufficient opportunities to wash hands.[6]

**Inmate Populations Also Have the Highest Risk of Acute Illness and Poor Health Outcomes if Infected with COVID-19.**

8.     There are more than 2.3 million people incarcerated in the United States[7]

---

[3] Stephen Rex Brown, *'Business as Usual' For Federal Prosecutors Despite Coronavirus, Nadler Writes, Calling for Release of Inmates*, N.Y. Daily News (Mar. 20, 2020), https://www.nydailynews.com/new-york/ny-nadler-doj-inmates-20200320-d6hbdjcuj5aitppi3ui2xz7tjy-story.html.

[4] Courtney Bublé, *Lawmakers, Union Urge Halt to All Prison Inmate Transfers*, Government Executive (Mar. 25, 2020), https://www.govexec.com/management/2020/03/lawmakers-union-urge-halt-all-prison-inmate-transfers/164104/; Hamilton, *Sick Staff, Inmate Transfers*; Luke Barr, *Despite Coronavirus Warnings, Federal Bureau of Prisons Still Transporting Inmates*, ABC News (Mar. 23, 2020),https://abcnews.go.com/Health/warnings-bureau-prisons-transporting-inmates-sources/story?id=69747416.

[5] Justine van der Leun, *The Incarcerated Person Who Knows How Bad It Can Get*, Medium (Mar. 19, 2020), https://gen.medium.com/what-its-like-to-be-in-prison-during-the-coronavirus-pandemic-1e770d0ca3c5 ("If you don't have money, you don't have soap or tissues."); Keri Blakinger and Beth Schwartzapfel, *How Can Prisons Contain Coronavirus When Purrell Is a Contraband?*, ABA Journal (Mar. 13, 2020), https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-contain-coronavirus.

[6] Rosa Schwartzburg, *'The Only Plan the Prison Has Is to Leave Us To Die in Our Beds'*, The Nation (Mar. 25, 2020), https://www.thenation.com/article/society/coronavirus-jails-mdc/.

[7] Kimberly Kindy *et al.*, *'Disaster Waiting to Happen': Thousands of Inmates Released as Jails and Prisons Face Coronavirus Threat*, Washington Post (Mar. 25, 2020), https://www.washingtonpost.com/national/disaster-waiting-to-happen-thousands-of-inmates-released-as-jails-face-coronavirus-threat/2020/03/24/761c2d84-6b8c-11ea-b313-df458622c2cc_story.html.

approximately 16% of whom are age 50 or older.[8]  The risk of coronavirus to incarcerated seniors is high.  "Their advanced age, coupled with the challenges of practicing even the most basic disease prevention measures in prison, is a potentially lethal combination."[9]  To make matters worse, correctional facilities are often ill-equipped to care for aging prisoners, who are more likely to suffer from chronic health conditions than the general public.

9.     An estimated 39-43% of all prisoners, and over 70% of older prisoners, have at least one chronic condition, some of the most common of which are diabetes, hypertension, and heart problems.[10] According to the CDC, each of these conditions—as well as  chronic bronchitis, emphysema, heart failure, blood disorders, chronic kidney disease, chronic liver disease, any condition or treatment that weakens the immune response, current or recent pregnancy in the last two weeks, inherited metabolic disorders and mitochondrial disorders, heart disease, lung disease, and certain neurological and neurologic and neurodevelopment conditions[11]—puts them at a "high-risk for severe illness from COVID-19."[12]

---

[8] Brie Williams *et al.*, *Strategies to Optimize the Use of Compassionate Release from US Prisons*, 110 AJPH S1, S28 (2020), *available at* https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2019.305434; Kimberly A. Skarupski, *The Health of America's Aging Prison Population*, 40 Epidemiologic Rev. 157, 157 (2018), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5982810/.

[9]  Weihua Li and Nicole Lewis, *This Chart Shows Why the Prison Population is So Vulnerable to COVID-19*, The Marshall Project (Mar. 19, 2020), https://www.themarshallproject.org/2020/03/19/this-chart-shows-why-the-prison-population-is-so-vulnerable-to-covid-19.

[10] Brie A. Williams *et al.*, *How Health Care Reform Can Transform the Health of Criminal Justice-Involved Individuals*, 33 Health Affairs 462-67 (2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4034754/; Brie A. Williams *et al.*, *Coming Home: Health Status and Homelessness Risk of Older Pre-release Prisoners*, 25 J. Gen. Internal Med. 1038-44 (2010), *available at*  https://link.springer.com/content/pdf/10.1007/s11606-010-1416-8.pdf; Laura M. Maruschak *et al.*, *Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12*, U.S. Dept of Justice (Oct. 4, 2016), at 5, *available at* https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

[11] Harvard Health Publishing, *Coronavirus Research Center*, Harvard Medical School (Mar. 25, 2020), https://www.health.harvard.edu/diseases-and-conditions/coronavirus-resource-center.

[12] Centers for Disease Control and Prevention, *Coronavirus Disease 2019: People Who Are at Higher Risk*, https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html (last updated Mar. 22, 2020).

10. However, even many young federal prisoners suffer from asthma, rendering them also very vulnerable to coronavirus.[13]

11. But it is not only the elderly, or those with preexisting medical conditions that are at risk of coronavirus in a correctional setting. As of March 23, 2020, New York City reported that "[p]eople ranging in ages from 18 to 44 have accounted for 46 percent of positive tests."[14] Across the United States, 38% of those hospitalized are between the ages of 20 and 54 and 12% of the intensive care patients are between 20 and 44.[15]

12. This data is of particular concern for inmate populations, since prisoners' physiological age *averages 10 to 15 years older* than their chronological age.[16] Therefore, the consensus of those who study correctional health is that inmates are considered "geriatric, by the age of 50 or 55 years."[17] It is not clear that prison health care administrations are taking accelerated ageing into account when determining the eligibility criteria for age-related screening tools and medical care protocols for coronavirus, potentially leaving large swathes of the prison population at risk.[18]

---

[13] Laura Maruschak, *Medical Problems of Jail Inmates*, Dep't of Justice (Nov. 2006), at p. 2, *available at* https://www.bjs.gov/content/pub/pdf/mpji.pdf.

[14] Kimiko de Freytas-Tamura, *20-Somethings Now Realizing That They Can Get Coronavirus, Too*, N.Y. Times (Mar. 23, 2020), https://www.nytimes.com/2020/03/23/nyregion/nyc-coronavirus-young.html.

[15] *Id.*

[16] Brie A. Williams *et al.*, *Aging in Correctional Custody: Setting a Policy Agenda for Older Prisoner Health Care*, 102 Am. J. Public Health 1475-81 (2012), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3464842/; *see also* Brie Williams *et al.*, *Detained and Distressed: Persistent Distressing Symptoms in a Population of Older Jail Inmates*, 64 J. Am. Geriatrics Soc. 2349-55 (2016), https://onlinelibrary.wiley.com/doi/pdf/10.1111/jgs.14310 ("For example, older jail inmates with an average age of 60 in this study reported poor or fair health [and] chronic lung disease . . . at rates similar to those reported by community-based lower income older adults with an average age of 72.").

[17] Brie A. Williams *et al.*, *The Older Prisoner and Complex Chronic Medical Care* 165-70 in World Health Organization, *Prisons and Health* (2014), https://pdfs.semanticscholar.org/64aa/10d3cff6800ed42dd152fcf4e13440b6f139.pdf.

13.     In one study, we found that inmates who died in hospitals were, on average, nearly two decades younger than non-incarcerated decedents, had significantly shorter hospitalizations, and had higher rates of several chronic conditions including cancer, liver disease and/or hepatitis, mental health conditions, and HIV/AIDS."[19]

**The Entire Community is at Risk If Prison Populations Are Not Reduced**

14.     As the World Health Organization has warned, prisons around the world can expect "huge mortality rates" from Covid-19 unless they take immediate action including screening for the disease.[20]

15.     As of March 24, 2020, at least 38 people involved in the New York City correctional system have tested positive for Covid-19.[21]  Already, three inmates and three staff at federal correctional facilities across the United States have tested positive for the coronavirus, according to the Federal Bureau of Prisons.[22]

16.     Jails and prisons are fundamentally ill-equipped to handle a pandemic.

17.     Medical treatment capacity is not at the same level in a correctional setting as it is in a hospital.  Some correctional facilities have no formal medical ward and no place to quarantine

---

[18] Brie A. Williams *et al.*, *Differences Between Incarcerated and Non-Incarcerated Patients Who Die in Community Hospitals Highlight the Need For Palliative Care Services For Seriously Ill Prisoners in Correctional Facilities and in Community Hospitals: a Cross-Sectional Study*, 32 J. Pallitive Med. 17-22 (2018), *available at* https://journals.sagepub.com/doi/pdf/10.1177/0269216317731547.

[19] *Id.* at 20.

[20] Hannah Summers, *'Everyone Will Be Contaminated'*: *Prisons Face Strict Coronavirus Controls*, The Guardian (Mar. 23, 2020), https://www.theguardian.com/global-development/2020/mar/23/everyone-will-be-contaminated-prisons-face-strict-coronavirus-controls.

[21] Ellis, *Covid-19 Poses a Heightened Threat in Jails and Prisons.*

[22] Ryan Lucas, *As COVID-19 Spreads, Calls Grow to Protect Inmates in Federal Prisons*, NPR (Mar. 24, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/03/24/820618140/as-covid-19-spreads-calls-grow-to-protect-inmates-in-federal-prisons.

sick inmates, other than the facilities' Special Housing Unit (SHU).[23]  While the cells in the SHU

have solid doors to minimize the threat of viral spread in otherwise overcrowded facilities, they

rarely have intercoms or other ways for sick inmates to contact officers in an emergency.[24]  This

is particularly dangerous for those with COVID-19 infection since many patients with COVID-19

descend suddenly and rapidly into respiratory distress.[25]

18.     Even those facilities that do have healthcare centers can only treat relatively mild

types of respiratory problems for a very limited number of people.[26]  This means that people who

become seriously ill while in prisons and jails will be transferred to community hospitals for care.

At present, access to palliative care in prison is also limited.

19.     Corrections officers may also be particularly vulnerable to coronavirus due to

documented high rates of diabetes and heart disease.[27]  Prison staff in Pennsylvania, Michigan,

New York and Washington state have tested positive for the virus, resulting in inmate quarantines.

In Washington, D.C., a U.S. marshal who works in proximity to new arrestees tested positive for

the virus, meaning dozens of defendants headed for jail could have been exposed.[28]  In New York,

---

[23] MCC New York COVID 19 Policy Memo, Mar. 19, 2020, https://www.documentcloud.org/documents/6818073-MCC-New-York-COVID-19-Policy-Memo.html; Danielle Ivory, *'We Are Not a Hospital': A Prison Braces for the Coronavirus*, N.Y. Times (Mar. 17, 2020), https://www.nytimes.com/2020/03/17/us/coronavirus-prisons-jails.html.

[24] Brie Williams *et al.*, *Correctional Facilities in the Shadow of COVID-19: Unique Challenges and Proposed Solutions*, Health Affairs (Mar. 26, 2020), https://www.healthaffairs.org/do/10.1377/hblog20200324.784502/full/.

[25] Lizzie Presser, *A Medical Worker Describes Terrifying Lung Failure From COVID-19–Even in His Young Patients*, ProPublica (Mar. 21, 2020), https://www.propublica.org/article/a-medical-worker-describes--terrifying-lung-failure-from-covid19-even-in-his-young-patients.

[26] Ellis, *Covid-19 Poses a Heightened Threat in Jails and Prisons*; Li and Lewis, *This Chart Shows Why the Prison Population is So Vulnerable to COVID-19*.

[27] Brie Williams, *Role of US-Norway Exchange in Placing Health and Well-Being at the Center of US Prison Reform*, https://ajph.aphapublications.org/doi/10.2105/AJPH.2019.305444 (published Jan. 22, 2020).

[28] Zusha Elinson and Deanna Paul, *Jails Release Prisoners, Fearing Coronavirus Outbreak*, WSJ (Mar. 22, 2020), https://www.wsj.com/articles/jails-release-prisoners-fearing-coronavirus-outbreak-11584885600 ("We're all headed for some dire consequences," said Daniel Vasquez, a former warden of San Quentin and Soledad state prisons in

236 members of the New York Police Department have tested positive for coronavirus and 3,200 employees are sick, triple the normal sick rate.[29] Two federal prison staffers have also tested positive.[30]

20.     For this reason, correctional health is public health. Decreasing risk in prisons and jails decreases risk to our communities.

21.     Reducing the overall population within correctional facilities will also help medical professionals spread their clinical care services throughout the remaining population more efficiently.  With a smaller population to manage and care for, healthcare and correctional leadership will be better able to institute shelter in place and quarantine protocols for those who remain. This will serve to protect the health of both inmates as well as correctional and healthcare staff.

    I declare under penalty of perjury that the foregoing is true and correct.

Dated: San Francisco, California
        March 27, 2020

_____
Dr. Brie Williams

---

California. "They're in such close quarters—some double- and triple-celled—I think it's going to be impossible to stop it from spreading.").

[29] Erin Durkin, *Thousands of NYPD Officers Out Sick Amid Coronavirus Crisis*, Politico (Mar. 25, 2020), https://www.politico.com/states/new-york/albany/story/2020/03/25/thousands-of-nypd-officers-out-sick-amid-coronavirus-crisis-1268960.

[30] Elinson and Paul, *Jails Release Prisoners, Fearing Coronavirus Outbreak*.

1  **Declaration of Dr. Carlos Franco-Paredes**

2  The Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2), is a

3  newly emerging zoonotic agent initially identified in December 2019 that, as of

4  today, has spread to more than 150 countries causing 297,000 confirmed cases and

5  12,755 deaths[a]. This viral pathogen causes the Coronavirus Disease 2019 (COVID-

6  19). Infection with COVID-19 is associated with significant morbidity and

7  mortality especially in patients above 55 years of age and those with chronic

8  medical conditions[b,c,d].

9  Immigration detention centers in the U.S. are tinderboxes for the

10  transmission of highly transmissible infectious pathogens including the SARS-

11  CoV-2, which causes COVID-19. Given the large population density of

12  immigration detention centers and the ease of transmission of this viral pathogen,

13  the attack rate inside these centers will take exponential proportions, consuming

14  significant medical and financial resources.

15  As an infectious disease clinician with a public health degree in the

16  dynamics of infectious disease epidemics and pandemics and twenty years of

17  clinical experience, I am concerned about the treatment of immigrants inside

18  detention centers which could make the current COVID-19 epidemic worse in the

19  U.S. by having a high case fatality rate among detainees and potentially spreading

20  the outbreak into the larger community. A copy of my CV is presented in Exhibit

21  A.

22  I have experience providing care to individuals in a civil detention center

23  and have performed approximately two medical forensic examinations and fifteen

24  medical second opinion evaluations for patients in the custody of the Department

25  of Homeland Security (DHS). Based on my conversations with patients, my own

26  observations, and information that exists regarding the resources available within

27  immigration detention facilities as detailed by the ICE Health Services Corps, it is

28  my professional opinion that the medical care available in DHS custody cannot

properly accommodate the needs of patients should there be an outbreak of COVID-19 in an immigration detention facility. The physical and emotional trauma that detainees and asylum seekers experience can weaken their immune systems, resulting in increased risk of severe manifestations of infections. For example cases of influenza virus infections causing pneumonia and respiratory failure, - albeit influenza infection is not as communicable and not transmitted during asymptomatic infection as it is the case with SARS-CoV-2 -, has caused human deaths inside immigration detention centers [e].

- **For people in the highest risk populations, the fatality rate of COVID-19 infection is about 15 percent.**

   According to the CDC, groups deemed to be at high risk of developing severe disease and dying from COVID-19 include those above 55 years of age and those with underlying medical conditions (regardless of their age) (See Table 1). These cases are also amplifiers or hyper-spreaders of the infection since they tend to have high viral concentrations in their respiratory secretions.

   The clinical experience in China, South Korea, Italy and Spain has shown that 80% of confirmed cases tend to occur in persons 30-69 years of age regardless of whether they had underlying medical conditions. Of these, 20% develop severe clinical manifestations or become critically ill. Among those with severe clinical manifestations, regardless of their age or underlying medical conditions, the virus progresses into respiratory failure, septic shock, and multiorgan dysfunction requiring intensive care support including the use of mechanical ventilator support. The overall case fatality rate is 10-14% of those who develop severe disease. In China, 80% of deaths occurred among adults $\geq$ 60 years[c].

Table 1. Risk factors for developing severe disease and death outside the U.S.

| Age groups at high risk of developing severe disease and dying without underlying medical | 50-59 years (1% CFR)*<br>60-69 years (3.6% CFR)<br>70-79 years (8% CFR) |
|---|---|

| conditions | |
|---|---|
| **Groups with underlying medical conditions at high risk of dying regardless of their age** | -Cardiovascular Disease (congestive heart failure, history of myocardial infarction, history of cardiac surgery)<br><br>-Systemic Arterial Hypertension (high blood pressure)<br><br>-Chronic Respiratory Disease (asthma, chronic obstructive pulmonary disease including chronic bronchitis or emphysema, or other pulmonary diseases)<br><br>-Diabetes Mellitus<br><br>-Cancer<br><br>-Chronic Liver Disease<br><br>-Chronic Kidney Disease<br><br>-Autoimmune Diseases (psoriasis, rheumatoid arthritis, systemic lupus erythematosus)<br><br>-Severe Psychiatric Illness **<br><br>-History of Transplantation<br><br>-HIV/AIDS<br><br>-Pregnancy*** |

*CFR= Case Fatality Rate. This is an indicator of lethality used during outbreaks to identify the number of individuals who succumb out of those infected.

** In South Korea, 20% of deaths occurred in what they defined as Psychiatric Illness (J Korean Med Sci 2020; 35(10): e112).

*** Extrapolation from previous influenza pandemics including the 2009 pandemic that increased pregnancy-related mortality 4-fold particularly during second and third trimesters. The reason is due to immune mediated changes during pregnancy and lung function compromise due to gravid uterus (Omer S. N Engl J Med 2017;376(13): 1256-1267.

There is a growing number of confirmed cases in the U.S., increasing number of hospitalizations and admissions to intensive care units, and many deaths. In this wave of the pandemic or in subsequent ones, it is likely the number of infected individuals will continue to augment. In the closed settings of immigration detention centers, where there is overcrowding and confinement of a large number of persons, networks of transmission become highly conducive to spread rapidly.

As of March 16, 2020[c], cases of COVID-19 in the U.S. reported by the CDC shows that 31% of COVID-19 cases, 45% of hospitalizations, and 80% of deaths occurred among adults > 65 years of age. Case-fatality in persons aged > 85 ranged from 10-27%, followed by 3-11% among persons aged 65-84 years, 1% among persons aged 55-64 and <1% among persons 20-54 years of age.

Reports by the Chinese CDC demonstrate that the case fatality rate is highest among critical cases in the high-risk categories with COVID at 49%[f]. Case fatality was higher for patients with comorbidities: 10.5% for those with cardiovascular disease, 7% for diabetes, and 6% each for chronic respiratory disease, hypertension, and cancer. Case fatality for patients who developed respiratory failure, septic shock, or multiple organ dysfunction was 49%[b].

- **For people with these risk factors, COVID-19 can severely damage lung tissue, which requires an extensive period of rehabilitation, and in some cases, can cause permanent loss of respiratory capacity.**

There is preliminary evidence that persons with COVID-19 who are recovering from severe disease and who have developed extensive pulmonary disease including Acute Respiratory Distress Syndrome (ARDS)[g] may have long-term sequelae similar to other infectious pathogens evolving in a similar pattern. Long term sequelae of those with sepsis, ARDS and respiratory failure identified in the literature include long-term cognitive impairment, psychological morbidities, neuromuscular weakness, pulmonary dysfunction, and ongoing healthcare

utilization with reduced quality of life[h] and need for rehabilitation services[i].

- **COVID-19 may also target the heart muscle, causing a medical condition called myocarditis, or inflammation of the heart muscle. Myocarditis can affect the heart muscle and electrical system, reducing the heart's ability to pump. This reduction can lead to rapid or abnormal heart rhythms in the short term, and long-term heart failure that limits exercise tolerance and the ability to work.**

The full description of the pathogenesis of COVID-19 requires to be completely elucidated. However, there is clinical evidence that in addition to the severe lung injury associated to this viral infection, some persons may also develop myocardial involvement that appears to be the result of either direct viral infection or caused by the immune response to SARS-CoV-2. From the published case reports, myocarditis caused by this viral pathogen is associated with congestive heart failure, cardiac arrhythmias and death[j].  Similar to other viral myocarditis, most patients may develop long-term myocardial damage[k].

- **Emerging evidence also suggests that COVID-19 can trigger an over-response of the immune system, further damaging tissues in a cytokine release syndrome that can result in widespread damage to other organs, including permanent injury to the kidneys and neurologic injury. These complications can manifest at an alarming pace.**

Among persons infected with SARS-CoV-2 and developing COVID-19, severe disease systemic inflammation is associated with adverse outcomes [l]. However, there is evidence that the use of corticosteroids have not shown benefit and they might be more likely to cause harm when administered to persons with ARDS caused by COVID-19[m]. Similar to influenza infection, acute lung injury and

acute respiratory distress syndrome are most likely caused by the respiratory epithelial membrane dysfunction leading to acute respiratory distress syndrome [l,n]. Preliminary evidence from case reports and small cases series from China and South Korea confirm that there is minimal inflammation and evidence of cell necrosis in the form of apoptosis of the respiratory epithelium [o]. The resultant tissue hypoxia is responsible and potential concomitant bacterial sepsis contribute to multiorgan dysfunction and death. If a patient with COVID-19 develops myocarditis, cardiogenic shock caused by fulminant myocarditis may also contribute to the overall occurrence of multiple organ failure [k].

- **Patients can show the first symptoms of infection in as little as two days after exposure, and their condition can seriously deteriorate in five days or sooner.**

There is evidence of substantial undocumented infection facilitating the rapid dissemination of novel coronavirus SARS-CoV-2 which is responsible for 79% of documented cases of COVID-19 in China[o].  Once an individual is exposed to this virus from either a symptomatic individual (21% of cases) or from asymptomatic individuals (79% of cases), the shortest incubation period is 3 days with a median incubation period of 5.1 (95% CI 4.5 to 5.8 days)[p]. Overall, 97.5% of persons who develop symptoms do so within 11.5 days of the initial exposure [p]. Most persons with COVID-19 who develop severe disease do so immediately after admission or within 3-5 days from their initial presentation[c,q] and represent 53% of those requiring intensive care unit admissions and advanced supportive care[c]. At my current institution, the two confirmed deaths occurred within 48 hours of admission to the hospital.

- **Most people in higher risk categories who develop serious disease will need advanced support. This level of supportive care requires highly specialized equipment that is in limited supply, and an entire**

**team of care providers, including 1:1 or 1:2 nurse to patient ratios, respiratory therapists, and intensive care physicians. This level of support can quickly exceed local health care resources.**

There is sufficient evidence that the SARS-CoV-2 pandemic has an overwhelming impact in healthcare utilization in all settings (China, South Korea, Italy, France, Germany, and others).  In the U.S.[c], current evidence demonstrates that COVID-19 can result in severe disease, including hospitalization (31%) and admission to an intensive care unit (53% of ICU admissions). To respond to this overwhelming demand in ICU admissions, there is a need for a multidisciplinary approach that is time consuming and requires highly trained personnel including pulmonary and critical care physicians, nurses, respiratory therapists, phlebotomists, social workers, and case managers. The care of this group of patients also requires subspecialists including nephrologists, infectious disease physicians, hematologists, hospitalists, and others. Patients on mechanical ventilation or requiring extracorporeal membrane oxygenation require additional staff including perfusionists and 1:1 dedicated nursing care. Currently, medical centers in many urban and rural settings in the U.S. are functioning at full capacity. Therefore, preventing the occurrence of an outbreak within a detention facility would reduce the risk of overwhelming local healthcare systems. Indeed, a potential outbreak occurring within an immigration detention center, the number of detainees who will require transfer outside the facility for specialized care may exceed the capacity of local hospitals. This is particularly important in rural and semirural settings where many immigration detention centers are located, and where they may have contact with a limited number of surrounding medical centers.

**Conclusions:**

There is a need to proactively consider alternative strategies to dilute the

7

potential community-based impact of an outbreak inside immigration detention centers. Therefore, it is my professional view that releasing detainees/asylum seekers on humanitarian parole from these centers constitutes a high-yield public health intervention that may significantly lessen the impact of this outbreak not only within detention centers but among the communities surrounding these centers. In particular, targeting the release of persons in the age groups at risk of severe disease and death; and persons with underlying medical conditions, may lessen the human and financial costs that this outbreak may eventually impose on ICE detention facilities nationwide. Responding to an outbreak requires significant improvements in staffing, upgrading medical equipment, substantial supplies including antibiotics, intravenous infusions, cardiac and respiratory monitors, devices for oxygen supply, and personal protection supplies among persons at high risk of severe COVID-19 disease.

A large outbreak of COVID-19 in an immigration detention facility would put a tremendous strain on the medical system to the detriment of patients in the communities surrounding these centers. It is reasonable to anticipate that there will be the loss of additional lives that could have otherwise been saved.

I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge.

Date: March 21, 2020

Carlos Franco-Paredes, MD, MPH, DTMH (Gorgas)
Associate Professor of Medicine

Division of Infectious Diseases
Department of Medicine
Program Director Infectious Disease Fellowship
Training Program, University of Colorado

# References

a. Johns Hopkins University. Coronavirus Resource Center Available at: https://coronavirus.jhu.edu/map.html. Accessed: March 21, 2020.

b. CDC-Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19) Available at: https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html). Accessed: March 21, 2020.

c. CDC COVID 19 Response Team. Severe outcomes among patients with coronavirus disease 2019 (COVID-19) – United States, February 12-March 16, 2020. Available at: https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm. Accessed: March 21, 2020.

d. Rodriguez-Morales AJ, Cardona-Ospina JA, Gutiérrez-Ocampo E, Villamizar-Peña R, Holguin-Rivera Y, Escalera-Antezana JP, Alvarado-Arnez LE, Bonilla-Aldana DK, Franco-Paredes C, Henao-Martinez AF, Paniz-Mondolfi A, Lagos-Grisales GJ, Ramírez-Vallejo E, Suárez JA, Zambrano LI, Villamil-Gómez WE, Balbin-Ramon GJ, Rabaan AA, Harapan H, Dhama K, Nishiura H, Kataoka H, Ahmad T, Sah R; Latin American Network of Coronavirus Disease 2019-COVID-19 Research (LANCOVID-19). Electronic address: https://www.lancovid.org. Clinical, laboratory and imaging features of COVID-19: A systematic review and meta-analysis.Travel Med Infect Dis. 2020 Mar 13:101623. doi: 10.1016/j.tmaid.2020.101623. [Epub ahead of print].

e. Foppian Palacios C, Opensahw JJ, Travassos MA. Influenza in U.S. detention centers- the desperate need for immunization. N Engl J Med 2020; 382(9): 789-792.

f. Novel Coronavirus Pneumonia Emergency Response Epidemiology Teamexternal iconexternal icon. [The Epidemiological Characteristics of an Outbreak of 2019 Novel Coronavirus Diseases (COVID-19) in China]. Zhonghua Liu Xing Bing Xue Za Zhi. 2020;41(2):145–151. DOI:10.3760/cma.j.issn.0254-6450.2020.02.003.

g. Mart M, Ware LB. The long-lasting effects of the acute respiratory distress syndrome. Expert Rev Respir Dis 2020; https://doi.org/10.1080/17476348.2020.1743182.

h. Wu C, Chen X, Cai Y, Xia J, Zhou X, Xu S, Huang H, Zhang L, Zhou X, Du C, Zhang Y, Song J, Wang S, Chao Y, Yang Z, Xu J, Zhou X, Chen D, Xiong W, Xu L, Zhou F, Jiang J, Bai C, Zheng J, Song Y. Risk Factors Associated With Acute Respiratory Distress Syndrome and Death in Patients With Coronavirus Disease 2019 Pneumonia in Wuhan, China. JAMA Intern Med. 2020 Mar 13. doi: 10.1001/jamainternmed.2020.0994. [Epub ahead of print].

i. Koh GC, Hoenig H. How should the rehabilitation community prepare for 2019-nCoV? Arch Phys Med Rehabil 2020 Mar 16. Pii: S0003-9993(20)30153-2. Doi: 10.1016/j.apmr.2020.03.003. (Epub ahead of print].

j. Chen C, Zhou Y, Wen WD. SARS-CoV-2: a potential novel etiology of fulminant myocarditis. Herz 2020; March 5. https://doiorg/10.1007/s00059-020-04909-z.

k. Hu H, Ma F, Wei X, Fang Y. Coronavirus fulminant myocarditis saved with glucocorticoid and human immunoglobulin. Eur Heat J 2020; Mar 16. [Epub ahead of print].

l. Li R, Pei S, Chen B, Song , Zhang T, Shaman J. Substantial undocumented infection facilitates the rapid dissemination of novel coronavirus (SARS-CoV2). Science 10.1126/scienceabb3221 (2020).

m. Russell CD, Millar JE, Baillie JK. Clinical evidence does not support corticosteroid treatment for 2019-nCoV lung injury. Lancet Infect Dis 2020; 395: 474-475.

n. Hoffmann M, Kleine-Weber H, Schroeder S, Krüger N, Herrler T, Erichsen S, Schiergens TS, Herrler G, Wu NH, Nitsche A, Müller MA, Drosten C, Pöhlmann S. SARS-CoV-2 Cell Entry Depends on ACE2 and TMPRSS2 and Is Blocked by a Clinically Proven Protease Inhibitor. Cell. 2020 Mar 4. pii: S0092-8674(20)30229-4. doi: 10.1016/j.cell.2020.02.052. [Epub ahead of print]

o. Tian S, Hu W, Niu L, Liu H, Su H, Xiao SY. Pulmonary pathology of early phase 2019 novel coronavirus (COVID-19) pneumonia in patients with lung cancer. J Thorac Oncol 2020; https://doi.org/10.1016/j.tho.2020.02.010.

p. Lauer SA, Grantz KH, Bi Q, Jones FK, Zheng Q, Meredith HR, Azman AS, Reich NG, Lessler J.The incubation period of coronavirus disease 2019 (COVID-19) from publicly reported confirmed cases: estimation and application. Ann Intern Med 2020; March 10, doi: https://doi/org/107326/M20-0504.

q. Korean Society of Infectious Diseases; Korean Society of Pediatric Infectious Diseases; Korean Society of Epidemiology; Korean Society for Antimicrobial Therapy; Korean Society for Healthcare-associated

Infection Control and Prevention; Korea Centers for Disease Control and Prevention. Report on the Epidemiological Features of Coronavirus Disease 2019 (COVID-19) Outbreak in the Republic of Korea from January 19 to March 2, 2020. J Korean Med Sci. 2020 Mar 16;35(10):e112. doi: 10.3346/jkms.2020.35.e112.

Declaration of Robert B. Greifinger, MD

I, Robert B. Greifinger, declare as follows:

1. I am a physician who has worked in health care for prisoners for more than 30 years. I have managed the medical care for inmates in the custody of New York City (Rikers Island) and the New York State prison system. I have authored more than 80 scholarly publications, many of which are about public health and communicable disease. I am the editor of *Public Health Behind Bars: from Prisons to Communities,* a book published by Springer (a second edition is due to be published in early 2021); and co-author of a scholarly paper on outbreak control in correctional facilities.[1]

2. I have been an independent consultant on prison and jail health care since 1995. My clients have included the U.S. Department of Justice, Division of Civil Rights (for 23 years) and the U.S. Department of Homeland Security, Section for Civil Rights and Civil Liberties (for six years). I am familiar with immigration detention centers, having toured and evaluated the medical care in approximately 20 immigration detention centers, out of the several hundred correctional facilities I have visited during my career. I currently monitor the medical care in three large county jails for Federal Courts. My resume is attached as Exhibit A.

3. COVID-19 is a coronavirus disease that has reached pandemic status. As of today, according to the World Health Organization, more than 132,000 people have been diagnosed with COVID-19 around the world and 4,947 have died.[2] In the United States, about 1,700 people have been diagnosed and 41 people have died thus far.[3] These numbers are likely an underestimate, due to the lack of availability of testing.

4. COVID-19 is a serious disease, ranging from no symptoms or mild ones for people at low risk, to respiratory failure and death in older patients and patients with chronic underlying conditions. There is no vaccine to prevent COVID-19. There is no known cure or anti-viral treatment for COVID-19 at this time. The only way to mitigate COVID-19 is to use scrupulous hand hygiene and social distancing.

5. People in the high-risk category for COVID-19, i.e., the elderly or those with underlying disease, are likely to suffer serious illness and death. According to preliminary data from China, 20% of people in high risk categories who contract COVID-19 have died.

---

[1] Parvez FM, Lobato MN, Greifinger RB. Tuberculosis Control: Lessons for Outbreak Preparedness in Correctional Facilities. Journal of Correctional Health Care OnlineFirst, published on May 12, 2010 as doi:10.1177/1078345810367593.
[2] See https://experience.arcgis.com/experience/685d0ace521648f8a5beeeee1b9125cd, accessed March 13, 2020.
[3] See https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html?searchResultPosition=1, accessed March 13, 2020.

6. Those who do not die have prolonged serious illness, for the most part requiring expensive hospital care, including ventilators that will likely be in very short supply.

7. The Centers for Disease Control and Prevention (CDC) has identified underlying medical conditions that may increase the risk of serious COVID-19 for individuals of any age: blood disorders, chronic kidney or liver disease, compromised immune system, endocrine disorders, including diabetes, metabolic disorders, heart and lung disease, neurological and neurologic and neurodevelopmental conditions, and current or recent pregnancy.

8. Social distancing and hand hygiene are the only known ways to prevent the rapid spread of COVID-19. For that reason, public health officials have recommended extraordinary measures to combat the spread of COVID-19. Schools, courts, collegiate and professional sports, theater and other congregate settings have been closed as part of risk mitigation strategy. At least one nursing home in the Seattle area has had cases of COVID-19 and has been quarantined.

9. The Seattle metropolitan area, hit hard by COVID, is the epicenter of the largest national outbreak at this time. Therefore, it is highly likely, and perhaps inevitable, that COVID-19 will reach the immigration detention facility in Tacoma, Washington. Immigration courts and the ICE field office in Seattle have already closed this month due to staff exposure to COVID-19.

10. The conditions of immigration detention facilities pose a heightened public health risk to the spread of COVID-19, even greater than other non-carceral institutions.

11. Immigration detention facilities are enclosed environments, much like the cruise ships that were the site of the largest concentrated outbreaks of COVID-19. Immigration detention facilities have even greater risk of infectious spread because of conditions of crowding, the proportion of vulnerable people detained, and often scant medical care resources. People live in close quarters and cannot achieve the "social distancing" needed to effectively prevent the spread of COVID-19. Toilets, sinks, and showers are shared, without disinfection between use. Food preparation and food service is communal, with little opportunity for surface disinfection. Staff arrive and leave on a shift basis; there is little to no ability to adequately screen staff for new, asymptomatic infection.

12. Many immigration detention facilities lack adequate medical care infrastructure to address the spread of infectious disease and treatment of high-risk people in detention. As examples, immigration detention facilities often use practical nurses who practice beyond the scope of their licenses; have part-time physicians who have limited availability to be on-site; and facilities with no formal linkages with local health departments or hospitals.

13. The only viable public health strategy available is risk mitigation. Even with the best-laid plans to address the spread of COVID-19 in detention facilities, the release of high-risk individuals is a key part of a risk mitigation strategy. In my opinion, the public health recommendation is to release high-risk people from detention, given the heightened risks

to their health and safety, especially given the lack of a viable vaccine for prevention or effective treatment at this stage.

14. To the extent that vulnerable detainees have had exposure to known cases with laboratory-confirmed infection with the virus that causes COVID-19, they should be tested immediately in concert with the local health department. Those who test negative should be released.

15. This release cohort can be separated into two groups. Group 1 could be released to home quarantine for 14 days, assuming they can be picked up from NWDC by their families or sponsors. Group 2 comprises those who cannot be easily transported to their homes by their families or sponsors. Group 2 could be released to a housing venue for 14 days, determined in concert with the Pierce County or Washington State Department of Health.


Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this _14th_ day in March, 2020 in New York City, New York.


Robert B. Greifinger, M.D.

## Declaration of Dr. Jaimie Meyer

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

## I.      Background and Qualifications

1.  I am Dr. Jaimie Meyer, an Assistant Professor of Medicine at Yale School of Medicine and Assistant Clinical Professor of Nursing at Yale School of Nursing in New Haven, Connecticut. I am board certified in Internal Medicine, Infectious Diseases and Addiction Medicine.  I completed my residency in Internal Medicine at NY Presbyterian Hospital at Columbia, New York, in 2008. I completed a fellowship in clinical Infectious Diseases at Yale School of Medicine in 2011 and a fellowship in Interdisciplinary HIV Prevention at the Center for Interdisciplinary Research on AIDS in 2012. I hold a Master of Science in Biostatistics and Epidemiology from Yale School of Public Health.

2.  I have worked for over a decade on infectious diseases in the context of jails and prisons. From 2008-2016, I served as the Infectious Disease physician for York Correctional Institution in Niantic, Connecticut, which is the only state jail and prison for women in Connecticut.  In that capacity, I was responsible for the management of HIV, Hepatitis C, tuberculosis, and other infectious diseases in the facility.  Since then, I have maintained a dedicated HIV clinic in the community for patients returning home from prison and jail. For over a decade, I have been continuously funded by the NIH, industry, and foundations for clinical research on HIV prevention and treatment for people involved in the criminal justice system, including those incarcerated in closed settings (jails and prisons) and in the community under supervision (probation and parole).  I have served as an expert consultant on infectious diseases and women's health in jails and prisons for the UN Office on Drugs and Crimes, the Federal Bureau of Prisons, and others.  I also served as an expert health witness for the US Commission on Civil Rights Special Briefing on Women in Prison.

3.  I have written and published extensively on the topics of infectious diseases among people involved in the criminal justice system including book chapters and articles in leading peer-reviewed journals (including Lancet HIV, JAMA Internal Medicine, American Journal of Public Health, International Journal of Drug Policy) on issues of prevention, diagnosis, and management of HIV, Hepatitis C, and other infectious diseases among people involved in the criminal justice system.

4.  My C.V. includes a full list of my honors, experience, and publications, and it is attached as Exhibit A.

5.  I am being paid $1,000 for my time reviewing materials and preparing this report.

6.  I have not testified as an expert at trial or by deposition in the past four years.

## II.     Heightened Risk of Epidemics in Jails and Prisons

1

7. The risk posed by infectious diseases in jails and prisons is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected. There are several reasons this is the case, as delineated further below.

8. Globally, outbreaks of contagious diseases are all too common in closed detention settings and are more common than in the community at large. Prisons and jails are not isolated from communities. Staff, visitors, contractors, and vendors pass between communities and facilities and can bring infectious diseases into facilities. Moreover, rapid turnover of jail and prison populations means that people often cycle between facilities and communities. People often need to be transported to and from facilities to attend court and move between facilities. Prison health is public health.

9. Reduced prevention opportunities: Congregate settings such as jails and prisons allow for rapid spread of infectious diseases that are transmitted person to person, especially those passed by droplets through coughing and sneezing. When people must share dining halls, bathrooms, showers, and other common areas, the opportunities for transmission are greater. When infectious diseases are transmitted from person to person by droplets, the best initial strategy is to practice social distancing. When jailed or imprisoned, people have much less of an opportunity to protect themselves by social distancing than they would in the community. Spaces within jails and prisons are often also poorly ventilated, which promotes highly efficient spread of diseases through droplets. Placing someone in such a setting therefore dramatically reduces their ability to protect themselves from being exposed to and acquiring infectious diseases.

10. Disciplinary segregation or solitary confinement is not an effective disease containment strategy. Beyond the known detrimental mental health effects of solitary confinement, isolation of people who are ill in solitary confinement results in decreased medical attention and increased risk of death. Isolation of people who are ill using solitary confinement also is an ineffective way to prevent transmission of the virus through droplets to others because, except in specialized negative pressure rooms (rarely in medical units if available at all), air continues to flow outward from rooms to the rest of the facility. Risk of exposure is thus increased to other people in prison and staff.

11. Reduced prevention opportunities: During an infectious disease outbreak, people can protect themselves by washing hands. Jails and prisons do not provide adequate opportunities to exercise necessary hygiene measures, such as frequent handwashing or use of alcohol-based sanitizers when handwashing is unavailable. Jails and prisons are often under-resourced and ill-equipped with sufficient hand soap and alcohol-based sanitizers for people detained in and working in these settings. High-touch surfaces (doorknobs, light switches, etc.) should also be cleaned and disinfected regularly with bleach to prevent virus spread, but this is often not done in jails and prisons because of a lack of cleaning supplies and lack of people available to perform necessary cleaning procedures.

12. Reduced prevention opportunities: During an infectious disease outbreak, a containment strategy requires people who are ill with symptoms to be isolated and that caregivers have

access to personal protective equipment, including gloves, masks, gowns, and eye shields.  Jails and prisons are often under-resourced and ill-equipped to provide sufficient personal protective equipment for people who are incarcerated and caregiving staff, increasing the risk for everyone in the facility of a widespread outbreak.

13. <u>Increased susceptibility</u>: People incarcerated in jails and prisons are more susceptible to acquiring and experiencing complications from infectious diseases than the population in the community.[1] This is because people in jails and prisons are more likely than people in the community to have chronic underlying health conditions, including diabetes, heart disease, chronic lung disease, chronic liver disease, and lower immune systems from HIV.

14. <u>Jails and prisons are often poorly equipped to diagnose and manage infectious disease outbreaks.</u>  Some jails and prisons lack onsite medical facilities or 24-hour medical care. The medical facilities at jails and prisons are almost never sufficiently equipped to handle large outbreaks of infectious diseases. To prevent transmission of droplet-borne infectious diseases, people who are infected and ill need to be isolated in specialized airborne negative pressure rooms.  Most jails and prisons have few negative pressure rooms if any, and these may be already in use by people with other conditions (including tuberculosis or influenza).  Resources will become exhausted rapidly and any beds available will soon be at capacity. This makes both containing the illness and caring for those who have become infected much more difficult.

15. <u>Jails and prisons lack access to vital community resources to diagnose and manage infectious diseases.</u> Jails and prisons do not have access to community health resources that can be crucial in identifying and managing widespread outbreaks of infectious diseases.  This includes access to testing equipment, laboratories, and medications.

16. <u>Jails and prisons often need to rely on outside facilities (hospitals, emergency departments) to provide intensive medical care</u> given that the level of care they can provide in the facility itself is typically relatively limited. During an epidemic, this will not be possible, as those outside facilities will likely be at or over capacity themselves.

17. <u>Health safety:</u> As an outbreak spreads through jails, prisons, and communities, medical personnel become sick and do not show up to work. Absenteeism means that facilities can become dangerously understaffed with healthcare providers. This increases a number of risks and can dramatically reduce the level of care provided.  As health systems inside facilities are taxed, people with chronic underlying physical and mental health conditions and serious medical needs may not be able to receive the care they need for these conditions.  As supply chains become disrupted during a global pandemic, the availability of medicines and food may be limited.

18. <u>Safety and security:</u> As an outbreak spreads through jails, prisons, and communities, correctional officers and other security personnel become sick and do not show up to

---

[1] *Active case finding for communicable diseases in prisons*, 391 The Lancet 2186 (2018), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(18)31251-0/fulltext.

work.  Absenteeism poses substantial safety and security risk to both the people inside the facilities and the public.

19. These risks have all been borne out during past epidemics of influenza in jails and prisons. For example, in 2012, the CDC reported an outbreak of influenza in 2 facilities in Maine, resulting in two inmate deaths.[2]  Subsequent CDC investigation of 995 inmates and 235 staff members across the 2 facilities discovered insufficient supplies of influenza vaccine and antiviral drugs for treatment of people who were ill and prophylaxis for people who were exposed.  During the H1N1-strain flu outbreak in 2009 (known as the "swine flu"), jails and prisons experienced a disproportionately high number of cases.[3] Even facilities on "quarantine" continued to accept new intakes, rendering the quarantine incomplete. These scenarios occurred in the "best case" of influenza, a viral infection for which there was an effective and available vaccine and antiviral medications, unlike COVID-19, for which there is currently neither.

### III.  Profile of COVID-19 as an Infectious Disease[4]

20.  The novel coronavirus, officially known as SARS-CoV-2, causes a disease known as COVID-19.  The virus is thought to pass from person to person primarily through respiratory droplets (by coughing or sneezing) but may also survive on inanimate surfaces.  People seem to be most able to transmit the virus to others when they are sickest but it is possible that people can transmit the virus before they start to show symptoms or for weeks after their symptoms resolve.  In China, where COVID-19 originated, the average infected person passed the virus on to 2-3 other people; transmission occurred at a distance of 3-6 feet.  Not only is the virus very efficient at being transmitted through droplets, everyone is at risk of infection because our immune systems have never been exposed to or developed protective responses against this virus. A vaccine is currently in development but will likely not be able for another year to the general public.  Antiviral medications are currently in testing but not yet FDA-approved, so only available for compassionate use from the manufacturer.  People in prison and jail will likely have even less access to these novel health strategies as they become available.

---

[2] *Influenza Outbreaks at Two Correctional Facilities — Maine, March 2011*, Centers for Disease Control and Prevention (2012), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6113a3.htm.

[3] David M. Reutter, *Swine Flu Widespread in Prisons and Jails, but Deaths are Few*, Prison Legal News (Feb. 15, 2010), https://www.prisonlegalnews.org/news/2010/feb/15/swine-flu-widespread-in-prisons-and-jails-but-deaths-are-few/.

[4] This whole section draws from Brooks J.  Global Epidemiology and Prevention of COVID19, COVID-19 Symposium, Conference on Retroviruses and Opportunistic Infections (CROI), virtual (March 10, 2020); *Coronavirus (COVID-19)*, Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/index.html; Brent Gibson, *COVID-19 (Coronavirus): What You Need to Know in Corrections*, National Commission on Correctional Health Care (February 28, 2020), https://www.ncchc.org/blog/covid-19-coronavirus-what-you-need-to-know-in-corrections.

21. Most people (80%) who become infected with COVID-19 will develop a mild upper respiratory infection but emerging data from China suggests serious illness occurs in up to 16% of cases, including death.[5]  Serious illness and death is most common among people with underlying chronic health conditions, like heart disease, lung disease, liver disease, and diabetes, and older age.[6]  Death in COVID-19 infection is usually due to pneumonia and sepsis.  The emergence of COVID-19 during influenza season means that people are also at risk from serious illness and death due to influenza, especially when they have not received the influenza vaccine or the pneumonia vaccine.

22. The care of people who are infected with COVID-19 depends on how seriously they are ill.[7]  People with mild symptoms may not require hospitalization but may continue to be closely monitored at home.  People with moderate symptoms may require hospitalization for supportive care, including intravenous fluids and supplemental oxygen.  People with severe symptoms may require ventilation and intravenous antibiotics. Public health officials anticipate that hospital settings will likely be overwhelmed and beyond capacity to provide this type of intensive care as COVID-19 becomes more widespread in communities.

23. COVID-19 prevention strategies include containment and mitigation.  Containment requires intensive hand washing practices, decontamination and aggressive cleaning of surfaces, and identifying and isolating people who are ill or who have had contact with people who are ill, including the use of personal protective equipment.  Jails and prisons are totally under-resourced to meet the demand for any of these strategies.  As infectious diseases spread in the community, public health demands mitigation strategies, which involves social distancing and closing other communal spaces (schools, workplaces, etc.) to protect those most vulnerable to disease.  Jails and prisons are unable to adequately provide social distancing or meet mitigation recommendations as described above.

24. The time to act is now.  Data from other settings demonstrate what happens when jails and prisons are unprepared for COVID-19.  News outlets reported that Iran temporarily released 70,000 prisoners when COVID-19 started to sweep its facilities.[8]  To date, few state or federal prison systems have adequate (or any) pandemic preparedness plans in

---

[5] *Coronavirus Disease 2019 (COVID-19): Situation Summary*, Centers for Disease Control and Prevention (March 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/summary.html.
[6] *Clinical course and risk factors for mortality of adult inpatients with COVID-19 in Wuhan, China: a retrospective cohort study*.  The Lancet (published online March 11, 2020), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30566-3/fulltext
[7] *Coronavirus Disease 2019 (COVID-19): Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease*, Centers for Disease Control and Prevention (March 7, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html.
[8] *Iran temporarily releases 70,000 prisoners as coronavirus cases surge*, Reuters (March 9, 2020), https://www.reuters.com/article/us-health-coronavirus-iran/iran-temporarily-releases-70000-prisoners-as-coronavirus-cases-surge-idUSKBN20W1E5.

place.[9]  Systems are just beginning to screen and isolate people on entry and perhaps place visitor restrictions, but this is wholly inadequate when staff and vendors can still come to work sick and potentially transmit the virus to others.

## IV.  Risk of COVID-19 in ICE's NYC-Area Detention Facilities

25. I have reviewed the following materials in making my assessment of the danger of COVID-19 in the Bergen, Essex, Hudson, and Orange County jails ("ICE's NYC-area jails"): (1) a declaration by Marinda van Dalen, a Senior Attorney in the Health Justice Program at New York Lawyers for the Public Interest (NYLPI); (2) the report *Detained and Denied: Healthcare Access in Immigration Detention*, released by NYLPI in 2017; and (3) the report *Ailing Justice*: *New Jersey*, *Inadequate Healthcare, Indifference, and Indefinite Confinement in Immigration Detention*, released by Human Rights First in 2018.

26.  Based on my review of these materials, my experience working on public health in jails and prisons, and my review of the relevant literature, it is my professional judgment that these facilities are dangerously under-equipped and ill-prepared to prevent and manage a COVID-19 outbreak, which would result in severe harm to detained individuals, jail and prison staff, and the broader community. The reasons for this conclusion are detailed as follows.

27. The delays in access to care that already exist in normal circumstances will only become worse during an outbreak, making it especially difficult for the facilities to contain any infections and to treat those who are infected.

28. Failure to provide individuals with continuation of the treatment they were receiving in the community, or even just interruption of treatment, for chronic underlying health conditions will result in increased risk of morbidity and mortality related to these chronic conditions.

29. Failure to provide individuals adequate medical care for their underlying chronic health conditions results in increased risk of COVID-19 infection and increased risk of infection-related morbidity and mortality if they do become infected.

30. People with underlying chronic mental health conditions need adequate access to treatment for these conditions throughout their period of detention.  Failure to provide adequate mental health care, as may happen when health systems in jails and prisons are taxed by COVID-19 outbreaks, may result in poor health outcomes.  Moreover, mental health conditions may be exacerbated by the stress of incarceration during the COVID-19 pandemic, including isolation and lack of visitation.

---

[9] Luke Barr & Christina Carrega, *State prisons prepare for coronavirus but federal prisons not providing significant guidance, sources say*, ABC News (March 11, 2020), https://abcnews.go.com/US/state-prisons-prepare-coronavirus-federal-prisons-providing-significant/story?id=69433690.

31. Failure to keep accurate and sufficient medical records will make it more difficult for the facilities to identify vulnerable individuals in order to both monitor their health and protect them from infection.  Inadequate screening and testing procedures in facilities increase the widespread COVID-19 transmission.

32. Language barriers will similarly prevent the effective identification of individuals who are particularly vulnerable or may have symptoms of COVID-19. Similarly, the failure to provide necessary aids to individuals who have auditory or visual disabilities could also limit the ability to identify and monitor symptoms of COVID-19.

33. The commonplace neglect of individuals with acute pain and serious health needs under ordinary circumstances is also strongly indicative that the facilities will be ill-equipped to identify, monitor, and treat a COVID-19 epidemic.

34. The failure of these facilities to adequately manage single individuals in need of emergency care is a strong sign that they will be seriously ill-equipped and under-prepared when a number of people will need urgent care simultaneously, as would occur during a COVID-19 epidemic.

35. For individuals in these facilities, the experience of an epidemic and the lack of care while effectively trapped can itself be traumatizing, compounding the trauma of incarceration.

## V.    Conclusion and Recommendations

36. For the reasons above, it is my professional judgment that individuals placed in ICE's NYC-area jails are at a significantly higher risk of infection with COVID-19 as compared to the population in the community and that they are at a significantly higher risk of harm if they do become infected. These harms include serious illness (pneumonia and sepsis) and even death.

37. Reducing the size of the population in jails and prisons can be crucially important to reducing the level of risk both for those within those facilities and for the community at large.

38. As such, from a public health perspective, it is my strong opinion that individuals who can safely and appropriately remain in the community not be placed in ICE's NYC-area jails at this time. I am also strongly of the opinion that individuals who are already in those facilities should be evaluated for release.

39. This is more important still for individuals with preexisting conditions (e.g., heart disease, chronic lung disease, chronic liver disease, suppressed immune system, diabetes) or who are over the age of 60. They are in even greater danger in these facilities, including a meaningfully higher risk of death.

40. It is my professional opinion that these steps are both necessary and urgent. The horizon of risk for COVID-19 in these facilities is a matter of days, not weeks. Once a case of

COVID-19 identified in a facility, it will likely be too late to prevent a widespread outbreak.

41. Health in jails and prisons is community health. Protecting the health of individuals who are detained in and work in these facilities is vital to protecting the health of the wider community.

I declare under penalty of perjury that the foregoing is true and correct.

March 15, 2020
New Haven, Connecticut

_____

Dr. Jaimie Meyer

# CURRICULUM VITAE

Date of Revision:          November 20, 2019
Name:                      Jaimie Meyer, MD, MS, FACP
School:                    Yale School of Medicine

## Education:

BA, Dartmouth College Anthropology 2000
MD, University of Connecticut School of Medicine 2005
MS, Yale School of Public Health Biostatistics and Epidemiology 2014

## Career/Academic Appointments:

| | |
|---|---|
| 2005 - 2008 | Residency, Internal Medicine, NY Presbyterian Hospital at Columbia, New York, NY |
| 2008 - 2011 | Fellowship, Infectious Diseases, Yale University School of Medicine, New Haven, CT |
| 2008 - 2012 | Clinical Fellow, Infectious Diseases, Yale School of Medicine, New Haven, CT |
| 2010 - 2012 | Fellowship, Interdisciplinary HIV Prevention, Center for Interdisciplinary Research on AIDS, New Haven, CT |
| 2012 - 2014 | Instructor, AIDS, Yale School of Medicine, New Haven, CT |
| 2014 - present | Assistant Professor, AIDS, Yale School of Medicine, New Haven, CT |
| 2015 - 2018 | Assistant Clinical Professor, Nursing, Yale School of Medicine, New Haven, CT |

## Board Certification:

AB of Internal Medicine, Internal Medicine, 08-2008, 01-2019
AB of Internal Medicine, Infectious Disease, 10-2010
AB of Preventive Medicine, Addiction Medicine, 01-2018

## Professional Honors & Recognition:

### International/National/Regional

| | |
|---|---|
| 2018 | NIH Center for Scientific Review, Selected as Early Career Reviewer |
| 2017 | Doris Duke Charitable Foundation, Doris Duke Charitable Foundation Scholar |
| 2016 | American College of Physicians, Fellow |
| 2016 | NIH Health Disparities, Loan Repayment Award Competitive Renewal |
| 2016 | AAMC, Early Career Women Faculty Professional Development Seminar |
| 2014 | NIH Health Disparities, Loan Repayment Program Award |
| 2014 | NIDA, Women & Sex/Gender Differences Junior Investigator Travel Award |
| 2014 | International Women's/Children's Health & Gender Working Group, Travel Award |
| 2014 | Patterson Trust, Awards Program in Clinical Research |
| 2013 | Connecticut Infectious Disease Society, Thornton Award for Clinical Research |
| 2011 | Bristol Myers-Squibb, Virology Fellows Award |

| 2006 | NY Columbia Presbyterian, John N. Loeb Intern Award |
| 2005 | American Medical Women's Association, Medical Student Citation |
| 2005 | Connecticut State Medical Society, Medical Student Award |
| 2000 | Dartmouth College, Hannah Croasdale Senior Award |
| 2000 | Dartmouth College, Palaeopitus Senior Leadership Society Inductee |

## Yale University

| 2014 | Women's Faculty Forum, Public Voices Thought Leadership Program Fellow |

## Grants/Clinical Trials History:

### Current Grants

| Agency: | Center for Interdisciplinary Research on AIDS (CIRA) |
| I.D.#: | 2019-20 Pilot Project Awards |
| Title: | Optimizing PrEP's Potential in Non-Clinical Settings: Development and Evaluation of a PrEP Decision Aid for Women Seeking Domestic Violence Services |
| P.I.: | Tiara Willie |
| Role: | Principal Investigator |
| Percent effort: | 2% |
| Direct costs per year: | $29,993.00 |
| Total costs for project period: | $29,993.00 |
| Project period: | 7/11/2019 - 7/10/2020 |

| Agency: | SAMHSA |
| I.D.#: | H79 TI080561 |
| Title: | CHANGE: Comprehensive Housing and Addiction Management Network for Greater New Haven |
| Role: | Principal Investigator |
| Percent effort: | 20% |
| Direct costs per year: | $389,054.00 |
| Total costs for project period: | $1,933,368.00 |
| Project period: | 11/30/2018 - 11/29/2023 |

| Agency: | Gilead Sciences, Inc. |
| I.D.#: | Investigator Sponsored Award, CO-US-276-D136 |
| Title: | Delivering HIV Pre-Exposure Prophylaxis to Networks of Justice-Involved Women |
| Role: | Principal Investigator |
| Percent effort: | 8% |
| Direct costs per year: | $81,151.00 |
| Total costs for project |

| | |
|---|---|
| period: | $306,199.00 |
| Project period: | 6/19/2018 - 1/31/2020 |

| | |
|---|---|
| Agency: | NIDA |
| I.D.#: | R21 DA042702 |
| Title: | Prisons, Drug Injection and the HIV Risk Environment |
| Role: | Principal Investigator |
| Percent effort: | 22% |
| Direct costs per year: | $129,673.00 |
| Total costs for project period: | $358,276.00 |
| Project period: | 8/1/2017 - 7/31/2020 |

| | |
|---|---|
| Agency: | Doris Duke Charitable Foundation |
| I.D.#: | Clinical Scientist Development Award |
| Title: | Developing and Testing the Effect of a Patient-Centered HIV Prevention Decision Aid on PrEP uptake for Women with Substance Use in Treatment Settings |
| Role: | Principal Investigator |
| Percent effort: | 27% |
| Direct costs per year: | $149,959.00 |
| Total costs for project period: | $493,965.00 |
| Project period: | 7/1/2017 - 6/30/2020 |

## Past Grants

| | |
|---|---|
| Agency: | NIDA |
| I.D.#: | K23 DA033858 |
| Title: | Evaluating and Improving HIV Outcomes in Community-based Women who Interface with the Criminal Justice System |
| Role: | Principal Investigator |
| Percent effort: | 75% |
| Direct costs per year: | $149,509.00 |
| Total costs for project period: | $821,147.00 |
| Project period: | 7/1/2012 - 11/30/2017 |

| | |
|---|---|
| Agency: | Robert Leet & Clara Guthrie Patterson Trust |
| I.D.#: | R12225, Award in Clinical Research |
| Title: | Disentangling the Effect of Gender on HIV Treatment and Criminal Justice Outcomes |
| Role: | Principal Investigator |
| Percent effort: | 10% |
| Direct costs per year: | $75,000.00 |

| | |
|---|---|
| Total costs for project period: | $75,000.00 |
| Project period: | 1/31/2014 - 10/31/2015 |

| | |
|---|---|
| Agency: | Bristol-Myers Squibb |
| I.D.#: | HIV Virology Fellowship Award |
| Title: | Effect of newer antiretroviral regimens on HIV biological outcomes in HIV-infected prisoners: a 13 year retrospective evaluation |
| Role: | Principal Investigator |
| Percent effort: | 10% |
| Direct costs per year: | $34,390.00 |
| Total costs for project period: | $34,390.00 |
| Project period: | 12/1/2011 - 11/30/2012 |

## Pending Grants

| | |
|---|---|
| Agency: | NIMH |
| I.D.#: | R01 MH121991 |
| Title: | Identifying Modifiable Risk and Protective Processes at the Day-Level that Predict HIV Care Outcomes among Women Exposed to Partner Violence |
| P.I.: | Sullivan, Tami |
| Role: | Principal Investigator |
| Percent effort: | 30% |
| Direct costs per year: | $499,755.00 |
| Total costs for project period: | $4,148,823.00 |
| Project period: | 1/1/2020 - 12/31/2024 |

## Invited Speaking Engagements, Presentations, Symposia & Workshops Not Affiliated With Yale:

### International/National

2019:   CME Outfitters, Washington, DC. "A Grassroots Approach to Weed out HIV and HCV in Special OUD Populations"

2019:   US Commission on Civil Rights, Washington, DC. "An Analysis of Women's Health, Personal Dignity and Sexual Abuse in the US Prison System"

2018:   College of Problems on Drug Dependence, College of Problems on Drug Dependence, San Diego, CA. "Research on Women who Use Drugs: Knowledge and Implementation Gaps and A Proposed Research Agenda"

2018:   Clinical Care Options, Washington, DC. "Intersection of the HIV and Opioid Epidemics"

2016:   Dartmouth Geisel School of Medicine, Hanover, NH. "Incarceration as Opportunity: Prisoner Health and Health Interventions"

2010:   Rhode Island Chapter of the Association of Nurses in AIDS Care, Providence, RI. "HIV and Addiction"

## Regional

2018:   Clinical Directors Network, New York, NY. "PrEP Awareness among Special Populations of Women and People who Use Drugs"

2018:   Frank H. Netter School of Medicine, Quinnipiac University, Hamden, CT. "HIV prevention for justice-involved women"

2017:   Clinical Directors Network, New York, NY. "Optimizing the HIV Care Continuum for People who use Drugs"

2016:   Frank H. Netter School of Medicine, Quinnipiac University, Hamden, CT. "Topics in Infectious Diseases"

2016:   Connecticut Advanced Practice Registered Nurse Society, Wethersfield, CT. "Trends in HIV Prevention: Integration of Biomedical and Behavioral Approaches"


## Peer-Reviewed Presentations & Symposia Given at Meetings Not Affiliated With Yale:

### International/National

2019:   CPDD 81st Annual Scientific Meeting, CPDD, San Antonio, TX. "Punitive approaches to pregnant women with opioid use disorder: Impact on health care utilization, outcomes and ethical implications"

2019:   14th International Conference on HIV Treatment and Prevention Adherence, IAPAC Adherence, Miami, FL. "Decision-Making about HIV Prevention among Women in Drug Treatment: Is PrEP Contextually Relevant?"

2019:   2019 NIDA International Forum, NIDA, San Antonio, TX. "Diphenhydramine Injection in Kyrgyz Prisons: A Qualitative Study Of A High-Risk Behavior With Implications For Harm Reduction"

2019:   11th International Women's and Children's Health and Gender (InWomen's) Group, InWomen's Group, San Antonio, TX. "Uniquely successful implementation of methadone treatment in a women's prison in Kyrgyzstan"

2019:   Harm Reduction International, Porto, Porto District, Portugal. "How does methadone treatment travel? On the 'becoming-methadone-body' of Kyrgyzstan prisons"

2019:   APA Collaborative Perspectives on Addiction Annual Meeting, APA Collaborative Perspectives on Addiction Annual Meeting, Providence, RI. "Impact of Trauma and Substance Abuse on HIV PrEP Outcomes among Women in Criminal Justice Systems. Symposium: "Partner Violence: Intersected with or Predictive of Substance Use and Health Problems among Women.""

2019:   Society for Academic Emergency Medicine (SAEM), Worcester, MA. "Effects of a Multisite Medical Home Intervention on Emergency Department Use among Unstably Housed People with Human Immunodeficiency Virus"

2019:   Conference on Retroviruses and Opportunistic Infections (CROI), IAS, Seattle, WA. "Released to Die: Elevated Mortality in People with HIV after Incarceration"

2019:   12th Academic and Health Policy on Conference on Correctional Health, 12th Academic and Health Policy on Conference on Correctional Health, Las Vegas, NV. "PrEP Eligibility and HIV Risk Perception for Women across the Criminal Justice Continuum in Connecticut"

2019:   Association for Justice-Involved Female Organizations (AJFO), Atlanta, GA. "Treatment of Women's Substance Use Disorders and HIV Prevention During and Following Incarceration"

2018:   American Public Health Association (APHA) Annual Meeting, American Public Health Association (APHA) Annual Meeting, San Diego, CA. "New Haven Syringe Service Program: A model of integrated harm reduction and health care services"

2018:   12th National Harm Reduction Conference, 12th National Harm Reduction Conference, New Orleans, LA. "Service needs and access to care among participants in the New Haven Syringe Services Program"

2018:   22nd International AIDS Conference, 22nd International AIDS Conference, Amsterdam, NH, Netherlands. "HIV risk perceptions and risk reduction strategies among prisoners in Kyrgyzstan: a qualitative study"

2018:   22nd International AIDS Conference, 22nd International AIDS Conference, Amsterdam, NH, Netherlands. "Methadone Maintenance Therapy Uptake, Retention, and Linkage for People who Inject Drugs Transitioning From Prison to the Community in Kyrgyzstan: Evaluation of a National Program"

2018:   NIDA International Forum, NIDA, San Diego, CA. "HIV and Drug Use among Women in Prison in Azerbaijan, Kyrgyzstan and Ukraine"

2018:   2018 Conference on Retroviruses and Opportunistic Infections (CROI), CROI, Boston, MA. "From prison's gate to death's door: Survival analysis of released prisoners with HIV"

2018:   11th Academic and Health Policy on Conference on Correctional Health, Academic Consortium on Criminal Justice Health, Houston, TX. "Assessing Concurrent Validity of Criminogenic and Health Risk Instruments among Women on Probation in Connecticut"

2017:   IDWeek: Annual Meeting of Infectious Diseases Society of America, Infectious Diseases Society of America, San Diego, CA. "Predictors of Linkage to and Retention in HIV Care Following Release from Connecticut, USA Jails and Prisons (Oral presentation)"

2017:   International AIDS Society (IAS) Meeting, International AIDS Society, Paris, Île-de-France, France. "Late breaker: Predictors of Linkage to and Retention in HIV Care Following Release from Connecticut, USA Jails and Prisons"

2017:   NIDA International Forum, NIDA, Montreal, QC, Canada. "A Mixed Methods Evaluation of HIV Risk among Women with Opioid Dependence in Ukraine"

2017:   International Women's and Children's Health and Gender Working Group, International Women's and Children's Health and Gender Working Group, Montreal, QC, Canada. "Assessing Receptiveness to and Eligibility for PrEP in Criminal Justice-Involved Women"

2017:   International Women's and Children's Health and Gender Working Group, International Women's and Children's Health and Gender Working Group, Montreal, QC, Canada. "A Mixed Methods Evaluation of HIV Risk among Women with Opioid Dependence in Ukraine"

2017:   Annual Meeting of the Society for Applied Anthropology, Society for Applied Anthropology, Santa Fe, NM. "Where rubbers meet the road: HIV risk reduction for women on probation (Oral presentation)"

2016:   International Women's and Children's Health and Gender Working Group, International Women's and Children's Health and Gender Working Group, Palm Springs, CA. "An Event-level Examination of Successful Condom Negotiation Strategies among College Women"

2015:   CDC National HIV Prevention Conference, CDC, Atlanta, GA. "Beyond the Syndemic: Condom Negotiation and Use among Women Experiencing Partner Violence (Oral presentation)"

2015:   International Harm Reduction Conference, International Harm Reduction, Kuala Lumpur, Federal Territory of Kuala Lumpur, Malaysia. "Evidence-Based Interventions to Enhance Assessment, Treatment, and Adherence in the Chronic Hepatitis C Care Continuum"

2015:   International Women's and Children's Health and Gender Working Group, International Women's and Children's Health and Gender Working Group, Phoenix, AZ. "Violence, Substance Use, and Sexual Risk among College Women"

2014:   International Women's and Children's Health and Gender Working Group, International Women's and Children's Health and Gender Working Group, San Juan, San Juan, Puerto Rico. "Gender Differences in HIV and Criminal Justice Outcomes"

2014:   College on Problems in Drug Dependence (CPDD), College on Problems in Drug Dependence (CPDD), San Juan, San Juan, Puerto Rico. "Gender Differences in HIV and Criminal Justice Outcomes"

2014:   Conference on Retroviruses and Opportunistic Infections (CROI), Conference on Retroviruses and Opportunistic Infections (CROI), Boston, MA. "Longitudinal Treatment Outcomes in HIV-Infected Prisoners and Influence of Re-Incarceration"

2013:   HIV Intervention and Implementation Science Meeting, HIV Intervention and Implementation Science Meeting, Bethesda, MD. "Women Released from Jail Experience Suboptimal HIV Treatment Outcomes Compared to Men: Results from a Multi-Center Study"

2013:   Conference on Retroviruses and Opportunistic Infections (CROI), Conference on Retroviruses and Opportunistic Infections (CROI), Atlanta, GA. "Women Released from Jail Experience Suboptimal HIV Treatment Outcomes Compared to Men: Results from a Multi-Center Study"

2012:   IDWeek: Infectious Diseases Society of America Annual Meeting, Infectious Diseases Society of America, San Diego, CA. "Correlates of Retention in HIV Care after Release from Jail: Results from a Multi-site Study"

2012:   IDWeek: Infectious Diseases Society of America Annual Meeting, Infectious Diseases Society of America, San Diego, CA. "Frequent Emergency Department Use among Released Prisoners with HIV: Characterization Including a Novel Multimorbidity Index"

2012:   5th Academic and Health Policy Conference on Correctional Health, 5th Academic and Health Policy Conference on Correctional Health, Atlanta, GA. "Effects of Intimate Partner Violence on HIV and Substance Abuse in Released Jail Detainees"

2011:   IAPAC HIV Treatment and Adherence Conference, IAPAC, Miami, FL. "Adherence to HIV treatment and care among previously homeless jail detainees"


## Regional

2019:   Connecticut Infectious Disease Society, New Haven, CT. "Preliminary Findings from a Novel PrEP Demonstration Project for Women Involved in Criminal Justice Systems and Members of their Risk Networks"

2017:   Connecticut Public Health Association Annual Conference, Connecticut Public Health Association, Farmington, CT. "The New Haven syringe services program"

2014:   Connecticut Infectious Disease Society Annual Meeting, Connecticut Infectious Disease Society, Orange, CT. "Longitudinal Treatment Outcomes in HIV-Infected Prisoners and Influence of Re-Incarceration"

2013:   Connecticut Infectious Disease Society Annual Meeting, Connecticut Infectious Disease Society, Orange, CT. "Women Released from Jail Experience Suboptimal HIV Treatment Outcomes Compared to Men: Results from a Multi-Center Study"

2011:   Connecticut Infectious Disease Society Annual Meeting, Connecticut Infectious Disease Society, Orange, CT. "Emergency Department Use by Released Prisoners with HIV"

## Professional Service:

### Peer Review Groups/Grant Study Sections

2019 - present   Reviewer, NIDA, NIH Reviewer: RFA-DA-19-025: HEAL Initiative: Justice Community Opioid Innovation Network (JCOIN) Clinical Research Centers

2019 - present   Reviewer, Yale DCFAR Pilot Projects

2018 - present   Reviewer, Center for Interdisciplinary Research on AIDS (CIRA)

2015 - present   Reviewer, University of Wisconsin-Milwaukee Research Growth Initiative

### Advisory Boards

2017   Advisor, HIV Prevention and Treatment in Cis-Gendered Women, Gilead Sciences, Inc.

### Journal Service

*Editor/Associate Editor*

2019 - present   Associate Editor, Journal of the International Association of Providers of AIDS Care (JIAPAC), Section Editor: Sex and Gender Issues

*Reviewer*

2019 - present   Reviewer, JAIDS

2012 - present   Reviewer, Addiction Sci and Clin Pract

2012 - present   Reviewer, Addictive Behav Reports

2012 - present   Reviewer, AIDS Care

2012 - present   Reviewer, Social Science and Medicine

2012 - present   Reviewer, SpringerPlus

2012 - present   Reviewer, Substance Abuse Treatment Prevention and Policy

2012 - present   Reviewer, Women's Health Issues

2012 - present   Reviewer, Yale Journal of Biology and Medicine

2012 - present   Reviewer, AIMS Public Health

2012 - present   Reviewer, American Journal on Addictions

2012 - present   Reviewer, American Journal of Epidemiology

2012 - present   Reviewer, American Journal of Public Health

2012 - present   Reviewer, Annals Internal Medicine

2012 - present   Reviewer, BMC Emergency Medicine

2012 - present   Reviewer, BMC Infectious Diseases

2012 - present   Reviewer, BMC Public Health

2012 - present   Reviewer, BMC Women's Health

| | |
|---|---|
| 2012 - present | Reviewer, Clinical Infectious Diseases |
| 2012 - present | Reviewer, Critical Public Health |
| 2012 - present | Reviewer, Drug and Alcohol Dependence |
| 2012 - present | Reviewer, Drug and Alcohol Review |
| 2012 - present | Reviewer, Epidemiologic Reviews |
| 2012 - present | Reviewer, Eurosurveillance |
| 2012 - present | Reviewer, Health and Justice (Springer Open) |
| 2012 - present | Reviewer, International Journal of Drug Policy |
| 2012 - present | Reviewer, International Journal of Prisoner Health |
| 2012 - present | Reviewer, International Journal of STDs and AIDS |
| 2012 - present | Reviewer, International Journal of Women's Health |
| 2012 - present | Reviewer, JAMA Internal Medicine |
| 2012 - present | Reviewer, Journal of Family Violence |
| 2012 - present | Reviewer, Journal of General Internal Medicine |
| 2012 - present | Reviewer, Journal of Immigrant and Minority Health |
| 2012 - present | Reviewer, Journal of International AIDS Society |
| 2012 - present | Reviewer, Journal of Psychoactive Drugs |
| 2012 - present | Reviewer, Journal of Urban Health |
| 2012 - present | Reviewer, Journal of Women's Health |
| 2012 - present | Reviewer, Open Forum Infectious Diseases |
| 2012 - present | Reviewer, PLoS ONE |
| 2012 - present | Reviewer, Public Health Reports |

## Professional Service for Professional Organizations

*AAMC Group on Women in Medicine and Science (GWIMS)*

2016 - present    Member, AAMC Group on Women in Medicine and Science (GWIMS)

*American College of Physicians*

2016 - present    Fellow, American College of Physicians
2013 - 2016       Member, American College of Physicians

*American Medical Association*

2005 - present    Member, American Medical Association

*American Medical Women's Association*

2011 - present    Member, American Medical Women's Association

*American Society of Addiction Medicine*

2009 - present    Member, American Society of Addiction Medicine

Jaimie Meyer, MD, MS, FACP

*Connecticut Infectious Disease Society*

2011 - present      Member, Connecticut Infectious Disease Society

*Infectious Disease Society of America*

2008 - present      Member, Infectious Disease Society of America

*InWomen's Network, NIDA International Program*

2013 - present      Member, InWomen's Network, NIDA International Program

*New York State Medical Society*

2005 - 2008        Member, New York State Medical Society

## Yale University Service

*University Committees*

2016 - 2018        Council Member, Leadership Council, Women's Faculty Forum

*Medical School Committees*

2015 - 2016        Committee Member, US Health and Justice Course, Yale School of Medicine
2014 - present      Committee Member, Yale Internal Medicine Traditional Residency Intern Selection
                    Committee

## Public Service

2019 - present      Faculty Member, Yale University Program in Addiction Medicine
2017 - present      Faculty Member, Arthur Liman Center for Public Interest Law, Yale Law School
2013 - present      Mentor, Women in Medicine at Yale Mentoring Program
2012 - present      Faculty Member, Yale Center for Interdisciplinary Research on AIDS
2009 - 2011        Instructor, Preclinical Clerkship Tutor, Yale School of Medicine
2002              Fellow, Soros Open Society Institute
1998 - 1999        Fellow, Costa Rican Humanitarian Foundation

## Bibliography:

### Peer-Reviewed Original Research

1.  **Meyer JP**, Qiu J, Chen NE, Larkin GL, Altice FL. Emergency department use by released prisoners
    with HIV: an observational longitudinal study. PloS One 2012, 7:e42416.
2.  Chen NE, **Meyer JP**, Bollinger R, Page KR. HIV testing behaviors among Latinos in Baltimore City.
    Journal Of Immigrant And Minority Health / Center For Minority Public Health 2012, 14:540-51.
3.  Chitsaz E, **Meyer JP**, Krishnan A, Springer SA, Marcus R, Zaller N, Jordan AO, Lincoln T, Flanigan TP,
    Porterfield J, Altice FL. Contribution of substance use disorders on HIV treatment outcomes and
    antiretroviral medication adherence among HIV-infected persons entering jail. AIDS And Behavior
    2013, 17 Suppl 2:S118-27.

4. Chen NE, **Meyer JP**, Avery AK, Draine J, Flanigan TP, Lincoln T, Spaulding AC, Springer SA, Altice FL. Adherence to HIV treatment and care among previously homeless jail detainees. AIDS And Behavior 2013, 17:2654-66.

5. Althoff AL, Zelenev A, **Meyer JP**, Fu J, Brown SE, Vagenas P, Avery AK, Cruzado-Quiñones J, Spaulding AC, Altice FL. Correlates of retention in HIV care after release from jail: results from a multi-site study. AIDS And Behavior 2013, 17 Suppl 2:S156-70.

6. Williams CT, Kim S, **Meyer J**, Spaulding A, Teixeira P, Avery A, Moore K, Altice F, Murphy-Swallow D, Simon D, Wickersham J, Ouellet LJ. Gender differences in baseline health, needs at release, and predictors of care engagement among HIV-positive clients leaving jail. AIDS And Behavior 2013, 17 Suppl 2:S195-202.

7. **Meyer JP**, Wickersham JA, Fu JJ, Brown SE, Sullivan TP, Springer SA, Altice FL. Partner violence and health among HIV-infected jail detainees. International Journal Of Prisoner Health 2013, 9:124-41.

8. **Meyer JP**, Qiu J, Chen NE, Larkin GL, Altice FL. Frequent emergency department use among released prisoners with human immunodeficiency virus: characterization including a novel multimorbidity index. Academic Emergency Medicine : Official Journal Of The Society For Academic Emergency Medicine 2013, 20:79-88.

9. **Meyer JP**, Cepeda J, Springer SA, Wu J, Trestman RL, Altice FL. HIV in people reincarcerated in Connecticut prisons and jails: an observational cohort study. The Lancet. HIV 2014, 1:e77-e84.

10. **Meyer JP**, Zelenev A, Wickersham JA, Williams CT, Teixeira PA, Altice FL. Gender disparities in HIV treatment outcomes following release from jail: results from a multicenter study. American Journal Of Public Health 2014, 104:434-41.

11. **Meyer JP**, Cepeda J, Wu J, Trestman RL, Altice FL, Springer SA. Optimization of human immunodeficiency virus treatment during incarceration: viral suppression at the prison gate. JAMA Internal Medicine 2014, 174:721-9.

12. **Meyer JP**, Cepeda J, Taxman FS, Altice FL. Sex-Related Disparities in Criminal Justice and HIV Treatment Outcomes: A Retrospective Cohort Study of HIV-Infected Inmates. American Journal Of Public Health 2015, 105:1901-10.

13. Boyd AT, Song DL, **Meyer JP**, Altice FL. Emergency department use among HIV-infected released jail detainees. Journal Of Urban Health : Bulletin Of The New York Academy Of Medicine 2015, 92:108-35.

14. Shrestha R, Karki P, Altice FL, Huedo-Medina TB, **Meyer JP**, Madden L, Copenhaver M. Correlates of willingness to initiate pre-exposure prophylaxis and anticipation of practicing safer drug- and sex-related behaviors among high-risk drug users on methadone treatment. Drug And Alcohol Dependence 2017, 173:107-116.

15. Peasant C, Sullivan TP, Weiss NH, Martinez I, **Meyer JP**. Beyond the syndemic: condom negotiation and use among women experiencing partner violence. AIDS Care 2017, 29:516-523.

16. Wickersham JA, Gibson BA, Bazazi AR, Pillai V, Pedersen CJ, **Meyer JP**, El-Bassel N, Mayer KH, Kamarulzaman A, Altice FL. Prevalence of Human Immunodeficiency Virus and Sexually Transmitted Infections Among Cisgender and Transgender Women Sex Workers in Greater Kuala Lumpur, Malaysia: Results From a Respondent-Driven Sampling Study. Sexually Transmitted Diseases 2017, 44:663-670.

17. Hoff E, Marcus R, Bojko MJ, Makarenko I, Mazhnaya A, Altice FL, **Meyer JP**. The effects of opioid-agonist treatments on HIV risk and social stability: A mixed methods study of women with opioid use disorder in Ukraine. Journal Of Substance Abuse Treatment 2017, 83:36-44.

18. Rutledge R, Madden L, Ogbuagu O, **Meyer JP**. HIV Risk perception and eligibility for pre-exposure prophylaxis in women involved in the criminal justice system. AIDS Care 2018, 30:1282-1289.

19. Peasant C, Sullivan TP, Ritchwood TD, Parra GR, Weiss NH, **Meyer JP**, Murphy JG. Words can hurt: The effects of physical and psychological partner violence on condom negotiation and condom use among young women. Women & Health 2018, 58:483-497.

20. Loeliger KB, Altice FL, Desai MM, Ciarleglio MM, Gallagher C, **Meyer JP**. Predictors of linkage to HIV care and viral suppression after release from jails and prisons: a retrospective cohort study. The Lancet. HIV 2018, 5:e96-e106.

21. Odio CD, Carroll M, Glass S, Bauman A, Taxman FS, **Meyer JP**. Evaluating concurrent validity of criminal justice and clinical assessments among women on probation. Health & Justice 2018, 6:7.

22. Loeliger KB, Altice FL, Ciarleglio MM, Rich KM, Chandra DK, Gallagher C, Desai MM, **Meyer JP**. All-cause mortality among people with HIV released from an integrated system of jails and prisons in Connecticut, USA, 2007-14: a retrospective observational cohort study. The Lancet. HIV 2018, 5:e617-e628.

23. Loeliger KB, **Meyer JP**, Desai MM, Ciarleglio MM, Gallagher C, Altice FL. Retention in HIV care during the 3 years following release from incarceration: A cohort study. PLoS Medicine 2018, 15:e1002667.

24. Azbel L, Wegman MP, Polonsky M, Bachireddy C, **Meyer J**, Shumskaya N, Kurmanalieva A, Dvoryak S, Altice FL. Drug injection within prison in Kyrgyzstan: elevated HIV risk and implications for scaling up opioid agonist treatments. International Journal Of Prisoner Health 2018, 14:175-187.

25. Peasant C, Montanaro EA, Kershaw TS, Parra GR, Weiss NH, **Meyer JP**, Murphy JG, Ritchwood TD, Sullivan TP. An event-level examination of successful condom negotiation strategies among young women. Journal Of Health Psychology 2019, 24:898-908.

26. Ranjit YS, Azbel L, Krishnan A, Altice FL, **Meyer JP**. Evaluation of HIV risk and outcomes in a nationally representative sample of incarcerated women in Azerbaijan, Kyrgyzstan, and Ukraine. AIDS Care 2019, 31:793-797.

27. Rhodes T, Azbel L, Lancaster K, **Meyer J**. The becoming-methadone-body: on the onto-politics of health intervention translations. Sociology Of Health & Illness 2019, 41:1618-1636.

28. Olson B, Vincent W, **Meyer JP**, Kershaw T, Sikkema KJ, Heckman TG, Hansen NB. Depressive symptoms, physical symptoms, and health-related quality of life among older adults with HIV. Quality Of Life Research : An International Journal Of Quality Of Life Aspects Of Treatment, Care And Rehabilitation 2019.

## Chapters, Books, and Reviews

29. Azar MM, Springer SA, **Meyer JP**, Altice FL. A systematic review of the impact of alcohol use disorders on HIV treatment outcomes, adherence to antiretroviral therapy and health care utilization. Drug And Alcohol Dependence 2010, 112:178-93.

30. **Meyer JP**, Springer SA, Altice FL. Substance abuse, violence, and HIV in women: a literature review of the syndemic. Journal Of Women's Health (2002) 2011, 20:991-1006.

31. **Meyer JP**, Chen NE, Springer SA. HIV Treatment in the Criminal Justice System: Critical Knowledge and Intervention Gaps. AIDS Research And Treatment 2011, 2011:680617.

32. Springer SA, Spaulding AC, **Meyer JP**, Altice FL. Public health implications for adequate transitional care for HIV-infected prisoners: five essential components. Clinical Infectious Diseases : An Official Publication Of The Infectious Diseases Society Of America 2011, 53:469-79.

33. Chen NE, **Meyer JP**, Springer SA. Advances in the prevention of heterosexual transmission of HIV/AIDS among women in the United States. Infectious Disease Reports 2011, 3.

34. **Meyer J**, Altice F.  HIV in Injection and Other Drug Users.  Somesh Gupta, Bhushan Kumar, eds. Sexually Transmitted Infections 2nd ed. New Delhi, India: Elsevier, 2012: 1061-80. ISBN 978-81-312-2809-8.

35. **Meyer JP**, Althoff AL, Altice FL. Optimizing care for HIV-infected people who use drugs: evidence-based approaches to overcoming healthcare disparities. Clinical Infectious Diseases : An Official Publication Of The Infectious Diseases Society Of America 2013, 57:1309-17.

36. **Meyer J**, Altice F.  Chapter 47, Treatment of Addictions: Transition to the Community.  Robert L. Trestman, Kenneth L. Appelbaum, Jeffrey L. Metzner, eds.  Oxford Textbook of Correctional Psychiatry (Winner of the 2016 Guttmacher Award).  Oxford University Press 2015.  ISBN 9780199360574.

37. **Meyer JP**, Moghimi Y, Marcus R, Lim JK, Litwin AH, Altice FL. Evidence-based interventions to enhance assessment, treatment, and adherence in the chronic Hepatitis C care continuum. The International Journal On Drug Policy 2015, 26:922-35.

38. Mohareb A, Tiberio P, Mandimika C, Muthulingam D, **Meyer J**.  Infectious Diseases in Underserved Populations.  Onyema Ogbuagu, Gerald Friedland, Merceditas Villanueva, Marjorie Golden, eds. Current Diagnosis and Treatment- Infectious Diseases.  McGraw-Hill Medical 2016.

39. **Meyer JP**, Womack JA, Gibson B. Beyond the Pap Smear: Gender-responsive HIV Care for Women. The Yale Journal Of Biology And Medicine 2016, 89:193-203.

40. **Meyer JP**, Muthulingam D, El-Bassel N, Altice FL. Leveraging the U.S. Criminal Justice System to Access Women for HIV Interventions. AIDS And Behavior 2017, 21:3527-3548.

41. Shrestha R, McCoy-Redd B, **Meyer J**.  Pre-Exposure Prophylaxis (PrEP) for People Who Inject Drugs (PWID).  Brianna Norton, Ed.  The Opioid Epidemic and Infectious Diseases.  Elsevier 2019.

42. **Meyer JP**, Isaacs K, El-Shahawy O, Burlew AK, Wechsberg W. Research on women with substance use disorders: Reviewing progress and developing a research and implementation roadmap. Drug And Alcohol Dependence 2019, 197:158-163.

## Peer-Reviewed Educational Materials

43. The Fortune Society Reentry Education Project Detailing Kit.  New York City Department of Health and Mental Hygiene.  October 2014

44. United Nations Office on Drugs and Crime.  Vienna, Austria

## Invited Editorials and Commentaries

45. **Meyer JP**. Capsule Commentary on Pyra et al., sexual minority status and violence among HIV infected and at-risk women. Journal Of General Internal Medicine 2014, 29:1164.

46. Brinkley-Rubinstein L, Dauria E, Tolou-Shams M, Christopoulos K, Chan PA, Beckwith CG, Parker S, **Meyer J**. The Path to Implementation of HIV Pre-exposure Prophylaxis for People Involved in Criminal Justice Systems. Current HIV/AIDS Reports 2018, 15:93-95.

47. **Meyer JP**. The Sustained Harmful Health Effects of Incarceration for Women Living with HIV. Journal Of Women's Health (2002) 2019, 28:1017-1018.

## Case Reports, Technical Notes, Letters

48.   **Paul J**. Bullous pemphigoid in a patient with psoriasis and possible drug reaction: a case report. Connecticut Medicine 2004, 68:611-5.

49.   How J, Azar MM, **Meyer JP**. Are Nectarines to Blame? A Case Report and Literature Review of Spontaneous Bacterial Peritonitis Due to Listeria monocytogenes. Connecticut Medicine 2015, 79:31-6.

50.   Vazquez Guillamet LJ, Malinis MF, **Meyer JP**. Emerging role of Actinomyces meyeri in brain abscesses: A case report and literature review. IDCases 2017, 10:26-29.

51.   Harada K, Heaton H, Chen J, Vazquez M, **Meyer J**. Zoster vaccine-associated primary varicella infection in an immunocompetent host. BMJ Case Reports 2017, 2017.

52.   Bernardo R, Streiter S, Tiberio P, Rodwin BA, Mohareb A, Ogbuagu O, Emu B, **Meyer JP**. Answer to December 2017 Photo Quiz. Journal Of Clinical Microbiology 2017, 55:3568.

53.   Bernardo R, Streiter S, Tiberio P, Rodwin BA, Mohareb A, Ogbuagu O, Emu B, **Meyer JP**. Photo Quiz: Peripheral Blood Smear in a Ugandan Refugee. Journal Of Clinical Microbiology 2017, 55:3313-3314.

## Scholarship In Press

54.   Hoff E, Adams Z, Dasgupta A, Goddard D, Sheth S, **Meyer J**.  Reproductive Health Justice and Autonomy: A systematic review of pregnancy planning intentions, needs, and interventions among women involved in US criminal justice systems.  J Women's Health

## Declaration of Dr. Marc Stern

I, Marc Stern, declare as follows:

1.       I am a physician, board-specialized in internal medicine, specializing in correctional health care. I most recently served as the Assistant Secretary for Health Care at the Washington State Department of Corrections. I also have considerable familiarity with the immigration detention system. I served for four years as a medical subject matter expert for the Officer of Civil Rights and Civil Liberties, U.S. Department of Homeland Security, and as a medical subject matter expert for one year for the California Attorney General's division responsible for monitoring the conditions of confinement in Immigration and Customs Enforcement (ICE) detention facilities. I have also served as a consultant to Human Rights Watch in their preparation of two reports on health-related conditions of confinement in ICE detention facilities. In those capacities, I have visited and examined more than 20 ICE detention facilities and reviewed hundreds of records, including medical records and detention death reviews of individuals in ICE detention. Attached as Exhibit A is a copy of my curriculum vitae.

2.       COVID-19 is a serious disease and has reached pandemic status. At least 132,758 people around the world have received confirmed diagnoses of COVID 19 as of March 13, 2020, including 1,629 people in the United States. At least 4,955 people have died globally as a result of COVID-19 as of March 13, 2020, including 41 in the United States. These numbers will increase, perhaps exponentially.

3.       COVID-19 is a novel virus. There is no vaccine for COVID-19, and there is no cure for COVID-19. No one has immunity. The only way to control the virus is to use preventive strategies, including social distancing.

4.       The time course of the disease can be very rapid. Individuals can show the first symptoms of infection in as little as two days after exposure and their condition can seriously deteriorate in as little as five days (perhaps sooner) after that.

5.       The effects of COVID-19 are very serious, especially for people who are most vulnerable. Vulnerable people include people over the age of 50, and those of any age with underlying health problems such as – but not limited to – weakened immune systems, hypertension, diabetes, blood, lung, kidney, heart, and liver disease, and possibly pregnancy.

6.       Vulnerable people who are infected by the COVID-19 virus can experience severe respiratory illness, as well as damage to other major organs. Treatment for serious cases of COVID-19 requires significant advanced support, including ventilator assistance for respiration and intensive care support. An outbreak of COVID-19 could put significant pressure on or exceed the capacity of local health infrastructure.

7.       Detention facilities are congregate environments, i.e. places where people live and sleep in close proximity. In such environments, infectious diseases that are transmitted via the air or touch are more likely to spread. This therefore presents an increased danger for the spread of COVID-

19 if and when it is introduced into the facility. To the extent that detainees are housed in close quarters, unable to maintain a six-foot distance from others, and sharing or touching objects used by others, the risks of spread are greatly, if not exponentially, increased as already evidenced by spread of COVID-19 in another congregate environment: nursing homes and cruise ships.

8.      Social distancing in ways that are recommended by public health officials can be difficult, if not impossible in detention facilities, placing people at risk, especially when the number of detainees is high.

9.      For detainees who are at high risk of serious illness or death should they contract the COVID-19 virus, release from detention is a critically important way to meaningfully mitigate that risk. Additionally, the release of detainees who present a low risk of harm to the community is also an important mitigation strategy as it reduces the total number of detainees in a facility. Combined, this has a number of valuable effects on public health and public safety: it allows for greater social distancing, which reduces the chance of spread if virus is introduced; it allows easier provision of preventive measures such as soap for handwashing, cleaning supplies for surfaces, frequent laundering and showers, etc.; and it helps prevent overloading the work of detention staff such that they can continue to ensure the safety of detainees.

10.     The release of detainees, especially those with increased health-related vulnerability, also supports the broader community because carceral and detention settings, regardless of the level of government authorities that oversee them, are integral parts of the community's public health infrastructure.  Reducing the spread and severity of infection in a Federal immigration detention center slows, if not reduces, the number of people who will become ill enough to require hospitalization, which in turn reduces the health and economic burden to the local community at large.

11.     As a correctional public health expert, I recommend release of eligible individuals from detention, with priority given to the elderly and those with underlying medical conditions most vulnerable to serious illness or death if infected with COVID-19.

12.     Conditions related to COVID-19 are changing rapidly and may change between the time I execute this Declaration and when this matter appears before the Court. One of the most worrisome changes would be confirmation of a case of COVID-19 within the detention center, either among staff or detainees. In the event of this occurring, and eligible detainees being quarantined or isolated due to possible exposure to the virus, I recommend that the detainee(s) be tested for the virus if testing is available. Armed with the results of that test if it is available, or in the absence of other instructions from the health authority of the municipality to which they will be returning or the Washington State public health authority, those who can easily return to a home without exposure to the public, should be released to that home for continued quarantine or isolation for the appropriate time period. All others can be released to appropriate housing as directed or arranged in coordination with the relevant health authority.

13.     I have reviewed Plaintiffs' complaint and on the basis of the claims presented, conclude that Plaintiffs have underlying medical conditions that increase the risk of serious illness or death if exposed to COVID-19. Due to the risks caused by the congregate environment in immigration

detention, compounded by the marked increase in risk conferred by their underlying medical conditions, I recommend their release.


Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.


Executed this __15th___ day in March, 2020 in Tumwater, Washington.

_____
Dr. Marc Stern

I, Homer Venters, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

**Background**

1.  I am a physician, internist and epidemiologist with over a decade of experience in providing, improving and leading health services for incarcerated people. My clinical training includes residency training in internal medicine at Albert Einstein/Montefiore Medical Center (2007) and a fellowship in public health research at the New York University School of Medicine (2009). My experience in correctional health includes two years visiting immigration detention centers and conducting analyses of physical and mental health policies and procedures for persons detained by the U.S. Department of Homeland Security. This work included and resulted in collaboration with ICE on numerous individual cases of medical release, formulation of health-related policies as well as testimony before U.S. Congress regarding mortality inside ICE detention facilities.

2.  After my fellowship training, I became the Deputy Medical Director of the NYC Jail Correctional Health Service. This position included both direct care to persons held in NYC's 12 jails, as well as oversight of medical policies for their care. This role included oversight of chronic care, sick call, specialty referral and emergency care. I subsequently was promoted to the positions of Medical Director, Assistant Commissioner, and Chief Medical Officer. In the latter two roles, I was responsible for all aspects of health services including physical and

mental health, addiction, quality improvement, re-entry and morbidity and mortality reviews as well as all training and oversight of physicians, nursing and pharmacy staff. In these roles I was also responsible for evaluating and making recommendations on the health implications of numerous security policies and practices including use of force and restraints. During this time I managed multiple communicable disease outbreaks including H1N1 in 2009, which impacts almost a third of housing areas inside the adolescent jail, multiple seasonal influenza outbreaks, a recurrent legionella infection and several other smaller outbreaks.

3. In March 2017, I left Correctional Health Services of NYC to become the Director of Programs for Physicians for Human Rights. In this role, I oversaw all programs of Physicians for Human Rights, including training of physicians, judges and law enforcement staff on forensic evaluation and documentation, analysis of mass graves and mass atrocities, documentation of torture and sexual violence, and analysis of attacks against healthcare workers.

4. In December 2018 I became the Senior Health and Justice Fellow for Community Oriented Correctional Health Services (COCHS), a nonprofit organization that promotes evidence-based improvements to correctional practices across the U.S. In January 2020, I became the president of COCHS. I also work as a medical expert in cases involving correctional health and I have a book on the health risks of jail (*Life and Death in Rikers Island*) which was

published in early 2019 by Johns Hopkins University Press. A copy of my curriculum vitae is attached to this report which includes my publications, a listing of cases in which I have been involved and a statement of my compensation.

**COVID-19 in ICE Detention**

5. Coronavirus disease of 2019 (COVID-19) is a viral pandemic. This is a novel virus for which there is no established curative medical treatment and no vaccine.

6. COVID-19 infection rates are growing exponentially in the U.S. The outbreak curve is in the early stages, meaning that communities are beginning to see their first cases, and that the number of cases overall is rising rapidly, with doubling times between one and three days. The Governor of California predicted that over half of all residents will become infected with COVID-19 and the Commissioner of Health for New Jersey predicted, "I'm definitely going to get it, we all will."[1] The Centers for Disease Control (CDC) now reports COVID-19 cases in all 50 states.

7. ICE will not be able to stop the entry of COVID-19 into ICE facilities, and the reality is that the infection is likely inside multiple facilities already. When COVID-19 impacts a community, it will also impact the detention facilities. In

---

[1] https://www.10news.com/news/coronavirus/newsom-56-percent-of-california-expect-to-get-coronavirus

5

New Jersey, one employee at an ICE detention facility has already tested positive,[2] and this is likely just the tip of the iceberg in terms of the number of ICE staff that are already infected but are unaware due to the lack of testing nationwide, and the fact that people who are infected can be asymptomatic for several days. In New York, one of the areas of early spread in the U.S., multiple correctional officers and jail and prison inmates have become infected with COVID-19. The medical leadership in the NYC jail system have announced that they will be unable to stop COVID from entering their facility and have called for release as the primary response to this crisis. Staff are more likely to bring COVID-19 into a facility, based solely on their movement in and out every day.

8. Once COVID-19 is inside a facility, ICE will be unable to stop the spread of the virus throughout the facility given long-existing inadequacies in ICE's medical care and also in light of how these facilities function. Newly released CDC guidance for correctional facilities makes clear that detention settings should plan for increased staffing shortages as COVID-19 impacts security and health staff.[3] ICE has faced longstanding challenges in maintaining adequate staffing of health staff for many years, and the outbreak of this pandemic will dramatically worsen this problem.

---

[2] https://www.buzzfeednews.com/article/hamedaleaziz/ice-medical-worker-coronavirus

[3] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html#social_distancing

9. I have been inside multiple ICE detention facilities, both county jails that house ICE detainees and dedicated facilities. My experience is that the densely packed housing areas, the manner in which health services, food services, recreation, bathroom and shower facilities for detained people, as well as the entry points, locker rooms, meal areas, and control rooms for staff, all contribute to many people being in small spaces. One of the most ubiquitous aspects of detention, the sally-port, or control port, a series of two locked gates that bring every staff member and detained person past a windowed control room as they stop between locked gates, provides but one example of this concern. The normal functioning of detention centers demands that during shift change for staff, or as the security count approaches for detained people, large numbers of people press into sally-ports as they move into or out of other areas of the facility. This process created close contact and the windows in these sally ports that are used to hand out radios, keys and other equipment to staff ensure efficient passage of communicable disease from the control rooms into the sally port areas on a regular basis. Detention facilities are designed to force close contact between people and rely on massive amounts of movement every day from one part of the facility to another, e.g., for programming, access to cafeterias, commissary, and medical, just to name a few. This movement is required of detained people as well as staff. My experience managing smaller outbreaks is that it is impossible to apply hospital-level infection control measures on security staff.

In a hospital or nursing home, staff may move up and down a single hallway over their shift, and they may interact with one patient at a time. In detention settings, officers move great distances, are asked to shout or yell commands to large numbers of people, routinely apply handcuffs and operate heavy doors/gates, operate large correctional keys and are trained in the use of force. These basic duties cause the personal protective equipment they are given to quickly break and become useless, and even when in good working order, may impede their ability talk and be understood, in the case of masks. For officers working in or around patients at risk or with symptoms, there may be an effort to have them wear protective gowns, as one would in any other setting with similar clinical risks. These gowns cover their radios, cut down tools and other equipment located on their belts and in my experience working with correctional staff, are basically impossible to use as a correctional officer.

10. Efforts to lock detained people into cells will worsen, not improve this facility-level contribution to infection control. When people are locked into cells alone, for most of the day, they quickly experience psychological distress that manifests in self-harm and suicidality, which requires rapid response and intensive care outside the facility for mental and physical health emergencies. In addition, units that are comprised of locked cells require additional staff to escort people to and from their cells for showers and other encounters, and medical, pharmacy and nursing staff move on and off these units daily to assess the

welfare and health needs of these people, creating the same movement of virus form the community into the facilities as if people were housed in normal units.

11. Another critical way in which detention settings promote transmission of communicable disease involve lack of access to hand washing. Many common areas lack operable sinks with access to soap and paper hand towels. In addition, many of the sinks utilized in correctional settings do not operate with a faucet that can be turned and left on, but instead rely on pushing a button which provides a limited amount of water over a limited amount of time. These metered faucets are designed to save water by limiting the amount of time water flows. This approach makes adequate hand washing with soap for at least 20 seconds very difficult, if not impossible.

12. As these examples illustrate, my experience is that the design and operation of detention settings promotes the spread of communicable diseases such as COVID-19.

13. ICE currently detains thousands of people with risk factors that increase their risk of serious complications from COVID-19, including death and long-lasting complications after recovery, such as fibrotic changes to the lung. The risk factors included by the CDC include people with heart disease, lung disease, immune compromising conditions and patients who are older. Additional risk factors may also include diabetes, hypertension, asthma and chronic obstructive

pulmonary disease.[4] In correctional settings, the age of 55 is used to identify older patients, because of the extremely high level of physical and behavioral health problems among this cohort of people.[5] I believe the age of 55 should be applied to ICE detainees for the same reason.

14. On the whole, ICE's response to the COVID-19 pandemic is lacking. I've reviewed available documents with their planning. The interim guidance sheet provided by ICE Health Services Corps, which oversees medical care in ICE detention facilities, on March 6, 2020[6] as a protocol for their clinical COVID-19 response, as well as ICE's guidance on its website,[7] is grossly deficient in multiple areas, including;

   a. The protocol focuses on asking questions about travel contacts and other potential ways in which a person may have come into contact with someone who has COVID-19. It is likely that almost everyone in the general public who is not practicing social distancing is in contact with the COVID-19 virus, and these questions give a false impression that they will somehow help identify those most likely to have this type of contact. The appropriate focus should be on checking for active symptoms

---

[4] https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications.html

[5] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3464842/

[6] https://www.aila.org/infonet/ice-interim-reference-sheet-coronavirus

[7] https://www.ice.gov/covid19

including fever, and known sick contacts of any type every time a person enters an ICE facility, whether a staff member or detained person. Even this approach is likely to miss staff as they bring in and transmit the virus while asymptomatic, a critical observation mentioned in the newly released CDC guidelines for correctional settings. COVID-19 is a pandemic and the exponential rates of growth in the U.S. mean that once the virus arrives in a community, it will enter the detention facilities, often via staff. These screening questions may be appropriate as a subset of questions in retrospective contact tracing, a process utilized to reveal how an infection has spread, and which is conducted by trained public health professionals, but they are no longer core to establishing the presence of COVID-19 since it has arrived in full force in every state of the U.S.

b. The ICE protocol fails to include basic infection control measures that are present in CDC guidelines for long term care facilities, and other congregate settings, including access to hand sanitizer and use of masks for anyone with a cough.

c. The protocol fails to include guidance for health staff or administrators regarding how to plan their surge capacity needs as the level of medical encounters increases, and the number of available staff decreases, due to illness. This is a critical component of the CDC guidance on long term care response and is a critical omission in this protocol.

d.  There is no guidance for clinical staff on when to test patients for COVID-19, which leaves detained patients at a significant disadvantage. While the guidelines for testing may evolve over time, the protocol should create a structure for daily dissemination of testing criteria from ICE leadership, and time for daily briefings among all health staff at the start of every shift, to review this and other elements of the COVID-19 response. This briefing must include participation by epidemiologists tasked to COVID-19 response who are also coordinating with local and federal COVID-19 activities.

e.  The protocol states that people with suspected COVID-19 contact will be monitored for 14 days with symptom checks. The protocol is written as if this is a rare occurrence, reflecting smaller outbreak management, but the prevalence of COVID-19 is now growing to such an extent that a large share of newly arrived people will have recent contact with someone who is infected. ICE would need to use this level of monitoring for every person arriving in detention. Accordingly, ICE would need to dramatically expand its medical facilities and staffing to conduct this daily monitoring of every newly arrived person for 14 days. The protocol fails to contemplate these necessary changes.

f.  The ICE protocol provides no guidance about identification of high-risk patients at the time of entry or any special precautions that will be enacted

to protect them. The protocol also fails to address the identification of high-risk patients who have already been admitted. This is a dangerous omission, because many of the ICE facilities employ paper medical records, and identification of the people who meet criteria for being high risk of serious illness and death from COVID-19 will require significant time and staffing. I have led these types of risk reviews in outbreaks using both electronic and paper based medical records in multiple correctional settings, and there must be a clear direction and protocol for how this process will occur and how often it is repeated, and how critical information will flow from health to security staff. The protocol focuses on whether patients have contact with known COVID-19 patients and whether they are symptomatic. It is true that symptomatic patients require higher levels of assessment and care, but a basic element of outbreak management is protection of patients who, if they become infected, are at high risk of serious illness or death. The ICE protocol fails to address this. Such a management plan would not only include the questions asked during the intake process, but would also include cohorted housing areas, increased infection control measures by staff who come onto the housing areas and increased medical surveillance, likely daily checks of signs and symptoms. I have established this type of surveillance for high risk patients during several outbreak responses, and the two elements that will

pose a significant challenge to ICE are the lack of appropriate housing areas, and the need for significantly more security and health staff. The protocol is crafted to address a relatively small and time-limited outbreak and lacks anticipation of what has already started elsewhere and will soon impact these facilities, widespread infection with a massive impact on the level of staffing, The newly released CDC guidelines for detention settings recommends social distancing in these facilities, maintaining 6 feet separation between people, "Implement social distancing strategies to increase the physical space between incarcerated/detained persons (ideally 6 feet between all individuals, regardless of the presence of symptoms)." ICE will be unable to adhere to this recommendation in virtually every facility it operates, and the practice of facility "lockdowns" stands in direct contradiction to this recommendation by the CDC.

15. Because the ICE response fails to create increased protections for people with risk factors for serious illness and death from COVID-19, they are unlikely to detect illness in these patients until many of them are critically ill. As with the lack of guidance on testing, this lack of clear guidance on how to determine who meets criteria for hospital transfer may prove deadly for detained people, and clinical staff encounter patients seriously ill with COVID-19 for the first time in their careers. While COVID-19 shares some similarities with influenza, there are critical aspects of this pandemic that pose greater risk to both patients and

staff, and asking staff to rely on their historical knowledge of influenza treatment without precise guidance on the critical decisions regarding COVID-19 testing, treatment and hospital transfer will leave them and their patients without clear guidelines. These deficiencies, compounded by the time it will take to evaluate and transport them to a local hospital (especially given the remoteness of many facilities), will likely result in numerous deaths, many of which could have been avoided with earlier care.

16. The ICE response, including the protocol, envisions that "isolation rooms" will be used to monitor people who are symptomatic with COVID-19. My experience in visiting and working in detention facilities across the nation is that each facility has 1-4 cells located in or near the medical clinic that meet this definition. When COVID-19 arrives in a facility, there will be many more people who meet this criteria of being symptomatic, and ICE will need to designate entire housing areas for this level of increased surveillance of symptomatic patients. This approach requires that empty housing areas be available, so that small numbers of symptomatic patients can be cohorted together away from those without symptoms. Facilities that are over 80 percent capacity will find this basic approach impossible once they start to see multiple symptomatic patients. Based on my experience visiting detention facilities, this process will be essentially impossible.

17. ICE should not employ isolation in locked cells as a primary means to protect either at risk patients, or patients who are symptomatic. When patients are places into locked cells, the level of monitoring is dramatically reduced. In addition, this practice causes new health problems in the form of risk for suicide and self-harm. Also, isolation units often drive increased physical interaction between staff and patients, in the form of increased handcuffing, escorting individuals to and from showers and other out of cell encounters, and increased uses of force due to the psychological stress these units cause. In sum, it is my expert opinion that the use of isolation and/or lockdown is not a medically appropriate method for abating the substantial risk of harm from COVID-19.

18. In addition, transferring large numbers of detained people between facilities to cohort symptomatic and asymptomatic people will increase the spread of COVID-19 infection throughout geographic areas. The newly released CDC guidelines for detention settings recommend a level of infection control measures in transportation of symptomatic patients that would require far more staffing and training ICE has the capacity to provide for large scale transfers: "If a transfer is absolutely necessary, perform verbal screening and a temperature check as outlined in the Screening section below, before the individual leaves the facility. If an individual does not clear the screening process, delay the transfer and follow the protocol for a suspected COVID-19 case – including putting a face mask on the individual, immediately placing them under medical

isolation, and evaluating them for possible COVID-19 testing. If the transfer must still occur, ensure that the receiving facility has capacity to properly isolate the individual upon arrival. Ensure that staff transporting the individual wear recommended PPE . . . and that the transport vehicle is cleaned thoroughly after transport." In other words, transferring people between facilities, as ICE routinely does and as I understand is still going on, requires far more measures than ICE implements and should be ceased.

19. As the number of infections inside ICE facilities rise, there will be fewer health and security staff coming to work. This has already been observed in other law enforcement settings and will inevitably occur inside detention facilities. The ICE response fails to address this central and inescapable reality. Critically, there will be far more work to be done inside these facilities than before, and the lack of available staffing will impact basic operations, as well as the ability to cohort high risk and symptomatic patients (in different areas) as well as provide care inside the facility and even conduct escort for emergency room evaluation and inpatient hospitalization. The protocol fails to detail how patient education will occur, both for newly arrived people and those already in detention.

20. I have reviewed 15 statements by people currently detained by ICE or who represent detained people in multiple facilities, and their observations indicate that, in detention facilities throughout ICE's system, ICE is not following even

the most basic infection control policies that they report as their standard of care including:

a. Failure to provide hand washing supplies including soap and paper towels and ensure access to handwashing, including operable sinks;

b. Failure to check symptoms among newly arrived detained people;

c. Continued transfer among detention centers of detained people;

d. Lack of symptom screening of staff arriving to work in detention centers;

e. Failure to ask about risk factors of serious illness or death from COVID-19 infection;

f. Failure to provide adequate supplies for cleaning of housing areas;

g. Failure to establish standards of use of gloves and masks by security personnel;

h. Failure to provide patient education about hand washing, infection control or COVID-19 in Spanish;

i. Failure to enact social distancing among staff and detained people; and

j. Lack of communication regarding COVID-19 status inside quarantined housing areas.

21. I have also reviewed the declarations of all the named subclass members and agree their medical conditions place them at high-risk and make them medically vulnerable to COVID-19.

22. ICE's inadequate responses to COVID-19—coupled with its pre-existing inadequate healthcare—places people with risk factors at a high risk of contracting COVID-19 and suffering serious complications—including death.

23. ICE must release all people with risk factors to prevent their serious illness and/or death. The ICE response makes clear that they do not plan to establish special protections of high-risk patients and will wait for them to become symptomatic. This approach will result in preventable morbidity and mortality. Both the oversight authority of the NYC jail system and the current medical director for geriatrics and complex care have called for high risk patients to be immediately transferred out of detention.[8] ICE faces a completely preventable disaster by keeping high risk patients in detention as COVID-19 arrived in facilities where the virus will quickly spread. The basic limitation of the physical plant and looming staffing concerns make clear that these patients are in peril of serious illness or death if they remain in detention. In addition, transfer of these patients to other ICE detention facilities will only compound exposure and transmission of COVID-19. They must be released immediately.

I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge.

---

[8] https://www.newyorker.com/news/news-desk/a-rikers-island-doctor-speaks-out-to-save-her-elderly-patients-from-the-coronavirus
https://www.nbcnewyork.com/news/local/nyc-officials-call-for-release-of-most-at-risk-on-rikers-prison-as-more-test-positive-for-virus/2333348/

Signature:                                          Homer Venters

Date: 3/24/2020

Location: Port Washington, NY

# Dr. Homer D. Venters

10 ½ Jefferson St., Port Washington, NY, 11050
hventers@gmail.com, Phone: 646-734-5994

---

**HEALTH ADMINISTRATOR**          **PHYSICIAN**          **EPIDEMIOLOGIST**

## *Professional Profile*

- International leader in provision and improvement of health services to patients with criminal justice involvement.
- Innovator in linking care of the incarcerated to Medicaid, health homes, DSRIPs.
- Successful implementer of nations' first electronic health record, performance dashboards and health information exchange among pre-trial patients.
- Award winning epidemiologist focused on the intersection of health, criminal justice and human rights in the United States and developing nations.
- Human rights leader with experience using forensic science, epidemiology and public health methods to prevent and document human rights abuses.

## *Professional Experience*

**President**, Community Oriented Correctional Health Services (COCHS), 1/1/2020-present.
- Lead COCHS efforts to provide technical assistance, policy guidance and research regarding correctional health and justice reform.
- Oversee operations and programmatic development of COCHS
- Serve as primary liaison between COCHS board, funders, staff and partners.

**Senior Health and Justice Fellow**, Community Oriented Correctional Health Services (COCHS), 12/1/18-12/31/2018
- Lead COCHS efforts to expand Medicaid waivers for funding of care for detained persons relating to Substance Use and Hepatitis C.
- Develop and implement COCHS strategy for promoting non-profit models of diversion and correctional health care.

**Medical/Forensic Expert**, 3/2016-present
- Provide expert input, review and testimony regarding health care, quality improvement, electronic health records and data analysis in detention settings.

**Director of Programs,** Physicians for Human Rights, 3/16-11/18.
- Lead medical forensic documentation efforts of mass crimes against Rohingya and Yazidi people.
- Initiate vicarious trauma program.
- Expand forensic documentation of mass killings and war crimes.
- Develop and support sexual violence capacity development with physicians, nurses and judges.
- Expand documentation of attacks against health staff and facilities in Syria and Yemen.

**Chief Medical Officer/Assistant Vice President**, Correctional Health Services, NYC Health and Hospitals Corporation 8/15-3/17.
o   Transitioned entire clinical service (1,400 staff) from a for-profit staffing company model to a new division within NYC H + H.
o   Developed new models of mental health and substance abuse care that significantly lowered morbidity and other adverse events.
o   Connected patients to local health systems, DSRIP and health homes using approximately $5 million in external funding (grants available on request).
o   Reduced overall mortality in the nation's second largest jail system.
o   Increased operating budget from $140 million to $160 million.
o   Implemented nation's first patient experience, provider engagement and racial disparities programs for correctional health.

**Assistant Commissioner,** Correctional Health Services, New York Department of Health and Mental Hygiene, 6/11-8/15.
o   Implemented nation's first electronic medical record and health information exchange for 1,400 staff and 75,000 patients in a jail.
o   Developed bilateral agreements and programs with local health homes to identify incarcerated patients and coordinate care.
o   Increased operating budget of health service from $115 million to $140 million.
o   Established surveillance systems for injuries, sexual assault and mental health that drove new program development and received American Public Health Association Paper of the Year 2014.
o   Personally care for and reported on over 100 patients injured during violent encounters with jail security staff.

**Medical Director,** Correctional Health Services, New York Department of Health and Mental Hygiene, 1/10-6/11.
o   Directed all aspects of medical care for 75,000 patients annually in 12 jails, including specialty, dental, primary care and emergency response.
o   Direct all aspects of response to infectious outbreaks of H1N1, Legionella, Clostridium Difficile.
o   Developed new protocols to identify and report on injuries and sexual assault among patients.

**Deputy Medical Director,** Correctional Health Services, New York Department of Health and Mental Hygiene, 11/08-12/09.
o   Developed training program with Montefiore Social internal medicine residency program.
o   Directed and delivered health services in 2 jails.

**Clinical Attending Physician,** Bellevue/NYU Clinic for Survivors of Torture, 10/07-12/11.

**Clinical Attending Physician,** Montefiore Medical Center Bronx NY, Adult Medicine, 1/08-11/09.

EXHIBIT A

## Education and Training

**Fellow, Public Health Research,** New York University 2007-2009. MS 6/2009
Projects: Health care for detained immigrants, Health Status of African immigrants in NYC.

**Resident, Social Internal Medicine**, Montefiore Medical Center/Albert     Einstein University7/2004- 5/2007.

**M.D.,** University of Illinois, Urbana, 12/2003.

**M.S.** Biology, University of Illinois, Urbana, 6/03.

**B.A.** International Relations, Tufts University, Medford, MA, 1989**.**

## Academic Appointments, Licensure

Clinical Associate Professor, New York University College of Global Public Health, 5/18-present.

Clinical Instructor, New York University Langone School of Medicine, 2007-2018.

M.D.   New York (2007-present).

## Media

TV
i24 Crossroads re Suicide in U.S. Jails 8/13/19.

i24 Crossroads re re *Life and Death in Rikers Island* 6/13/19.

Amanpour & Company, NPR/PBS re *Life and Death in Rikers Island* 4/15/19.

CNN, Christiane Amanpour re Forensic documentation of mass crimes against Rohingya. 7/11/18.

i24 Crossroads with David Shuster re health crisis among refugees in Syria. 7/6/18.

Canadian Broadcasting Corporation TV with Sylvie Fournier (in French) re crowd control weapons. 5/10/18

i24 Crossroads with David Shuster re Cholera outbreak in Yemen.  2/15/18.

China TV re WHO guidelines on HIV medication access 9/22/17.

Radio/Podcast
Morning Edition, NPR re Health Risks of Criminal Justice System. 8/9/19.

Fresh Air with Terry Gross, NPR re *Life and Death in Rikers Island*, 3/6/19.

Morning Edition, NPR re *Life and Death in Rikers Island*, 2/22/19.

LeShow with Harry Sherer re forensic documentation of mass crimes in Myanmar, Syria,

EXHIBIT A

Iraq. 4/17/18.

<u>Print articles and public testimony</u>
Oped: Four ways to protect our jails and prisons from coronavirus. The Hill 2/29/20.

Oped: It's Time to Eliminate the Drunk Tank. The Hill 1/28/20.

Oped: With Kathy Morse. A Visit with my Incarcerated Mother. The Hill 9/24/19.

Oped: With Five Omar Muallim-Ak. The Truth about Suicide Behind Bars is Knowable. The Hill 8/13/19.

Oped: With Katherine McKenzie. Policymakers, provide adequate health care in prisons and detention centers. CNN Opinion, 7/18/19.

Oped: Getting serious about preventable deaths and injuries behind bars. *The Hill*, 7/5/19.

Testimony: Access to Medication Assisted Treatment in Prisons and Jails,  New York State Assembly Committee on Alcoholism and Drug Abuse, Assembly Committee on Health, and Assembly Committee on Correction**.** NY, NY, 11/14/18.

Oped: Attacks in Syria and Yemen are turning disease into a weapon of war, *STAT News*, 7/7/17.

Testimony: Connecticut Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use of solitary confinement for prisoners. Hartford CT, 2/3/17.

Testimony: Venters HD, New York Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use of solitary confinement for juveniles in New York. July 10, 2014. NY NY.

Testimony: New York State Assembly Committee on Correction with the Committee on Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014. Albany NY.
Testimony: New York State Assembly Committee on Correction with the Committee on Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014. Albany NY.

Oped: Venters HD and Keller AS, The Health of Immigrant Detainees. Boston Globe, April 11, 2009.

Testimony: U.S. House of Representatives, House Judiciary Committee's Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law: Hearing on Problems with Immigration Detainee Medical Care, June 4, 2008.

EXHIBIT A

*Peer Reviewed Publications*

Parmar PK, Leigh J, **Venters H**, Nelson T. Violence and mortality in the Northern Rakhine State of Myanmar, 2017: results of a quantitative survey of surviving community leaders in Bangladesh. Lancet Planet Health. 2019 Mar;3(3):e144-e153.

**Venters H.** Notions from Kavanaugh hearings contradict medical facts. *Lancet.* 10/5/18.

Taylor GP, Castro I, Rebergen C, Rycroft M, Nuwayhid I, Rubenstein L, Tarakji A, Modirzadeh N, **Venters H**, Jabbour S. Protecting health care in armed conflict: action towards accountability. *Lancet.* 4/14/18.

Katyal M, Leibowitz R, **Venters H**. IGRA-Based Screening for Latent Tuberculosis Infection in Persons Newly Incarcerated in New York City Jails. *J Correct Health Care.* 2018 4/18.

Harocopos A, Allen B, Glowa-Kollisch S, **Venters H**, Paone D, Macdonald R. The Rikers Island Hot Spotters: Exploring the Needs of the Most Frequently Incarcerated.
*J Health Care Poor Underserved.* 4/28/17.

MacDonald R, Akiyama MJ, Kopolow A, Rosner Z, McGahee W, Joseph R, Jaffer M, **Venters H**.  Feasibility of Treating Hepatitis C in a Transient Jail Population.
*Open Forum Infect Dis.* 7/7/18.

Siegler A, Kaba F, MacDonald R, **Venters H**. Head Trauma in Jail and Implications for Chronic Traumatic Encephalopathy. *J Health Care Poor and Underserved.* In Press (May 2017).

Ford E, Kim S, **Venters H**. Sexual abuse and injury during incarceration reveal the need for re-entry trauma screening. *Lancet.* 4/8/18.

Alex B, Weiss DB, Kaba F, Rosner Z, Lee D, Lim S, **Venters H,** MacDonald R. Death After Jail Release. *J Correct Health Care*. 1/17.

Akiyama MJ, Kaba F, Rosner Z, Alper H, Kopolow A, Litwin AH, **Venters H**, MacDonald R. Correlates of Hepatitis C Virus Infection in the Targeted Testing Program of the New York City Jail System. *Public Health Rep.* 1/17.

Kalra R, Kollisch SG, MacDonald R, Dickey N, Rosner Z, **Venters H**. Staff Satisfaction, Ethical Concerns, and Burnout in the New York City Jail Health System. *J Correct Health Care.* 2016 Oct;22(4):383-392.

**Venters H.** A Three-Dimensional Action Plan to Raise the Quality of Care of US Correctional Health and Promote Alternatives to Incarceration. *Am J Public Health*. April 2016.104.

Glowa-Kollisch S, Kaba F, Waters A, Leung YJ, Ford E, **Venters H**. From Punishment to Treatment: The "Clinical Alternative to Punitive Segregation" (CAPS) Program in New York City Jails. *Int J Env Res Public Health.* 2016. 13(2),182.

Jaffer M, Ayad J, Tungol JG, MacDonald R, Dickey N, Venters H. Improving Transgender Healthcare in the New York City Correctional System. *LGBT Health.* 2016 1/8/16.

EXHIBIT A

Granski M, Keller A, Venters H. Death Rates among Detained Immigrants in the United States. *Int J Env Res Public Health.* 2015. 11/10/15.

Michelle Martelle, Benjamin Farber, Richard Stazesky, Nathaniel Dickey, Amanda Parsons, **Homer Venters**. Meaningful Use of an Electronic Health Record in the NYC Jail System. *Am J Public Health*. 2015. 8/12/15.

Fatos Kaba, Angela Solimo, Jasmine Graves, Sarah Glowa-Kollisch, Allison Vise, Ross MacDonald, Anthony Waters, Zachary Rosner, Nathaniel Dickey, Sonia Angell, **Homer Venters**. Disparities in Mental Health Referral and Diagnosis in the NYC Jail Mental Health Service. *Am J Public Health.* 2015. 8/12/15.

Ross MacDonald, Fatos Kaba, Zachary Rosner, Alison Vise, Michelle Skerker, David Weiss, Michelle Brittner, Nathaniel Dickey, **Homer Venters**. The Rikers Island Hot Spotters. *Am J Public Health*. 2015. 9/17/15.

Selling Molly Skerker, Nathaniel Dickey, Dana Schonberg, Ross MacDonald, **Homer Venters**. Improving Antenatal Care for Incarcerated Women: fulfilling the promise of the Sustainable Development Goals. *Bulletin of the World Health Organization*.2015.

Jasmine Graves, Jessica Steele, Fatos Kaba, Cassandra Ramdath, Zachary Rosner, Ross MacDonald, Nathanial Dickey, **Homer Venters**. Traumatic Brain Injury and Structural Violence among Adolescent males in the NYC Jail System *J Health Care Poor Underserved.* 2015;26(2):345-57.

Glowa-Kollisch S, Graves J, Dickey N, MacDonald R, Rosner Z, Waters A, **Venters H**. Data-Driven Human Rights: Using Dual Loyalty Trainings to Promote the Care of Vulnerable Patients in Jail. *Health and Human Rights*. Online ahead of print, 3/12/15.

Teixeira PA[1], Jordan AO, Zaller N, Shah D, **Venters H**. Health Outcomes for HIV-Infected Persons Released From the New York City Jail System With a Transitional Care-Coordination Plan. 2014. *Am J Public Health*. 2014 Dec 18.

Selling D, Lee D, Solimo A, **Venters H.** A Road Not Taken: Substance Abuse Programming in the New York City Jail System. *J Correct Health Care.* 2014 Nov 17.

Glowa-Kollisch S, Lim S, Summers C, Cohen L, Selling D, **Venters H**. Beyond the Bridge: Evaluating a Novel Mental Health Program in the New York City Jail System. *Am J Public Health*. 2014 Sep 11.

Glowa-Kollisch S, Andrade K, Stazesky R, Teixeira P, Kaba F, MacDonald R, Rosner Z, Selling D, Parsons A, **Venters H**. Data-Driven Human Rights: Using the Electronic Health Record to Promote Human Rights in Jail. *Health and Human Rights*. 2014. Vol 16 (1): 157-165.

MacDonald R, Rosner Z, **Venters H**. Case series of exercise-induced rhabdomyolysis in the New York City Jail System. *Am J Emerg Med*. 2014. Vol 32(5): 446-7.

Bechelli M, Caudy M, Gardner T, Huber A, Mancuso D, Samuels P, Shah T, **Venters H.** Case Studies from Three States: Breaking Down Silos Between Health Care and Criminal Justice. *Health Affairs*. 2014. Vol. 3. 33(3):474-81.

EXHIBIT A

Selling D, Solimo A, Lee D, Horne K, Panove E, **Venters H**. Surveillance of suicidal and non-suicidal self-injury in the new York city jail system. *J Correct Health Care*. 2014. Apr:20(2).

Kaba F, Diamond P, Haque A, MacDonald R, **Venters H**. Traumatic Brain Injury Among Newly Admitted Adolescents in the New York City Jail System. *J Adolesc Health*. 2014. Vol 54(5): 615-7.

Monga P, Keller A, **Venters H**. Prevention and Punishment: Barriers to accessing health services for undocumented immigrants in the United States. *LAWS*. 2014. 3(1).

Kaba F, Lewsi A, Glowa-Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, **Venters H**. Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014. Vol 104(3):442-7.

MacDonald R, Parsons A, **Venters H.** The Triple Aims of Correctional Health:   Patient  safety, Population Health and Human Rights. *Journal of Health Care for the Poor and Underserved*. 2013. 24(3).

Parvez FM, Katyal M, Alper H, Leibowitz R, **Venters H.** Female sex workers incarcerated in New York City jails: prevalence of sexually transmitted infections and associated risk behaviors. *Sexually Transmitted Infections*. 89:280-284. 2013.

Brittain J, Axelrod G, **Venters H.** Deaths in New York City Jails: 2001 – 2009. *Am J Public Health*. 2013 103:4.

Jordan AO, Cohen LR, Harriman G, Teixeira PA, Cruzado-Quinones J, **Venters H.** Transitional Care Coordination in New York City Jails: Facilitating Linkages to Care for People with HIV Returning Home from Rikers Island. *AIDS Behav. Nov.* 2012.

Jaffer M, Kimura C, **Venters H.** Improving medical care for patients with HIV in New York City jails. *J Correct Health Care*. 2012 Jul;18(3):246-50.

Ludwig A, Parsons, A, Cohen, L, **Venters H.** Injury Surveillance in the NYC Jail System, *Am J Public Health* 2012 Jun;102(6).

**Venters H**, Keller, AS. *Psychiatric Services*. (2012) Diversion of Mentally Ill Patients from Court-ordered care to Immigration Detention. Epub. 4/2012.

**Venters H**, Gany, F. *Journal of Immigrant and Minority Health* (2011) Mental Health Concerns Among African Immigrants. 13(4): 795-7.

**Venters H,** Foote M, Keller AS. *Journal of Immigrant and Minority Health.* (2010) Medical Advocacy on Behalf of Detained Immigrants. 13(3): 625-8.

**Venters H,** McNeely J, Keller AS. *Health and Human Rights.* (2010) HIV Screening and Care for Immigration Detainees. 11(2) 91-102.

**Venters H,** Keller AS. *Journal of Health Care for the Poor and Underserved*. (2009) The Immigration Detention Health Plan: An Acute Care Model for a Chronic Care Population. 20:951-957.

**Venters H**, Gany, F. *Journal of Immigrant and Minority Health* (2009) African Immigrant Health. 4/4/09.

**Venters H**, Dasch-Goldberg D, Rasmussen A, Keller AS, *Human Rights Quarterly* (2009) Into the Abyss: Mortality and Morbidity among Detained Immigrant. 31 (2) 474-491.

**Venters H**, *The Lancet* (2008) Who is Jack Bauer? 372 (9653).

**Venters H**, Lainer-Vos J, Razvi A, Crawford J, Shaf˜on Venable P, Drucker EM, *Am J Public Health* (2008) Bringing Health Care Advocacy to a Public Defender's Office. 98 (11).

**Venters H**, Razvi AM, Tobia MS, Drucker E. *Harm Reduct J*. (2006) The case of Scott Ortiz: a clash between criminal justice and public health. Harm Reduct J. 3:21

Cloez-Tayarani I, Petit-Bertron AF, **Venters HD**, Cavaillon JM (2003) *Internat. Immunol.* Differential effect of serotonin on cytokine production in lipopolysaccharide-stimulated human peripheral blood mononuclear cells.15,1-8.

Strle K, Zhou JH, Broussard SR, **Venters HD**, Johnson RW, Freund GG, Dantzer R, Kelley KW, (2002) *J. Neuroimmunol.* IL-10 promotes survival of microglia without activating Akt. 122, 9-19.

**Venters HD,** Broussard SR, Zhou JH, Bluthe RM, Freund GG, Johnson RW, Dantzer R, Kelley KW, (2001) *J. Neuroimmunol.* Tumor necrosis factor(alpha) and insulin-like growth factor-I in the brain: is the whole greater than the sum of its parts? 119, 151-65.

**Venters HD,** Dantzer R, Kelley KW, (2000) *Ann. N. Y. Acad. Sci.* Tumor necrosis factor-alpha induces neuronal death by silencing survival signals generated by the type I insulin-like growth factor receptor. 917, 210-20.

**Venters HD,** Dantzer R, Kelley KW, (2000) *Trends. Neurosci.* A new concept in neurodegeneration: TNFalpha is a silencer of survival signals. 23, 175-80.

**Venters HD,** Tang Q, Liu Q, VanHoy RW, Dantzer R, Kelley KW, (1999) *Proc. Natl. Acad. Sci. USA.* A new mechanism of neurodegeneration: A proinflammatory cytokine inhibits receptor signaling by a survival peptide, 96, 9879-9884.

**Venters HD,** Ala TA, Frey WH 2nd , (1998) Inhibition of antagonist binding to human brain muscarinic receptor by vanadium compounds. *Recept. Signal. Transduct.* 7, 137-142.

**Venters HD,** Tang Q, Liu Q, VanHoy RW, Dantzer R, Kelley KW, (1999) *Proc. Natl. Acad. Sci. USA.* A new mechanism of neurodegeneration: A proinflammatory cytokine inhibits receptor signaling by a survival peptide, 96, 9879-9884.

**Venters HD,** Ala TA, Frey WH 2nd , (1998) Inhibition of antagonist binding to human brain muscarinic receptor by vanadium compounds. *Recept. Signal. Transduct.* 7, 137-142**.**

**Venters HD,** Bonilla LE, Jensen T, Garner HP, Bordayo EZ, Najarian MM, Ala TA, Mason RP, Frey WH 2nd, (1997) Heme from Alzheimer's brain inhibits muscarinic receptor binding via thiyl radical generation. *Brain. Res.* 764, 93-100.

EXHIBIT A

Kjome JR, Swenson KA, Johnson MN, Bordayo EZ, Anderson LE, Klevan LC, Fraticelli AI, Aldrich SL, Fawcett JR, **Venters HD**, Ala TA, Frey WH 2nd (1997) Inhibition of antagonist and agonist binding to the human brain muscarinic receptor by arachidonic acid. *J. Mol. Neurosci.* 10, 209-217.

## *Honors and Presentations (past 10 years)*

**Keynote Address**, Academic Correctional Health Conference, April 2020, Chapel Hill, North Carolina.

**TedMed Presentation**, Correctional Health, Boston MA, March 2020.

**Finalist, Prose Award for Literature**, Social Sciences category for *Life and Death in Rikers Island*, February, 2020.

**Keynote Address,** John Howard Association Annual Benefit, November 2019, Chicago IL.

**Keynote Address,** Kentucky Data Forum, Foundation for a Healthy Kentucky, November 2019, Cincinnati Ohio.

**Oral Presentation,** Dual loyalty and other human rights concerns for physicians in jails an prisons. Association of Correctional Physicians, Annual meeting. 10/16, Las Vegas.

**Oral Presentation,** Clinical Alternatives to Punitive Segregation: Reducing self-harm for incarcerated patients with mental illness. American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Analysis of Deaths in ICE Custody over 10 Years . American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Medication Assisted Therapies for Opioid Dependence in the New York City Jail System. American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement in an Urban Jail. American Public Health Association Annual Meeting, November 2014, New Orleans, LA.

**Training,** International Committee of the Red Cross and Red Crescent, Medical Director meeting 10/15, Presentation on Human Rights and dual loyalty in correctional health.

**Paper of the Year,** American Public Health Association. 2014. (Kaba F, Lewis A, Glowa-Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, Venters H. Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014. Vol 104(3):442-7.)

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement in an Urban Jail. *American Public Health Association* Annual Meeting, New Orleans LA, 2014.

**Oral Presentation,** Human rights at Rikers: Dual loyalty among jail health staff. American Public Health Association Annual Meeting, New Orleans LA, 2014.

**Poster Presentation**, Mental Health Training for Immigration Judges. American Public Health

Association Annual Meeting, New Orleans LA, 2014.

**Distinguished Service Award;** Managerial Excellence. Division of Health Care Access and Improvement, NYC DOHMH. 2013.

**Oral Presentation,** Solitary confinement in the ICE detention system. American Public Health Association Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Self-harm and solitary confinement in the NYC jail system. American Public Health Association Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Implementing a human rights practice of medicine inside New York City jails. American Public Health Association Annual Meeting, Boston MA, 2013.

**Poster Presentation,** Human Rights on Rikers: integrating a human rights-based framework for healthcare into NYC's jail system. *American Public Health Association* Annual Meeting, Boston MA, 2013.

**Poster Presentation**, Improving correctional health care: health information exchange and the affordable care act. *American Public Health Association* Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Management of Infectious Disease Outbreaks in a Large Jail System. American Public Health Association Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Diversion of Patients from Court Ordered Mental Health Treatment to Immigration Detention. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation**, Initiation of Antiretroviral Therapy for Newly Diagnosed HIV Patients in the NYC Jail System. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Medical Case Management in Jail Mental Health Units. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation**, Injury Surveillance in New York City Jails. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Ensuring Adequate Medical Care for Detained Immigrants. Venters H, Keller A, American Public Health Association Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** HIV Testing in NYC Correctional Facilities. Venters H and Jaffer M, *American Public Health Association,* Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** Medical Concerns for Detained Immigrants. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Growth of Immigration Detention Around the Globe. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Role of Hospital Ethics Boards in the Care of Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA,

EXHIBIT A

November 2009.

**Oral Presentation,** Health Law and Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Bro Bono Advocacy Award,** Advocacy on behalf of detained immigrants. Legal Aid Society of New York, October 2009.

**Oral Presentation,** Deaths of immigrants detained by Immigration and Customs Enforcement. Venters H, Rasmussen A, Keller A, *American Public Health Association* Annual Meeting, San Diego CA, October 2008.

**Poster Presentation,** Death of a detained immigrant with AIDS after withholding of prophylactic Dapsone. Venters H, Rasmussen A, Keller A, *Society of General Internal Medicine* Annual Meeting, Pittsburgh PA, April 2008.

**Poster Presentation,** Tuberculosis screening among immigrants in New York City reveals higher rates of positive tuberculosis tests and less health insurance among African immigrants. *Society of General Internal Medicine* Annual Meeting, Pittsburgh PA, April 2008.

**Daniel Leicht Award for Achievement in Social Medicine,** Montefiore Medical Center, Department of Family and Social Medicine, 2007.

**Poster Presentation**, Case Findings of Recent Arestees. Venters H, Deluca J, Drucker E. *Society of General Internal Medicine* Annual Meeting, Toronto Canada, April 2007.

**Poster Presentation,** Bringing Primary Care to Legal Aid in the Bronx. Venters H, Deluca J, Drucker E. *Society of General Internal Medicine* Annual Meeting, Los Angeles CA, April 2006.

**Poster Presentation**, A Missed Opportunity, Diagnosing Multiple Myeloma in the Elderly Hospital Patient. Venters H, Green E., *Society of General Internal Medicine* Annual Meeting, New Orleans LA, April 2005.

## *Grants: Program*

San Diego County: Review of jail best practices (COCHS), 1/2020, $90,000.

Ryan White Part A **-** Prison Release Services (PRS). From HHS/HRSA to Correctional Health Services (NYC DOHMH), 3/1/16-2/28/17 (Renewed since 2007). Annual budget $ 2.7 million.

Ryan White Part A **-** Early Intervention Services**-** Priority Population Testing. From HHS/HRSA to Correctional Health Services (NYC DOHMH), 3/1/16-2/28/18 (Renewed since 2013). Annual budget $250,000.

Comprehensive HIV Prevention. From HHS to Correctional Health Services (NYC DOHMH), 1/1/16**-** 12/31/16. Annual budget $500,000.

HIV/AIDS Initiative for Minority Men. From HHS Office of Minority Health to Correctional Health Services (NYC DOHMH), 9/30/14-8/31/17. Annual budget $375,000.

EXHIBIT A

\#                                                                        34

\#

SPNS Workforce Initiative, From HRSA SPNS to Correctional Health Services (NYC DOHMH), 8/1/14-7/31/18. Annual budget $280,000.

SPNS Culturally Appropriate Interventions. From HRSA SPNS to Correctional Health Services (NYC DOHMH), 9/1/13-8/31/18. Annual budget $290,000.

Residential substance abuse treatment. From New York State Division of Criminal Justice Services to Correctional Health Services (NYC DOHMH), 1/1/11-12/31/17. Annual budget $175,000.

Community Action for Pre-Natal Care (CAPC). From NY State Department of Health AIDS Institute to Correctional Health Services (NYC DOHMH), 1/1/05-12/31/10. Annual budget $290,000.

Point of Service Testing. From MAC/AIDS, Elton John and Robin Hood Foundations to Correctional Health Services (NYC DOHMH), 11/1/09-10/31/12. Annual budget $100,000.

Mental Health Collaboration Grant. From USDOJ to Correctional Health Services (NYC DOHMH), 1/1/11-9/30/13. Annual budget $250,000.

## Teaching

**Instructor,** Health in Prisons Course, Bloomberg School of Public Health, Johns Hopkins University, June 2015, June 2014, April 2019.

**Instructor**, Albert Einstein College of Medicine/Montefiore Social Medicine Program Yearly lectures on Data-driven human rights, 2007-present.

## Other Health & Human Rights Activities

**DIGNITY Danish Institute Against Torture**, Symposium with Egyptian correctional health staff regarding dual loyalty and data-driven human rights. Cairo Egypt, September 20-23, 2014.

**Doctors of the World,** Physician evaluating survivors of torture, writing affidavits for asylum hearings, with testimony as needed, 7/05-11/18.

**United States Peace Corps**, Guinea Worm Educator, Togo West Africa, June 1990- December 1991.
> -*Primary Project;* Draconculiasis Eradication. Activities included assessing levels of infection in 8 rural villages and giving prevention presentations to mothers in Ewe and French
> -*Secondary Project;* Malaria Prevention.

## Books

**Venters H.** *Life and Death in Rikers Island*. Johns Hopkins University Press. 2/19.

## Chapters in Books

**Venters H.** Mythbusting Solitary Confinement in Jail. In Solitary Confinement Effects, Practices, and Pathways toward Reform. Oxford University Press, 2020.

#

#

MacDonald R. and **Venters H.** Correctional Health and Decarceration. In Decarceration. Ernest
Drucker, New Press, 2017.

## *Membership in Professional Organizations*

**American Public Health Association**

## *Foreign Language Proficiency*

**French**        Proficient
**Ewe**          Conversant

\#                                                                                36
\#

## *Prior Testimony and Deposition*

Benjamin v. Horn, 75 Civ. 3073 (HB) (S.D.N.Y.) as expert for defendants, 2015

Rodgers v. Martin 2:16-cv-00216 (U.S.D.C. N.D.Tx) as expert for plaintiffs, 10/19/17

Fikes v. Abernathy, 2017 7:16-cv-00843-LSC (U.S.D.C. N.D.AL) as expert for plaintiffs
10/30/17.

Fernandez v. City of New York, 17-CV-02431 (GHW)(SN) (S.D.NY) as defendant in role as
City Employee 4/10/18.

Charleston v. Corizon Health INC, 17-3039 (U.S.D.C. E.D. PA) as expert for plaintiffs 4/20/18.

Gambler v. Santa Fe County, 1:17-cv-00617 (WJ/KK) as expert for plaintiffs 7/23/18.

Hammonds v. Dekalb County AL, CASE NO.: 4:16-cv-01558-KOB as expert for plaintiffs
11/30/2018.

Mathiason v. Rio Arriba County NM, No. D-117-CV-2007-00054, as expert for plaintiff 2/7/19.

Hutchinson v. Bates et. al. AL, No. 2:17-CV-00185-WKW- GMB, as expert for plaintiff 3/27/19.

Lewis v. East Baton Rouge Parish Prison LA, No. 3:16-CV-352-JWD-RLB, as expert for
plaintiff 6/24/19.

Belcher v. Lopinto, No No. 2:2018cv07368 - Document 36 (E.D. La. 2019) as expert for
plaintiffs 12/5/2019.


## Fee Schedule

Case review, reports, testimony $500/hour.
Site visits and other travel, $2,500 per day (not including travel costs).


EXHIBIT A