# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 99-035-01 |
| CURTIS WILKERSON | : | |

### GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)

Defendant Curtis Wilkerson seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). This motion should be denied, given that the criminal conduct for which the defendant is imprisoned involved his use of a firearm to threaten three victims, thereby making him a danger to the community, the fact that the asserted reasons are neither extraordinary nor compelling, and the fact that his medical conditions are well controlled with treatment in BOP custody.

## I.    Background.

### A.    Criminal Conduct.

On December 11, 1998, the defendant Wilkerson and co-defendant Willie Sawyer robbed the Harleysville National Bank, located in Spring City, Pennsylvania, at gunpoint. Wilkerson went into the bank wearing a mask and carrying a handgun. He pointed the gun at the bank branch manager, pushed past a bank teller while brandishing that firearm, and forced the head bank teller at gunpoint to put $18,800 into a stocking cap. Co-defendant Sawyer was waiting in a getaway car outside the bank. The two robbers drove

away and later split the proceeds, with Wilkerson receiving more because he went into the bank with the gun and stole the money.

Shortly after the armed robbery of the Harleysville National Bank, Wilkerson, Sawyer, and a third person (who unbeknownst to the defendants was a confidential source) planned another bank robbery. On December 22, 1998, while under the surveillance of case agents, the three men drove to the Progress Bank, in Conshohocken, Pennsylvania. In order to avoid any injuries to bank employees, customers, law enforcement personnel, and the cooperating source, federal agents stopped the car in which the defendants were located and arrested them. On Wilkerson's car seat, law enforcement found a handgun and on the defendant's person, he had a mask.

The government, as required by law, notified the victim bank employees from the Harleysville National Bank of the filing of compassionate release motions by Wilkerson and Sawyer. They responded that defendant Wilkerson's actions in threatening and frightening them with a handgun when he robbed the bank resulted in lasting psychological injuries. The victims reported nightmares, trust issues, and an inability to permit people to enter their personal spaces. In addition to this, one of the victims was so traumatized that she had her husband burn an expensive new outfit that she had worn at the time of the armed robbery. To this day, all three bank employee victims continue to suffer emotional trauma as a result of the defendant's criminal conduct.

Specifically, when recently contacted when Sawyer's motion was filed first and then pending, the victims advised as follows:

• One stated that she was thankful for the call. The reminder caused her to become emotional. She appeared to be crying and expressed concern about her safety in the event of Sawyer's imminent release from prison. The AUSA assured her that Sawyer is gravely ill and we do not believe he poses a threat to her.

• The second employee now lives in Florida. She voiced concern about Sawyer's release even though she is now living in Florida. She explained she is frightened and concerned for her safety and after receiving the AUSA's voice mail the previous day she was "rattled" for the remainder of the evening.

• The third employee expressed concern about Sawyer being released from prison. She mentioned she suffered from PTSD following the robbery and still becomes uncomfortable when she sees people wearing masks because the robber wore a mask when he confronted her in her office and pointed a gun at her. She stated that overall she is angry about Sawyer possibly being released from prison. When the AUSA explained Sawyer's medical issues to her she commented that she suffers from the same ailments as Sawyer so she is unsympathetic about his health concerns.

Should this Court elect to hold a hearing regarding this matter, the government will notify these victims of their right to attend and/or address the Court.

In this case, Wilkerson and Sawyer were convicted at trial of conspiracy to commit bank robbery, in violation of 18 U.S.C. § 371 (Count One); armed bank robbery, in violation of 18 U.S.C. § 2113(d) (Count Two); brandishing a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(i) (Count Three); attempted armed bank robbery, in violation of 18 U.S.C. § 2113(d) (Count Four); and using a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c) (Count Five).

On December 18, 2000, Wilkerson was sentenced to 427 months' imprisonment and five years of supervised release. The sentence included a period of 60 months' imprisonment on Count One, to run concurrently with a period of 63 months' imprisonment on each of Counts Two and Four; a period of 84 months' imprisonment on

Count Three, to run consecutively to all counts; and a period of 300 months'
imprisonment on Count Five, to run consecutively to all counts of the Indictment.

According to the presentence report, the defendant's medical condition included
high blood pressure and a back injury. None of the other medical conditions raised in
defendant Wilkerson's request for compassionate release were recorded at the time of his
sentencing.

The defendant is serving his sentence at FMC Butner, with an anticipated release
date of November 10, 2030. During his time in custody, the defendant committed
disciplinary infractions from 2000 through 2014. These include failure to stand count,
phone abuses, making sexually suggestive comments to a staff member, refusing to obey
an order, and possessing an unauthorized item. Since 2014, the defendant's record
reflects no additional disciplinary infractions.

**B.      Request for Compassionate Release.**

The defendant argues that his sentence should be reduced to time served. He
suggests that he should be granted compassionate relief because not only does he suffer
from certain medical conditions that make him particularly vulnerable to severe
complications were he to become infected with the COVID-19 virus, but also that the
BOP's plans and efforts are insufficient to handle the virus, especially at his current
institution, FMC Butner. Wilkerson also suggests that his significant rehabilitation while
in prison, as reflected in the programs and classes he has completed while imprisoned,
and his assignment as a nurse's assistant in the Inmate Companion Program, demonstrate
that the time he has served in prison has accomplished the rehabilitation goal of

- 4 -

sentencing, one factor under 18 U.S.C. § 3553(a). The defendant further argues that had

he been sentenced today, the "stacking" provisions under 18 U.S.C. § 924(c) would not

have produced the lengthy sentence that he is serving. Instead, under current law, he

already would have served more time than required. Instead of a 32-year mandatory

sentence for the two 924(c) charges, the defendant would have been facing only 12 years.

Wilkerson suggests that this creates a disparity amongst inmates for the same crimes, also

a factor under 18 U.S.C. § 3553(a).

On April 30, 2020, the defendant submitted a request for compassionate release to

the warden. The request was based on the following medical conditions: overweight,

hypertension, chronic kidney disease, and retinopathy, as well as the risk presented

should the defendant contract COVID-19. On May 29, 2020, the defendant, through

retained counsel, submitted a motion to this Court for compassionate release.

The undersigned obtained the medical records of the defendant for the past year

from BOP, and provided a copy to defense counsel. The records reveal that the

defendant, who is 45 years old, has no medical condition that would be a COVID-19 risk

factor that would make him a possible candidate for compassionate release. The

defendant's hypertension is characterized as "well controlled," as the result of medication

that he is taking. Any chronic kidney disease is noted as stable, that is, at worst,

moderate, and possibly mild. Either way, the defendant is not having dialysis treatment,

which would be required under CDC guidelines for this to be considered a risk factor for

an adverse outcome from COVID-19. The defendant's weight translates into a BMI of

27.9, significantly under the 40 BMI required for it to be considered a COVID-19 risk

factor. In fact, the defendant has lost weight while in BOP custody. Retinopathy is also not listed as a risk factor with respect to COVID-19. Regardless, the defendant's current medical reports do not reflect this condition. In summary, all of the conditions raised by the defendant appear well-controlled at this time with medication provided by the institution. The defendant otherwise is fully ambulatory and engages in all normal activities of daily living (ADLs).

 **C.** **BOP's Response to the COVID-19 Pandemic.**

 As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.

 The federal correctional complex at Butner consists of numerous separate institutions that house many thousands of inmates. There were COVID-19 outbreaks at some of the institutions, that are being addressed, but not at the federal medical center where Wilkerson is held. At that facility, which houses 894 inmates, there are currently four inmates who have tested positive for COVID-19, and are isolated, and one inmate who previously recovered.

 BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at

https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health

Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection

Control (Oct. 2012), available at

https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and

detailed, establishing a six-phase framework requiring BOP facilities to begin

preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i. The

plan addresses social distancing, hygienic and cleaning protocols, and the quarantining

and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus

transmissions in January. At that time, the agency established a working group to develop

policies in consultation with subject matter experts in the Centers for Disease Control,

including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its

Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-

19 transmission into and inside its facilities. Since that time, as events require, BOP has

repeatedly revised the Action Plan to address the crisis.

Beginning May 18, 2020, BOP implemented Phase Seven of the Action Plan,

which currently governs operations. The current modified operations plan requires that all

inmates in every BOP institution be secured in their assigned cells/quarters, in order to

stop any spread of the disease. Only limited group gathering is afforded, with attention to

social distancing to the extent possible, to facilitate commissary, laundry, showers,

telephone, and computer access. Further, BOP has severely limited the movement of

inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

BOP is endeavoring to regularly issue face masks to all staff and inmates, and strongly encouraged them to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended at this time, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP

has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3,

2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. *See* Attach. 2 (Mem. for Director of Bureau of Prisons). As of this filing, BOP has transferred 4,088 inmates to home confinement, which is an increase of 143% of the number who would have been eligible in the ordinary course during the same period.[1]

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

## II.    Discussion.

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act on December 21, 2018, provides in pertinent part:

(c) Modification of an Imposed Term of Imprisonment.—The court may not modify a term of imprisonment once it has been imposed except that—

---

[1]  This Court does not have authority to grant a transfer to home confinement, or review BOP's administrative decision regarding that issue. *See* 18 U.S.C. § 3621(b) (BOP's designation decision is not subject to judicial review). *See also, e.g., United States v. Cruz*, 2020 WL 1904476, at *4 (M.D. Pa. Apr. 17, 2020); *United States v. Mabe*, 2020 U.S. Dist. LEXIS 66269, at *1 (E.D. Tenn. Apr. 15, 2020) ("the CARES Act places decision making authority solely within the discretion of the Attorney General and the Director of the Bureau of Prisons. . . . This Court therefore does not have power to grant relief under Section 12003 of the CARES Act."); *United States v. White*, 2020 WL 1906845, at *2 (E.D. Va. Apr. 17, 2020); *United States v. Skaff*, 2020 WL 1666469 (S.D.W. Va. Apr. 3, 2020).

(1)  in any case—

(A)  the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

(i)  extraordinary and compelling reasons warrant such a reduction . . .

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Further, 28 U.S.C. § 994(t) provides: "The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." Accordingly, the relevant policy statement of the Commission is binding on the Court. *See Dillon v. United States,* 560 U.S. 817, 827 (2010) (where 18 U.S.C. § 3582(c)(2) permits a sentencing reduction based on a retroactive guideline amendment, "if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," the Commission's pertinent policy statements are binding on the court).[2]

_____

[2]  Prior to the passage of the First Step Act, while the Commission policy statement was binding on the Court's consideration of a motion under § 3582(c)(1)(A), such a motion could only be presented by BOP. The First Step Act added authority for an

The Sentencing Guidelines policy statement appears at § 1B1.13, and provides that the Court may grant release if "extraordinary and compelling circumstances" exist, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," and the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

Critically, in application note 1 to the policy statement, the Commission identifies the "extraordinary and compelling reasons" that may justify compassionate release. The note provides as follows:

> 1. Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2) [regarding absence of danger to the community], extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A)   Medical Condition of the Defendant.—
>
> > (i)   The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
> >
> > (ii)   The defendant is—

---

inmate himself to file a motion seeking relief, after exhausting administrative remedies, or after the passage of 30 days after presenting a request to the warden, whichever is earlier.

Under the law, the inmate does not have a right to a hearing. Rule 43(b)(4) of the Federal Rules of Criminal Procedure states that a defendant need not be present where "[t]he proceeding involves the correction or reduction of sentence under Rule 35 or 18 U.S.C. § 3582(c)." *See Dillon,* 560 U.S. at 827-28 (observing that, under Rule 43(b)(4), a defendant need not be present at a proceeding under Section 3582(c)(2) regarding the imposition of a sentencing modification).

(I)    suffering from a serious physical or medical condition,

(II)   suffering from a serious functional or cognitive impairment, or

(III)  experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B)    Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C)    Family Circumstances.—

(i)    The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii)   The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D)    Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

In general, the defendant has the burden to show circumstances meeting the test for compassionate release. *United States v. Heromin,* 2019 WL 2411311, at *2 (M.D. Fla. June 7, 2019); *United States v. Stowe*, 2019 WL 4673725, at *2 (S.D. Tex. Sept. 25, 2019). As the terminology in the statute makes clear, compassionate release is "rare" and "extraordinary." *United States v. Willis*, 2019 WL 2403192, at *3 (D.N.M. June 7, 2019) (citations omitted).

- 13 -

The mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not alone provide a basis for a sentence reduction. The guideline policy statement describes specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. The medical conditions cited by the defendant in his request for compassionate release are not included in those specific conditions. Instead, his medical ailments are well-controlled and do not present any impediment to his ability to provide self-care in the institution. The Third Circuit held: "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). *See also United States v. Roeder*, -- F. App'x --, 2020 WL 1545872, *3 (3d Cir. Apr. 1, 2020) (per curiam) (not precedential) ("the existence of a widespread health risk is not, without more, a sufficient reason for every individual subject to a properly imposed federal sentence of imprisonment to avoid or substantially delay reporting for that sentence."), *id.* at n.16 ("Similarly, the existence of some health risk to every federal prisoner as the result of this global pandemic does not, without more, provide the sole basis for granting release to each and every prisoner within our Circuit.").[3]

---

[3] *See also, e.g.*, *United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020) (denied for 28-year-old inmate at institution with outbreak); *United States v. Okpala*, 2020 WL 1864889 (E.D.N.Y. Apr. 14, 2020); *United States v. Weeks*, 2020 WL 1862634 (S.D.N.Y. Apr. 14, 2020); *United States v. Haney*, 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020) (denied for 61-year-old with no other conditions); *United States v. Pinto-Thomaz*, 2020 WL 1845875 (S.D.N.Y. Apr. 13, 2020) (two insider trading defendants

## A.  Wilkerson's Medical Condition Does Not Present an "Extraordinary and Compelling Reason."

The defendant asserts, however, that he does suffer from a condition that is a CDC risk factor in relation to COVID-19. The government acknowledges that an inmate who presents a risk factor identified by the CDC as increasing the risk of an adverse outcome from COVID-19 presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility," as stated in note 1(A), as, due to his comorbidities, the defendant may be less able to protect himself against an unfavorable outcome from the disease. But the defendant presents no such condition. As explained earlier, ordinary hypertension, kidney disease without dialysis, and weight reflecting a BMI of less than 40 are not CDC risk factors. Wilkerson therefore does not present an "extraordinary and compelling reason" for relief as stated in the guideline.

The government recognizes that it supported the recent motion for compassionate release presented by co-defendant Sawyer, which this Court then granted. However, Sawyer suffers from profound ailments, which qualified him for consideration (and in fact arguably would have met the test for compassionate release even without the threat of COVID-19). Sawyer suffers from chronic thromboembolic pulmonary hypertension

---

with less than a year to serve have no risk factors); *United States v. Korn*, 2020 WL 1808213, at *6 (W.D.N.Y. Apr. 9, 2020) ("in this Court's view, the mere *possibility* of contracting a communicable disease such as COVID-19, without any showing that the Bureau of Prisons will not or cannot guard against or treat such a disease, does not constitute an extraordinary or compelling reason for a sentence reduction under the statutory scheme."); *United States v. Carver*, 2020 WL 1892340 (E.D. Wash. Apr. 8, 2020).

(CTEPH) (which in contrast to ordinary hypertension is a CDC risk factor), has clots in his lungs, has diabetes, presents significant cardiac issues addressed just since January with two balloon angioplasties, and is morbidly obese. He thus presented numerous risk factors identified by the CDC as risk factors, satisfying the test of "extraordinary and compelling reasons," and requiring the Court to then consider the remaining 3553(a) factors. Wilkerson does not pass that threshold. (And Wilkerson likely would not fare as well if he did, given that he was the actual gunman who robbed the bank and terrified employees, while Sawyer was the getaway driver.[4]

### B. The Length of the "Stacked" 924(c) Sentences Does Not Provide a Basis for Compassionate Release.

Finally, Wilkerson suggests in passing that compassionate release would be justified based on the disparity in his sentence for "stacked" 924(c) offenses in relation to the much lower terms that would be imposed today for the same conduct. Mot. 16-17.

That suggestion, in effect, seeks retroactive application of Section 403 of the First Step Act of 2018, which reduced the penalty for multiple 924(c) violations committed by an offender who had not previously incurred a 924(c) conviction. At the time of his offenses, the statute required a mandatory consecutive 25-year sentence for a second or successive 924(c) offense, even if all 924(c) charges were incurred in the same case. *See Deal v. United States*, 508 U.S. 129 (1993). Wilkerson was therefore sentenced to a

---

[4] Even the defendant's most recent submission from the Director of Suicide Watch and Mental Health Inmate Companions Program at FMC Butner, stating that Wilkerson satisfactorily completed the program, is admirable, but not sufficient to warrant a reduction in his sentence under the compassionate release statute.

seven-year mandatory term on the first of his 924(c) offenses (as the crime involved "brandishing"), and a consecutive term of 25 years on the second.

In Section 403 of the First Step Act, effective December 18, 2018, Congress amended Section 924(c) to provide that the 25-year consecutive term for a successive 924(c) offense does not apply unless the defendant had a previous, final conviction for a 924(c) charge at the time of the offense. Under current law, the defendant would therefore face only a consecutive seven-year sentence on the second 924(c) charge. The statutory requirement still applies that each such sentence must run consecutively to each other and to any other sentence imposed. *See* First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5222, § 403.

The determination of the retroactivity of a statutory provision is made by Congress. *Dorsey v. United States*, 567 U.S. 260, 274 (2012). With respect to the change to Section 924(c) adopted in the First Step Act, Congress stated its intent explicitly, providing in Section 403(b): "This section, and the amendments made by this section, shall apply to any offense that was committed before the date of enactment of this Act, if a sentence for the offense has not been imposed as of such date of enactment." Given that the defendant was sentenced before December 21, 2018, Section 403 does not apply in this case, and the defendant's sentence remains intact. The Third Circuit has so held. *United States v. Hodge*, 948 F.3d 160 (3d Cir. 2020) (holding that § 403 of the Act does not apply retroactively in a case in which a sentence was imposed before the Act was passed, even if another non-924(c) part of the sentence was modified after the passage of the Act).

However, Wilkerson and similarly situated defendants seek an end run via the compassionate release statute, and indeed, a number of district courts in recent months have granted such relief in stacked-924(c) cases (while many others have denied it). Wilkerson's motion simply cites cases supporting his position, without explaining the details of the pertinent debate.[5]

---

[5] The first appellate decision on the issue agreed with the government's view. In *United States v. Saldana*, -- F. App'x --, 2020 WL 1486892 (10th Cir. Mar. 26, 2020) (not precedential), the panel held that compassionate release is not available based on a change in sentencing law that would produce a lower sentence today. The panel stated: "neither the § 1B1.13 commentary nor BOP Program Statement 5050.50 identify post-sentencing developments in case law as an 'extraordinary and compelling reason' warranting a sentence reduction."

In this district, in *United States v. Gibbs*, No. 96-539-02, ECF No. 1263 (E.D. Pa. Mar. 5, 2020), Judge Bartle denied the relief sought here. In that case, the defendant is serving a life sentence imposed under mandatory Guidelines, that might not be imposed today, and sought compassionate relief on that basis. The Court held that "[n]one of these cases [adopting the theory advanced by the defense here] adheres to the plain language of the relevant statutes or to the principles of the federal sentencing regime. We decline to follow them." The matter is on appeal in the Third Circuit, in No. 20-1636.

Other recent decisions supporting the government's view include *United States v. Strain*, 2020 WL 1977114, *4 (D. Alaska Apr. 24, 2020) ("The Director of the BOP has not issued any policy or finding that sentences that resulted from now-impermissible 'stacking' of § 924(c) offenses qualify as an 'extraordinary and compelling reason.' Accordingly, this reason cannot serve a basis for granting Strain's Motion even in light of her substantial and commendable efforts toward rehabilitation."); *United States v. Pitts*, 2020 WL 1676365, at *7 (W.D. Va. Apr. 6, 2020) (states remedy would be an inappropriate "end run" around the non-retroactivity of Section 403 of the First Step Act); *United States v. Neubert*, 2020 WL 1285624, at *3 (S.D. Ind. Mar. 17, 2020) ("a reduction under § 3582(c)(1)(A) is not warranted because the disparity between Mr. Neubert's actual sentence and the one he would receive if he committed his crimes today is not an 'extraordinary and compelling circumstance.' Instead, it is what the plain language of § 403 [of the First Step Act] requires.").

The government will provide additional briefing on this important issue at the Court's direction. Or, we direct this Court to the parties' lengthy briefs regarding this issue that were recently filed in *United States v. Clausen*, No. 00-291-02. The government's pleading in that case (ECF No. 271, May 15, 2020) discusses the relevant history of the Sentencing Reform Act in general and the compassionate release statute in particular, and cites and addresses the dozens of recent relevant decisions on this issue. What follows is a summary of the argument presented there.

The cases that have held that the compassionate release statute may be employed to correct a lengthy sentence[6] mostly rely on the following principal reasoning: In the relevant guideline policy statement, § 1B1.13, the Commission listed in application note 1(A) through (C) the medical, age, and family circumstances that may qualify, and then included as a "catch-all" in note 1(D) any other reason identified by the Bureau of Prisons. BOP then issued a program statement, now No. 5050.50, that describes the circumstances that BOP believes qualify – also limited to individual medical, age, and family circumstances, though defined with some variations from the application note. These courts then observe that the First Step Act removed BOP's sole authority to move for compassionate release, by allowing inmates to now also file motions in court directly, and they reason that this change somehow renders note 1(D) (which has not been updated since the First Step Act was passed) inoperative, leaving courts free to themselves decide the additional circumstances that might justify compassionate release.

---

[6] *United States v. Cantu*, 2019 WL 2498923 (S.D. Tex. June 17, 2019), is perhaps most frequently cited.

None of this, as other courts have held, makes any sense. *See, e.g., United States v. Lynn*, 2019 WL 3805349, at *3-4 (S.D. Ala. Aug. 13, 2019). Even if BOP no longer has sole authority to file a motion, that is no reason that BOP may still not be called upon to provide an expert opinion on which circumstances should qualify for compassionate release. And even if that were not so, and BOP's role under note 1(D) should be abrogated, that is no reason that courts may then assume a plenary power to define the "extraordinary and compelling reasons" that allow compassionate release.

The problem, that the cases supporting the defense view almost consistently ignore, is that the statute demands that any reduction be "consistent with applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A). *See also* 28 U.S.C. § 994(a)(2)(C) (directing the Sentencing Commission to adopt policy statements regarding "the appropriate use of . . . the sentence modification provisions set forth in section[] . . . 3582(c) of title 18."); 28 U.S.C. § 994(t) ("The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."). The cases also overlook that in *Dillon v. United States*, 560 U.S. 817 (2010), the Court addressed identical statutory language that applies to sentencing reductions under Section 3582(c)(2) based on a retroactive guideline amendment, and held that the Commission's applicable policy statement is therefore mandatory and binding.

Needless to say, the Commission's policy statement does not permit a sentencing reduction based on a court's determination that a sentence is too long in relation to current sentencing law. Nor does the policy statement give courts a plenary power to identify "extraordinary and compelling reasons." That settles the matter.

In fact, the remedy sought by the defendant would mark a profound alteration of the sentencing scheme carefully designed by Congress. It would afford individual judges the authority to, in effect, exercise a parole power that Congress specifically acted in 1984 to abolish, or exercise a clemency function that the Constitution affords exclusively to the President. *See* U.S. Const., Art. II, § 2, cl. 1. A judge could, for instance, impose a mandatory sentence as dictated by Congress, and then after the judgment became final act to reduce it, upon a declaration that imposition of the sentence in the particular case is "extraordinary" and unwarranted. This power would inevitably result in varying determinations by different courts, demolishing the certainty and consistency in sentencing that Congress required through passage of the Sentencing Reform Act. The suggested course would also undermine the finality of sentences, a concept "which is essential to the operation of our criminal justice system. Without finality, the criminal law is deprived of much of its deterrent effect." *Teague v. Lane*, 489 U.S. 288, 309 (1989).[7] And even if this plan has merit, it may only be authorized by Congress.

---

[7]  Other recent cases, outside the context of stacked 924(c) sentences, illustrate what is at play. One example is *United States v. Millan*, 2020 WL 1674058 (S.D.N.Y. Apr. 6, 2020), in which the court released a defendant after he served 28 years of a life sentence for drug and firearm crimes. The court summarized: "Mr. Millan's extraordinary rehabilitation, together with his remorse and contrition, his conduct as model prisoner and man of extraordinary character, his leadership in the religious community at FCI Fairton,

Wilkerson's request for compassionate release based on the length of his sentence is not authorized by the compassionate release statute or the binding guideline policy statement, and should be denied.

**C.      Conclusion.**

Because the defendant fails to present sufficient compelling and extraordinary reasons required by statute, his motion for compassionate release should be denied.

Respectfully yours,

WILLIAM M. McSWAIN
United States Attorney


*/s Robert A. Zauzmer*
ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals


*/s Roberta Benjamin*
ROBERTA BENJAMIN
Assistant United States Attorney

---

his dedication to work with at-risk youth and suicide prevention, and the support of BOP staff at FCI Fairton, including their opinion that if released, Mr. Millan would be a productive member of society and no danger to others, and the sentencing disparity that would result from further incarceration all constitute extraordinary and compelling reasons justifying a reduction in sentence." *Id.* at *15. In other words, just what the defendant seeks in this case, and just what Judge Bartle denied in the *Gibbs* case: a return of parole and indeterminate sentencing that was abolished in the Sentencing Reform Act.

## CERTIFICATE OF SERVICE

I hereby certify that this pleading has been served on the Filing User identified

below through the Electronic Case Filing (ECF) system:

> Kathleen Gaughan, Esq.
> Defender Association of Philadelphia
> Federal Court Division
> The Curtis Center Building
> 601 Walnut Street, Suite 540 West
> Philadelphia, PA  19106

*/s Roberta Benjamin*
ROBERTA BENJAMIN
Assistant United States Attorney

Dated:  June 12, 2020.